**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNION HOME MORTGAGE CORP., | ) | |
| | ) | |
| Plaintiff, | ) | Case No: 1:25-cv-00318 |
| | ) | |
| vs. | ) | |
| | ) | |
| MICHAEL BALLEW, ANDY (CARL) | ) | |
| BERRYMAN, ELIAS GONZALES, | ) | |
| PEDRO GONZALEZ, NICHOLAS LICHWICK, | ) | |
| HONG (BOBBY) LUU, BLAIN ROSENBERRY, | ) | |
| GEORGE TABORA, and ROBERT WEBB, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Union Home Mortgage Corp. ("Union Home"), by counsel, and for its Complaint for Injunctive Relief and Damages against Defendants Michael Ballew, Andy (Carl) Berryman, Elias Gonzales, Pedro Gonzalez, Nicholas Lichwick, Hong (Bobby) Luu, Blain Rosenberry, George Tabora, and Robert Webb, (collectively the "Defendants"), alleges and states as follows:

### NATURE OF THE ACTION

1.      Union Home brings this action against the Defendants, its former employees, for various breaches of their employment agreements with Union Home.

### PARTIES

2.      Union Home is an Ohio corporation with its principal place of business in Strongsville, Ohio.

3.      Upon information and belief and at all relevant times, Matthew Ballew is a resident of Daleville, Virginia.

4.     Upon information and belief and at all relevant times, Andy (Carl) Berryman is a resident of Spring Grove, Pennsylvania.

5.     Upon information and belief and at all relevant times, Elias Gonzales is a resident of Fairfax, Virginia.

6.     Upon information and belief and at all relevant times, Pedro Gonzalez is a resident of Fairfax, Virginia.

7.     Upon information and belief and at all relevant times, Nicholas Lichwick is a resident of Annandale, Virginia.

8.     Upon information and belief and at all relevant times, Hong (Bobby) Luu is a resident of Springfield, Virginia.

9.     Upon information and belief and at all relevant times, Blain Rosenberry is a resident of Chambersburg, Pennsylvania.

10.    Upon information and belief and at all relevant times, George Tabora is a resident of Centreville, Virginia.

11.    Upon information and belief and at all relevant times, Robert Webb is a resident of Kings Mountain, North Carolina.

**JURISDICTION AND VENUE**

12.    Jurisdiction is proper in federal court pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy – per Defendant – exceeds $75,000, exclusive of interest and costs.

13.    The Court also has supplemental jurisdiction over Union Home's contractual and state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because each Defendant signed an employee agreement with Union Home in which the Defendants agreed to personal jurisdiction in Ohio and that all disputes pertaining to their respective employee agreements would be filed in state or federal courts in Ohio.

## FACTUAL BACKGROUND

*Union Home's Business*

15.     Paragraphs 1-14 are incorporated herein by reference as if fully restated herein.

16.     Union Home is in the business of providing homeowners and prospective home buyers with mortgage and refinance loan products.

17.     Union Home invests significant time, effort, and resources into recruiting, training, and retaining its staff, including its sales team, managers, and loan officers.

18.     Union Home relies on its client base and realtor relationships for referrals.  It is expected that if a client or realtor is satisfied with its services, the client or realtor will refer other potential clients to Union Home. Client and realtor referrals are a crucial source of business for Union Home.

19.     Union Home has, through substantial time, effort, and resources, developed confidential, proprietary, and trade secret information relating to its provision of mortgage services, including but not limited to, strategic plans for developing and marketing Union Home products and services, strategic plans for recruitment, sales data, training materials, and customer and referral source information. Union Home maintains this information solely for its business purposes, and the information is not available to the public or competitors.

20.     Union Home's sales staff, including loan officers and branch managers, are the face of the company. These employees cultivate much of the goodwill that Union Home has with its

3

clients and referral sources through use of Union Home's resources and platforms. These employees are an integral part of developing and maintaining Union Home's goodwill and relationships with its clients and referral sources, which is critical to the success of Union Home's business.

21.     Union Home takes reasonable measures to keep its confidential, proprietary, and trade secret information and out of its competitors' hands. Union Home does so, for example, by taking physical and electronic security measures and requiring employees to sign employee agreements containing provisions, including certain restrictive covenants, intended to protect this information.

22.     Union Home has a legitimate business interest in protecting its confidential, proprietary, and trade secret information, goodwill, customer relations, and referral sources.

***Union Home employees depart en masse to work for competitor American Pacific.***

23.     On January 2, 2025, Union Home Regional Manager Craig Franczak resigned from his Union Home employment.

24.     Franczak now works for American Pacific Mortgage Corporation ("American Pacific"), a direct competitor to Union Home, in a capacity the same as or similar to his work for Union Home.

25.     When Franczak left Union Home, he was bound not to directly or indirectly solicit Union Home employees on behalf of himself or a competitor of Union Home for a period of two years after his Union Home employment ended. (**Exhibit K**, Franczak Employee Agreement 12/3/2022 at 3, ¶ 8.)

26.     At the time of his departure, Union Home sent to Franczak a letter reminding him of the legal and contractual obligations he owed to Union Home, including the non-solicitation of employees provision. (**Exhibit L**, Letter to C. Franczak.)

27.     Despite Union Home's reminder, as alleged more fully below, within a month after Franczak's departure from Union Home numerous employees who worked under him at Union Home, including all but one of the Defendants, began to terminate their employment with Union Home to join Franczak at American Pacific.

*Michael Ballew*

A.      **Michael Ballew's employment and contractual obligations to Union Home.**

28.     Union Home hired Michael Ballew on or about February 15, 2022.

29.     In conjunction with Ballew's employment as a Loan Officer and Branch Manager, he entered an employee agreement with Union Home on or about June 20, 2023 (the "Ballew Agreement"). A true and accurate copy of the Ballew Agreement is attached as **Exhibit A.**

30.     As a Loan Officer and Branch Manager, Ballew's job duties included building a referral network through marketing and self-sourcing business to generate and originate loans, as well as managing a branch office, including the other loan officers assigned to it.

31.     Ballew worked as part of a team led by former Union Home Regional Manager Craig Franczak. (*See* **Exhibit B**, Organizational Chart.)

32.     Ballew acquired confidential, proprietary, and trade secret information regarding, among other things, Union Home's customers, prospective customers, and referral sources, as well as Union Home's sales and marketing strategies, lending practices, and risk tolerances.

33.     Ballew was a trusted employee of Union Home, who was given access to the goodwill Union Home has developed with its customers, prospective customers, and referral

sources, as well as Union Home's confidential and trade secret information, including confidential information about Union Home's customers, prospective customers, and referral sources.

34.  As a Branch Manager, Ballew also had access to confidential information regarding the other loan officers in his branch and the customers and prospects they were serving or pursuing and the referral sources upon which they relied.

35.  In the Ballew Agreement, Ballew acknowledged that:

> 2. _Legitimate Interests._ Due to the nature of the business of the Company, certain employees, including Employee, are provided access to confidential and/or "trade secret" information that is proprietary to the Company. Likewise, via their employment, certain employees, including Employee, are introduced to, given the opportunity to develop personal contacts with, and actually develop an advantageous familiarity with the Company's customers, prospective customers, and referral sources. If this confidential or "trade secret" information or these contacts and familiarity were made available to the Company's competitors or other individuals outside the Company, or otherwise used against the Company's interests, it would provide a competitor with an unfair competitive advantage and likely result in a loss of business or competitive position for the Company and/or harm the Company's goodwill and investment in developing and maintaining its business relationships. The parties expressly agree that the terms of this Agreement are reasonable, enforceable, and necessary to protect the Company's interests and will not prevent Employee ability from earning a livelihood.

(Ex. A at 1, ¶ 2.).

36.  With respect to confidential information, Ballew agreed as follows:

> 6. _Confidential Information._ Employee shall not (i) use any Confidential Information for any purpose other than on behalf of the Company, or (ii) directly or indirectly disclose, divulge, reveal, report, publish or transfer, for any purpose whatsoever, any Confidential Information to any third party. Employee agrees that all Confidential Information, however stored or memorialized, is the sole property of the Company and shall be immediately returned to the Company upon request or the termination of Employee's employment, whichever comes first, and no copies shall be retained by Employee. For purposes of this Agreement, "Confidential Information" shall include confidential or proprietary information or trade secrets of the Company, including, but not limited to, written or electronic information: (i) disclosed to Employee or known by Employee as a result of his or her employment, (ii) which is not generally known, and (iii) which relates to or concerns the Company's business, technology, information systems, computer programs,
>
> software, customers, prospective customers, referral sources, pipelines, customer relationship management databases, suppliers, vendors, sales, marketing or finances. Confidential Information shall also include all information and matters specifically designated as proprietary and/or confidential by the Company's customers, referral sources, or other business partners.

(_Id._ at 2, ¶ 6.)

37.  Ballew agreed to the following limited non-competition provision:

> 3. _Limited Non-Compete._ Employee agrees they will not engage in Competitive Activity on behalf of a Competitive Entity in the Restricted Area during the Restricted Period. For purposes of this Agreement, the "Restricted Period" shall be the period between the date this Agreement is executed and **April 30, 2025**; the "Restricted Area" shall mean any state in which Employee is legally able to originate or broker mortgages and has done so on behalf of the Company in the thirty-six (36) months preceding the termination of Employee's employment with the Company; a "Competitive Entity" shall be any entity that competes with the Company in the home mortgage banking or brokering business; and "Competitive Activity" shall be acting in the same or similar capacity in which Employee worked for the Company and shall include, but not be limited to performing the functions of a loan officer, such as by, directly or indirectly, originating or brokering mortgages for real estate located in the Restricted Area. For the avoidance of doubt, the fact that Employee's office after their employment with the Company concludes is located outside of the Restricted Area does not resolve whether Employee has engaged in Competitive Activity in violation of this covenant. Further, during the Restricted Period and for one year thereafter, Employee shall not have any ownership interest in a Competitive Entity, whether as a shareholder, member, partner or otherwise, within the Restricted Area.

(*Id.* at 1, ¶ 3.)

38.     The Ballew Agreement also provides that if Ballew violates any of the restrictive covenants in the agreement, the term of all covenants is automatically extended for a period of one year after either (a) Ballew ceases the violation or (b) a court order is entered enforcing the covenant. (*Id.* at 2, ¶ 8.)

39.     The Ballew Agreement is a valid and enforceable contract between Union Home and Ballew.

40.     Union Home performed its material obligations under the Ballew Agreement.

41.     Ballew owed and continues to owe legal and contractual obligations to Union Home pursuant to the Ballew Agreement.

**B.     Michael Ballew voluntarily resigns from Union Home to join their former Regional Manager at a Direct Competitor.**

42.     Ballew voluntarily resigned from his employment with Union Home on January 31, 2025.

43.     Ballew now works for American Pacific, a direct competitor to Union Home and Craig Franczak's current employer.

44.     On information and belief, Ballew is working for American Pacific in the same or similar capacity and in the same geographic area that he worked for Union Home, in violation of the Ballew Agreement's limited non-compete provision.  This breach has and will continue to cause harm to Union Home's legitimate business interests, including its goodwill and confidential information, in an amount in excess of $75,000.

45.     Paragraph 13 of the Ballew Agreement that Ballew voluntarily entered into provides that Ballew would be responsible for Union Home's reasonable attorneys' fees incurred in conjunction with a successful suit to enforce the Ballew Agreement. (*Id.* at 2, ¶ 13.)

46. Union Home has been required to retain the services of its undersigned counsel for the purposes of protecting its interests under the Ballew Agreement and has incurred and will continue to incur attorney fees in an amount yet to be determined as a result of Ballew's breach of the Ballew Agreement's limited non-compete provision.

*Carl Berryman*

**A.     Andy (Carl) Berryman's employment and contractual obligations to Union Home.**

47. Union Home hired Carl Berryman on or about October 29, 2021.

48. In conjunction with Berryman's employment as an Area Sales Manager, he entered an employee agreement with Union Home on or about October 14, 2024 (the "Berryman Agreement"). A true and accurate copy of the Berryman Agreement is attached as **Exhibit C.**

49. As an Area Sales Manager, Berryman's job duties included building a referral network through marketing and self-sourcing business to generate and originate loans, as well as managing a territory (i.e., "area"), including the other loan officers assigned to it. In addition, Berryman was responsible for recruiting, training, and directing the retail sales team to achieve growth and production goals while operating within Union Home's specific policies and procedures.

50. Berryman worked as part of a team led by former Union Home Regional Manager Craig Franczak. (*See* **Exhibit B**, Organizational Chart.)

51. Berryman acquired confidential, proprietary, and trade secret information regarding, among other things, Union Home's customers, prospective customers, and referral sources, as well as Union Home's sales and marketing strategies, lending practices, and risk tolerances.

52.     Berryman was a trusted employee of Union Home, who was given access to the goodwill Union Home has developed with its customers, prospective customers, and referral sources, as well as Union Home's confidential and trade secret information, including confidential information about Union Home's customers, prospective customers, and referral sources.

53.     As an Area Sales Manager, Berryman also had access to confidential information regarding the other loan officers in his area and the customers and prospects they were serving or pursuing and the referral sources upon which they relied.

54.     In the Berryman Agreement, Berryman acknowledged that:

> 2.     Legitimate Interests. Due to the nature of the business of the Company, certain employees, including Employee, are provided access to confidential and/or trade secret information that is proprietary to the Company. Likewise, via their employment, certain employees, including Employee, are introduced to, given the opportunity to develop personal contacts with, and develop an advantageous familiarity with the Company's customers, prospective customers, and referral sources. If this confidential or "trade secret" information or these contacts and familiarity were made available to the Company's competitors or other individuals outside the Company, or otherwise used against the Company's interests, it would provide a competitor with an unfair competitive advantage and likely result in a loss of business or competitive position for the Company and/or harm the Company's goodwill and investment in developing and maintaining its business relationships. The parties expressly agree that the terms of this Agreement are reasonable, enforceable, and necessary to protect the Company's interests and will not prevent Employee ability from earning a livelihood.

(Ex. C at 1, ¶ 2.).

55.     With respect to confidential information, Berryman agreed as follows:

> 8.     Confidential Information. Employee shall not (i) use any Confidential Information for any purpose other than on behalf of the Company, or (ii) directly or indirectly disclose, divulge, reveal, report, publish or transfer, for any purpose whatsoever, any Confidential Information to any third party. Employee agrees that all Confidential Information, however stored or memorialized, is the sole property of the Company and shall be immediately returned to the Company upon request or the termination of Employee's employment, whichever comes first, and no copies shall be retained by Employee. For purposes of this Agreement, "Confidential Information" shall include confidential or proprietary information or trade secrets of the Company, including, but not limited to, written or electronic information: (i) disclosed to Employee or known by Employee as a result of his or her employment, (ii) which is not generally known, and (iii) which relates to or concerns the Company's customers, prospective customers, referral sources, personnel, pipelines, customer relationship management databases, business, technology, information systems, computer programs, software, suppliers, vendors, sales, marketing or finances. Confidential Information shall also include all information and matters specifically designated as proprietary and/or confidential by the Company's customers, referral sources, or other business partners.

(*Id.* at 2, ¶ 8.)

56.     Berryman agreed to the following limited non-competition provision:

3.  <u>Limited non-compete.</u>  Employees agree they will not engage in Competitive Activity on behalf of a Competitive Entity in the Restricted Area during the Restricted Period. For purposes of this Agreement, the "Restricted Period" shall be the period between the date this Agreement is executed and **November 30, 2025**; the "Restricted Area" shall mean any state in which Employee is legally able to originate or broker mortgages and has done so on behalf of the Company in the thirty-six (36) months preceding the termination of Employee's employment with the Company; a "Competitive Entity" shall be any entity that competes with the Company in the home mortgage banking or brokering business; and "Competitive Activity" shall be acting in the same or similar capacity in which Employee worked for the Company and shall include, but not be limited to performing the functions of a loan officer, such as by, directly or indirectly, originating or brokering mortgages for real estate located in the Restricted Area.  For the avoidance of doubt, the fact that Employee's office after their employment with the Company concludes is located outside of the Restricted Area does not resolve whether Employee has engaged in Competitive Activity in violation of this covenant.  Further, during the Restricted Period and for one year thereafter, Employee shall not have any ownership interest in a Competitive Entity, whether as a shareholder, member, partner or otherwise, within the Restricted Area.  Notwithstanding, an ownership interest of less than 5% in a publicly traded company shall not violate this provision.

(*Id.* at 1, ¶ 3.)

57.     The Berryman Agreement also provides that if Berryman violates any of the restrictive covenants in the agreement, the term of all covenants is automatically extended for a period of one year after either (a) Berryman ceases the violation or (b) a court order is entered enforcing the covenant. (*Id.* at 2, ¶ 10.)

58.     The Berryman Agreement is a valid and enforceable contract between Union Home and Berryman.

59.     Union Home performed its material obligations under the Berryman Agreement.

60.     Berryman owed and continues to owe legal and contractual obligations to Union Home pursuant to the Berryman Agreement.

**B.     Carl Berryman voluntarily resigns from Union Home to join their former Regional Manager at a Direct Competitor.**

61.     Berryman voluntarily resigned from his employment with Union Home on January 31, 2025.

62.     Berryman now works for American Pacific, a direct competitor to Union Home and Craig Franczak's current employer.

63.     On information and belief, Berryman is working for American Pacific in the same or similar capacity and in the same geographic area that he worked for Union Home, in violation of the Berryman Agreement's limited non-compete provision.  This breach has and will continue

10

to cause harm to Union Home's legitimate business interests, including its goodwill and confidential information, in an amount in excess of $75,000.

64.     Paragraph 15 of the Berryman Agreement that Berryman voluntarily entered into provides that Berryman would be responsible for Union Home's reasonable attorneys' fees incurred in conjunction with a successful suit to enforce the Berryman Agreement. (*Id.* at 3, ¶ 15.)

65.     Union Home has been required to retain the services of its undersigned counsel for the purposes of protecting its interests under the Berryman Agreement and has incurred and will continue to incur attorney fees in an amount yet to be determined as a result of Berryman's breach of the Berryman Agreement's limited non-compete provision.

*Elias Gonzales*

A.     **Elias Gonzales's employment and contractual obligations to Union Home.**

66.     Union Home hired Elias Gonzales on or about July 29, 2022.

67.     In conjunction with Gonzales's employment as a Branch Manager, he entered an employee agreement with Union Home on or about July 1, 2024 (the "Gonzales Agreement"). A true and accurate copy of the Gonzales Agreement is attached as **Exhibit D.**

68.     As a Branch Manager, Gonzales's job duties included building a referral network through marketing and self-sourcing business to generate and originate loans. In addition, Gonzales was responsible for hiring, training, and directing the retail sales team to achieve growth and production goals while operating within Union Home's specific policies and procedures.

69.     Gonzales worked as part of a team led by former Union Home Regional Manager Craig Franczak. (*See* **Exhibit B**, Organizational Chart.)

70.     Gonzales acquired confidential, proprietary, and trade secret information regarding, among other things, Union Home's customers, prospective customers, and referral sources, as well as Union Home's sales and marketing strategies, lending practices, and risk tolerances.

71.     Gonzales was a trusted employee of Union Home, who was given access to the goodwill Union Home has developed with its customers, prospective customers, and referral sources, as well as Union Home's confidential and trade secret information, including confidential information about Union Home's customers, prospective customers, and referral sources.

72.     As a Branch Manager, Gonzales also had access to confidential information regarding the other loan officers in his branch and the customers and prospects they were serving or pursuing and the referral sources upon which they relied.

73.     In the Gonzales Agreement, Gonzales acknowledged that:

> 2.     Legitimate Interests.  Due to the nature of the business of the Company, certain employees, including Employee, are provided access to confidential and/or trade secret information that is proprietary to the Company.  Likewise, via their employment, certain employees, including Employee, are introduced to, given the opportunity to develop personal contacts with, and actually develop an advantageous familiarity with the Company's customers, prospective customers, and referral sources.  If this confidential or "trade secret" information or these contacts and familiarity were made available to the Company's competitors or other individuals outside the Company, or otherwise used against the Company's interests, it would provide a competitor with an unfair competitive advantage and likely result in a loss of business or competitive position for the Company and/or harm the Company's goodwill and investment in developing and maintaining its business relationships.  The parties expressly agree that the terms of this Agreement are reasonable, enforceable, and necessary to protect the Company's interests and will not prevent Employee ability from earning a livelihood.

(Ex. D at 1, ¶ 2.).

74.     With respect to confidential information, Gonzales agreed as follows:

> 6.     Confidential Information.  Employee shall not (i) use any Confidential Information for any purpose other than on behalf of the Company, or (ii) directly or indirectly disclose, divulge, reveal, report, publish or transfer, for any purpose whatsoever, any Confidential Information to any third party.  Employee agrees that all Confidential Information, however stored or memorialized, is the sole property of the Company and shall be immediately returned to the Company upon request or the termination of Employee's employment, whichever comes first, and no copies shall be retained by Employee.  For purposes of this Agreement, "Confidential Information" shall include confidential or proprietary information or trade secrets of the Company, including, but not limited to, written or electronic information: (i) disclosed to Employee or known by Employee as a result of his or her employment, (ii) which is not generally known, and (iii) which relates to or concerns the Company's customers, prospective customers, referral sources, personnel, pipelines, customer relationship management databases, business, technology, information systems, computer programs, software, suppliers, vendors, sales, marketing or finances.  Confidential Information shall also include all information and matters specifically designated as proprietary and/or confidential by the Company's customers, referral sources, or other business partners.

(*Id.* at 1, ¶ 6.)

75.    Gonzales agreed to the following limited non-competition provision:

> 3.      Limited non-compete.  Employee will not become employed as an employee of a Competitive Entity or a vendor to the Company, in the same or similar capacity as the Employee is employed with the Company, between the date this Agreement is executed and December 31, 2025  As Employee can perform virtually their entire job remotely from any physical location, this restriction shall apply throughout the United States, including, but not limited to any state in which the Company does business or within 100 miles of any of the Company's offices ("Restricted Area").  For purposes of this Agreement, the term "Competitive Entity" shall mean a business operating or competing with the Company in the residential mortgage banking industry.  Further, during the Restricted Period and for one year thereafter, Employee shall not have any ownership interest in a Competitive Entity, whether as a shareholder, member, partner or otherwise, within the Restricted Area.

(*Id.* at 1, ¶ 3.)

76.    The Gonzales Agreement also provides that if Gonzales violates any of the restrictive covenants in the agreement, the term of all covenants is automatically extended for a period of one year after either (a) Gonzales ceases the violation or (b) a court order is entered enforcing the covenant. (*Id.* at 2, ¶ 8.)

77.    The Gonzales Agreement is a valid and enforceable contract between Union Home and Gonzales.

78.    Union Home performed its material obligations under the Gonzales Agreement.

79.    Gonzales owed and continues to owe legal and contractual obligations to Union Home pursuant to the Gonzales Agreement.

**B.    Elias Gonzales voluntarily resigns from Union Home to join their former Regional Manager at a Direct Competitor.**

80.    Gonzales voluntarily resigned from his employment with Union Home on January 31, 2025.

81.    Gonzales now works for American Pacific, a direct competitor to Union Home and Craig Franczak's current employer.

82.    On information and belief, Gonzales is working for American Pacific in the same or similar capacity and in the same geographic area that he worked for Union Home, in violation of the Gonzales Agreement's limited non-compete provision.  This breach has and will continue

to cause harm to Union Home's legitimate business interests, including its goodwill and confidential information, in an amount in excess of $75,000.

83. Paragraph 13 of the Gonzales Agreement that Gonzales voluntarily entered into provides that Gonzales would be responsible for Union Home's reasonable attorneys' fees incurred in conjunction with a successful suit to enforce the Gonzales Agreement. (*Id.* at 2, ¶ 13.)

84. Union Home has been required to retain the services of its undersigned counsel for the purposes of protecting its interests under the Gonzales Agreement and has incurred and will continue to incur attorney fees in an amount yet to be determined as a result of Gonzales's breach of the Gonzales Agreement's limited non-compete provision.

*Pedro Gonzalez*

**A. Pedro Gonzalez's employment and contractual obligations to Union Home.**

85. Union Home hired Pedro Gonzalez on or about August 31, 2022.

86. In conjunction with Gonzalez's employment as a Branch Banager, he entered an employee agreement with Union Home on or about July 1, 2024 (the "Gonzalez Agreement"). A true and accurate copy of the Gonzalez Agreement is attached as **Exhibit E.**

87. As a Branch Manager, Gonzalez's job duties included building a referral network through marketing and self-sourcing business to generate and originate loans. In addition, Gonzalez was responsible for hiring, training, and directing the retail sales team to achieve growth and production goals while operating within Union Home's specific policies and procedures.

88. Gonzalez worked as F led by former Union Home Regional Manager Craig Franczak. (*See* **Exhibit B**, Organizational Chart.)

89. Gonzalez acquired confidential, proprietary, and trade secret information regarding, among other things, Union Home's customers, prospective customers, and referral

sources, as well as Union Home's sales and marketing strategies, lending practices, and risk tolerances.

90.     Gonzalez was a trusted employee of Union Home, who was given access to the goodwill Union Home has developed with its customers, prospective customers, and referral sources, as well as Union Home's confidential and trade secret information, including confidential information about Union Home's customers, prospective customers, and referral sources.

91.     As a Branch Manager, Gonzalez also had access to confidential information regarding the other loan officers in his branch and the customers and prospects they were serving or pursuing and the referral sources upon which they relied.

92.     In the Gonzalez Agreement, Gonzalez acknowledged that:

> 2.  <u>Legitimate Interests</u>.  Due to the nature of the business of the Company, certain employees, including Employee, are provided access to confidential and/or trade secret information that is proprietary to the Company.  Likewise, via their employment, certain employees, including Employee, are introduced to, given the opportunity to develop personal contacts with, and actually develop an advantageous familiarity with the Company's customers, prospective customers, and referral sources.  If this confidential or "trade secret" information or these contacts and familiarity were made available to the Company's competitors or other individuals outside the Company, or otherwise used against the Company's interests, it would provide a competitor with an unfair competitive advantage and likely result in a loss of business or competitive position for the Company and/or harm the Company's goodwill and investment in developing and maintaining its business relationships.  The parties expressly agree that the terms of this Agreement are reasonable, enforceable, and necessary to protect the Company's interests and will not prevent Employee ability from earning a livelihood.

(Ex. E at 1, ¶ 2.).

93.     With respect to confidential information, Gonzalez agreed as follows:

> 6.  <u>Confidential Information</u>.  Employee shall not (i) use any Confidential Information for any purpose other than on behalf of the Company, or (ii) directly or indirectly disclose, divulge, reveal, report, publish or transfer, for any purpose whatsoever, any Confidential Information to any third party.  Employee agrees that all Confidential Information, however stored or memorialized, is the sole property of the Company and shall be immediately returned to the Company upon request or the termination of Employee's employment, whichever comes first, and no copies shall be retained by Employee.  For purposes of this Agreement, "Confidential Information" shall include confidential or proprietary information or trade secrets of the Company, including, but not limited to, written or electronic information: (i) disclosed to Employee or known by Employee as a result of his or her employment, (ii) which is not generally known, and (iii) which relates to or concerns the Company's customers, prospective customers, referral sources, personnel, pipelines, customer relationship management databases, business, technology, information systems, computer programs, software, suppliers, vendors, sales, marketing or finances.  Confidential Information shall also include all information and matters specifically designated as proprietary and/or confidential by the Company's customers, referral sources, or other business partners.

(*Id.* at 1, ¶ 6.)

94.     Gonzalez agreed to the following limited non-competition provision:

3.    Limited non-compete.  Employee will not become employed as an employee of a Competitive Entity or a vendor to the Company, in the same or similar capacity as the Employee is employed with the Company, between the date this Agreement is executed and December 31, 2025  As Employee can perform virtually their entire job remotely from any physical location, this restriction shall apply throughout the United States, including, but not limited to any state in which the Company does business or within 100 miles of any of the Company's offices ("Restricted Area").  For purposes of this Agreement, the term "Competitive Entity" shall mean a business operating or competing with the Company in the residential mortgage banking industry.  Further, during the Restricted Period and for one year thereafter, Employee shall not have any ownership interest in a Competitive Entity, whether as a shareholder, member, partner or otherwise, within the Restricted Area.

(*Id.* at 1, ¶ 3.)

95.    The Gonzalez Agreement also provides that if Gonzalez violates any of the restrictive covenants in the agreement, the term of all covenants is automatically extended for a period of one year after either (a) Gonzalez ceases the violation or (b) a court order is entered enforcing the covenant. (*Id.* at 2, ¶ 8.)

96.    The Gonzalez Agreement is a valid and enforceable contract between Union Home and Gonzalez.

97.    Union Home performed its material obligations under the Gonzalez Agreement.

98.    Gonzalez owed and continues to owe legal and contractual obligations to Union Home pursuant to the Gonzalez Agreement.

**B.    Pedro Gonzalez voluntarily resigns from Union Home to join their former Regional Manager at a Direct Competitor.**

99.    Gonzalez voluntarily resigned from his employment with Union Home on January 31, 2025.

100.    Gonzalez now works for American Pacific, a direct competitor to Union Home and Craig Franczak's current employer.

101.    On information and belief, Gonzalez is working for American Pacific in the same or similar capacity and in the same geographic area that he worked for Union Home, in violation of the Gonzalez Agreement's limited non-compete provision.  This breach has and will continue

to cause harm to Union Home's legitimate business interests, including its goodwill and confidential information, in an amount in excess of $75,000.

102.    Paragraph 13 of the Gonzalez Agreement that Gonzalez voluntarily entered into provides that Gonzalez would be responsible for Union Home's reasonable attorneys' fees incurred in conjunction with a successful suit to enforce the Gonzalez Agreement. (*Id.* at 2, ¶ 13.)

103.    Union Home has been required to retain the services of its undersigned counsel for the purposes of protecting its interests under the Gonzalez Agreement and has incurred and will continue to incur attorney fees in an amount yet to be determined as a result of Gonzalez's breach of the Gonzalez Agreement's limited non-compete provision.

*Nicholas Lichwick*

**A.    Nicholas Lichwick's employment and contractual obligations to Union Home.**

104.    Union Home hired Nicholas Lichwick on or about October 15, 2018.

105.    In conjunction with Lichwick's employment as an Area Sales Manager, he entered an employee agreement with Union Home on or about May 31, 2023 (the "Lichwick Agreement"). A true and accurate copy of the Lichwick Agreement is attached as **Exhibit F.**

106.    As an Area Sales Manager, Lichwick's job duties included building a referral network through marketing and self-sourcing business to generate and originate loans, as well as managing a territory (i.e., "area"), including the other loan officers assigned to it. In addition, Lichwick was responsible for recruiting, training, and directing the retail sales team to achieve growth and production goals while operating within Union Home's specific policies and procedures.

107.    Lichwick worked as part of a team led by former Union Home Regional Manager Craig Franczak. (*See* **Exhibit B**, Organizational Chart.)

108.    Lichwick acquired confidential, proprietary, and trade secret information regarding, among other things, Union Home's customers, prospective customers, and referral sources, as well as Union Home's sales and marketing strategies, lending practices, and risk tolerances.

109.    Lichwick was a trusted employee of Union Home, who was given access to the goodwill Union Home has developed with its customers, prospective customers, and referral sources, as well as Union Home's confidential and trade secret information, including confidential information about Union Home's customers, prospective customers, and referral sources.

110.    As an Area Sales Manager, Lichwick also had access to confidential information regarding the other loan officers in his area and the customers and prospects they were serving or pursuing and the referral sources upon which they relied.

111.    In the Lichwick Agreement, Lichwick acknowledged that:

> 2.    Legitimate Interests.  Due to the nature of the business of the Company, certain employees, including Employee, are provided access to confidential and/or "trade secret" information that is proprietary to the Company.  Likewise, via their employment, certain employees, including Employee, are introduced to, given the opportunity to develop personal contacts with, and actually develop an advantageous familiarity with the Company's customers, prospective customers, and referral sources.  If this confidential or "trade secret" information or these contacts and familiarity were made available to the Company's competitors or other individuals outside the Company, or otherwise used against the Company's interests, it would provide a competitor with an unfair competitive advantage and likely result in a loss of business or competitive position for the Company and/or harm the Company's goodwill and investment in developing and maintaining its business relationships.  The parties expressly agree that the terms of this Agreement are reasonable, enforceable, and necessary to protect the Company's interests and will not prevent Employee ability from earning a livelihood.

(Ex. F at 2, ¶ 2.).

112.    With respect to confidential information, Lichwick agreed as follows:

> 6.    Confidential Information.  Employee shall not (i) use any Confidential Information for any purpose other than on behalf of the Company, or (ii) directly or indirectly disclose, divulge, reveal, report, publish or transfer, for any purpose whatsoever, any Confidential Information to any third party.  Employee agrees that all Confidential Information, however stored or memorialized, is the sole property of the Company and shall be immediately returned to the Company upon request or the termination of Employee's employment, whichever comes first, and no copies shall be retained by Employee.  For purposes of this Agreement, "Confidential Information" shall include confidential or proprietary information or trade secrets of the Company, including, but not limited to, written or electronic information: (i) disclosed to Employee or known by Employee as a result of his or her employment, (ii) which is not generally known, and (iii) which relates to or concerns the Company's business, technology, information systems, computer programs, software, customers, prospective customers, referral sources, pipelines, customer relationship management databases, suppliers, vendors, sales, marketing or finances.  Confidential Information shall also include all information and matters specifically designated as proprietary and/or confidential by the Company's customers, referral sources, or other business partners.

(*Id.* at 2, ¶ 6.)

113.    Lichwick agreed to the following limited non-competition provision:

> 3.    <u>Limited Non-Compete.</u>  Employee agrees they will not engage in Competitive Activity on behalf of a Competitive Entity in the Restricted Area during the Restricted Period. For purposes of this Agreement, the "Restricted Period" shall be the period between the date this Agreement is executed and April 30, 2025; the "Restricted Area" shall mean any state in which Employee is legally able to originate or broker mortgages and has done so on behalf of the Company in the thirty-six (36) months preceding the termination of Employee's employment with the Company; a "Competitive Entity" shall be any entity that competes with the Company in the home mortgage banking or brokering business; and "Competitive Activity" shall be acting in the same or similar capacity in which Employee worked for the Company and shall include, but not be limited to performing the functions of a loan officer, such as by, directly or indirectly, originating or brokering mortgages for real estate located in the Restricted Area.  For the avoidance of doubt, the fact that Employee's office after their employment with the Company concludes is located outside of the Restricted Area does not resolve whether Employee has engaged in Competitive Activity in violation of this covenant.  Further, during the Restricted Period and for one year thereafter, Employee shall not have any ownership interest in a Competitive Entity, whether as a shareholder, member, partner or otherwise, within the Restricted Area.

(*Id.* at 2, ¶ 3.)

114.    The Lichwick Agreement also provides that if Lichwick violates any of the restrictive covenants in the agreement, the term of all covenants is automatically extended for a period of one year after either (a) Lichwick ceases the violation or (b) a court order is entered enforcing the covenant. (*Id.* at 3, ¶ 8.)

115.    The Lichwick Agreement is a valid and enforceable contract between Union Home and Lichwick.

116.    Union Home performed its material obligations under the Lichwick Agreement.

117.    Lichwick owed and continues to owe legal and contractual obligations to Union Home pursuant to the Lichwick Agreement.

**B.    Nicholas Lichwick voluntarily resigns from Union Home to join their former Regional Manager at a Direct Competitor.**

118.    Lichwick voluntarily resigned from his employment with Union Home on February 1, 2025.

119.    Lichwick now works for American Pacific, a direct competitor to Union Home and Craig Franczak's current employer.

120. On information and belief, Lichwick is working for American Pacific in the same or similar capacity and in the same geographic area that he worked for Union Home, in violation of the Lichwick Agreement's limited non-compete provision. This breach has and will continue to cause harm to Union Home's legitimate business interests, including its goodwill and confidential information, in an amount in excess of $75,000.

121. Paragraph 13 of the Lichwick Agreement that Lichwick voluntarily entered into provides that Lichwick would be responsible for Union Home's reasonable attorneys' fees incurred in conjunction with a successful suit to enforce the Lichwick Agreement. (*Id.* at 4, ¶ 13.)

122. Union Home has been required to retain the services of its undersigned counsel for the purposes of protecting its interests under the Lichwick Agreement and has incurred and will continue to incur attorney fees in an amount yet to be determined as a result of Lichwick's breach of the Lichwick Agreement's limited non-compete provision.

*Hong (Bobby) Luu*

    **A.**    **Bobby Luu's employment and contractual obligations to Union Home.**

123. Union Home hired Bobby Luu on or about October 15, 2018.

124. In conjunction with Luu's employment as a Team Lead, he entered an employee agreement with Union Home on or about December 2, 2024 (the "Luu Agreement"). A true and accurate copy of the Luu Agreement is attached as **Exhibit G.**

125. As a Team Lead, Luu's job duties included building a referral network through marketing and self-sourcing business to generate and originate loans. In addition, Luu was responsible for hiring, training, and directing the retail sales team to achieve growth and production goals while operating within Union Home's specific policies and procedures.

126.     Luu worked as part of a team led by former Union Home Regional Manager Craig Franczak. (*See* **Exhibit B**, Organizational Chart.)

127.     Luu acquired confidential, proprietary, and trade secret information regarding, among other things, Union Home's customers, prospective customers, and referral sources, as well as Union Home's sales and marketing strategies, lending practices, and risk tolerances.

128.     Luu was a trusted employee of Union Home, who was given access to the goodwill Union Home has developed with its customers, prospective customers, and referral sources, as well as Union Home's confidential and trade secret information, including confidential information about Union Home's customers, prospective customers, and referral sources.

129.     As a Team Lead, Luu also had access to confidential information regarding the other loan officers in his branch and the customers and prospects they were serving or pursuing and the referral sources upon which they relied.

130.     In the Luu Agreement, Luu acknowledged that:

> 2.    Legitimate Interests.  Due to the nature of the business of the Company, certain employees, including Employee, are provided access to confidential and/or trade secret information that is proprietary to the Company.  Likewise, via their employment, certain employees, including Employee, are introduced to, given the opportunity to develop personal contacts with, and actually develop an advantageous familiarity with the Company's customers, prospective customers, and referral sources.  If this confidential or "trade secret" information or these contacts and familiarity were made available to the Company's competitors or other individuals outside the Company, or otherwise used against the Company's interests, it would provide a competitor with an unfair competitive advantage and likely result in a loss of business or competitive position for the Company and/or harm the Company's goodwill and investment in developing and maintaining its business relationships.  The parties expressly agree that the terms of this Agreement are reasonable, enforceable, and necessary to protect the Company's interests and will not prevent Employee ability from earning a livelihood.

(Ex. G at 2, ¶ 2.).

131.     With respect to confidential information, Luu agreed as follows:

9.    _Confidential Information._  Employee shall not (i) use any Confidential Information for any purpose other than on behalf of the Company, or (ii) directly or indirectly disclose, divulge, reveal, report, publish or transfer, for any purpose whatsoever, any Confidential Information to any third party.  Employee agrees that all Confidential Information, however stored or memorialized, is the sole property of the Company and shall be immediately returned to the Company upon request or the termination of Employee's employment, whichever comes first, and no copies shall be retained by Employee.  For purposes of this Agreement, "Confidential Information" shall include confidential or proprietary information or trade secrets of the Company, including, but not limited to, written or electronic information: (i) disclosed to Employee or known by Employee as a result of his or her employment, (ii) which is not generally known, and (iii) which relates to or concerns the Company's customers, prospective customers, referral sources, personnel, pipelines, customer relationship management databases, business, technology, information systems, computer programs, software, suppliers, vendors, sales, marketing or finances.  Confidential Information shall also include all information and matters specifically designated as proprietary and/or confidential by the Company's customers, referral sources, or other business partners.

(*Id.* at 3, ¶ 9.)

132.    Luu agreed to the following limited non-competition provision:

6.    _Limited non-compete._  Employees agree they will not engage in Competitive Activity on behalf of a Competitive Entity in the Restricted Area during the Restricted Period.  For purposes of this Agreement, the "Restricted Period" shall be the period between the date this Agreement is executed and October 2, 2026; the "Restricted Area" shall mean any state in which Employee is legally able to originate or broker mortgages and has done so on behalf of the Company in the thirty-six (36) months preceding the termination of Employee's employment with the Company or 100 miles within the office to which Employee is assigned during Employee's employment with Company; a "Competitive Entity" shall be any entity that competes with the Company in the home mortgage banking or brokering business; and "Competitive Activity" shall be acting in the same or similar capacity in which Employee worked for the Company.  For the avoidance of doubt, the fact that Employee's office after their employment with the Company concludes is located outside of the Restricted Area does not resolve whether Employee has engaged in Competitive Activity in violation of this covenant.  Further, during the Restricted Period and for one year thereafter, the Employee shall not have any ownership interest in a Competitive Entity, whether as a shareholder, member, partner or otherwise, within the Restricted Area.  Notwithstanding the foregoing, an ownership interest of less than 5% in a publicly traded company shall not violate this provision.

(*Id.* at 3, ¶ 6.)

133.    The Luu Agreement also provides that if Luu violates any of the restrictive covenants in the agreement, the term of all covenants is automatically extended for a period of one year after either (a) Luu ceases the violation or (b) a court order is entered enforcing the covenant. (*Id.* at 3, ¶ 11.)

134.    When Luu executed the Luu Agreement, he accepted a one-time conditional signing bonus, which totaled $60,000 (the "Luu Bonus"). The Bonus was conditional in the sense that if Luu did not remain employed with Union Home for two years after December 2, 2024, he would be required to repay the entire Luu Bonus. (*Id.* at 2, ¶ 4.)

135.    The Luu Agreement is a valid and enforceable contract between Union Home and Luu.

136.    Union Home performed its material obligations under the Luu Agreement.

137.    Luu owed and continues to owe legal and contractual obligations to Union Home pursuant to the Luu Agreement.

**B.    Bobby Luu voluntarily resigns from Union Home to join their former Regional Manager at a Direct Competitor.**

138.    Luu voluntarily resigned from his employment with Union Home on February 3, 2025.

139.    Luu resigned from Union Home prior to December 2, 2026.

140.    Luu did not repay the portion of the Luu Bonus due to Union Home.

141.    Luu now works for American Pacific, a direct competitor to Union Home and Craig Franczak's current employer.

142.    On information and belief, Luu is working for American Pacific in the same or similar capacity and in the same geographic area that he worked for Union Home, in violation of the Luu Agreement's limited non-compete provision.  This breach has and will continue to cause harm to Union Home's legitimate business interests, including its goodwill and confidential information, in an amount in excess of $75,000.

143.    Paragraph 16 of the Luu Agreement that Luu voluntarily entered into provides that Luu would be responsible for Union Home's reasonable attorneys' fees incurred in conjunction with a successful suit to enforce the Luu Agreement. (*Id.* at 4, ¶ 16.)

144.    Union Home has been required to retain the services of its undersigned counsel for the purposes of protecting its interests under the Luu Agreement and has incurred and will continue to incur attorney fees in an amount yet to be determined as a result of Luu's breach of the Luu Agreement's limited non-compete provision and failure to properly repay the Luu Bonus.

***Blain Rosenberry***

23

**A.  Blain Rosenberry's employment and contractual obligations to Union Home.**

145.  Union Home hired Blain Rosenberry on or about August 22, 2016.

146.  In conjunction with Rosenberry's employment as a Branch Manager, he entered an employee agreement with Union Home on or about October 1, 2024 (the "Rosenberry Agreement"). A true and accurate copy of the Rosenberry Agreement is attached as **Exhibit H.**

147.  As a Branch Manager, Rosenberry's job duties included building a referral network through marketing and self-sourcing business to generate and originate loans. In addition, Rosenberry was responsible for hiring, training, and directing the retail sales team to achieve growth and production goals while operating within Union Home's specific policies and procedures.

148.  Rosenberry worked as part of a team led by former Union Home Regional Manager Craig Franczak. (*See* **Exhibit B**, Organizational Chart.)

149.  Rosenberry acquired confidential, proprietary, and trade secret information regarding, among other things, Union Home's customers, prospective customers, and referral sources, as well as Union Home's sales and marketing strategies, lending practices, and risk tolerances.

150.  Rosenberry was a trusted employee of Union Home, who was given access to the goodwill Union Home has developed with its customers, prospective customers, and referral sources, as well as Union Home's confidential and trade secret information, including confidential information about Union Home's customers, prospective customers, and referral sources.

151.  As a Branch Manager, Rosenberry also had access to confidential information regarding the other loan officers in his branch and the customers and prospects they were serving or pursuing and the referral sources upon which they relied.

152.     In the Rosenberry Agreement, Rosenberry acknowledged that:

> 2.     <u>Legitimate Interests.</u>  Due to the nature of the business of the Company, certain employees, including Employee, are provided access to confidential and/or trade secret information that is proprietary to the Company.  Likewise, via their employment, certain employees, including Employee, are introduced to, given the opportunity to develop personal contacts with, and actually develop an advantageous familiarity with the Company's customers, prospective customers, and referral sources.  If this confidential or "trade secret" information or these contacts and familiarity were made available to the Company's competitors or other individuals outside the Company, or otherwise used against the Company's interests, it would provide a competitor with an unfair competitive advantage and likely result in a loss of business or competitive position for the Company and/or harm the Company's goodwill and investment in developing and maintaining its business relationships.  The parties expressly agree that the terms of this Agreement are reasonable, enforceable, and necessary to protect the Company's interests and will not prevent Employee ability from earning a livelihood.

(Ex. H at 2, ¶ 2.).

153.     With respect to confidential information, Rosenberry agreed as follows:

> 9.     <u>Confidential Information.</u>  Employee shall not (i) use any Confidential Information for any purpose other than on behalf of the Company, or (ii) directly or indirectly disclose, divulge, reveal, report, publish or transfer, for any purpose whatsoever, any Confidential Information to any third party.  Employee agrees that all Confidential Information, however stored or memorialized, is the sole property of the Company and shall be immediately returned to the Company upon request or the termination of Employee's employment, whichever comes first, and no copies shall be retained by Employee.  For purposes of this Agreement, "Confidential Information" shall include confidential or proprietary information or trade secrets of the Company, including, but not limited to, written or electronic information: (i) disclosed to Employee or known by Employee as a result of his or her employment, (ii) which is not generally known, and (iii) which relates to or concerns the Company's customers, prospective customers, referral sources, personnel, pipelines, customer relationship management databases, business, technology, information systems, computer programs, software, suppliers, vendors, sales, marketing or finances.  Confidential Information shall also include all information and matters specifically designated as proprietary and/or confidential by the Company's customers, referral sources, or other business partners.

(*Id.* at 3, ¶ 9.)

154.     Rosenberry agreed to the following limited non-competition provision:

> 6.     <u>Limited non-compete.</u>  Employees agree they will not engage in Competitive Activity on behalf of a Competitive Entity in the Restricted Area during the Restricted Period. For purposes of this Agreement, the "Restricted Period" shall be the period between the date this Agreement is executed and September 30, 2026; the "Restricted Area" shall mean any state in which Employee is legally able to originate or broker mortgages and has done so on behalf of the Company in the thirty-six (36) months preceding the termination of Employee's employment with the Company or 100 miles within the office to which Employee is assigned during Employee's employment with Company; a "Competitive Entity" shall be any entity that competes with the Company in the home mortgage banking or brokering business; and "Competitive Activity" shall be acting in the same or similar capacity in which Employee worked for the Company.  For the avoidance of doubt, the fact that Employee's office after their employment with the Company concludes is located outside of the Restricted Area does not resolve whether Employee has engaged in Competitive Activity in violation of this covenant.  Further, during the Restricted Period and for one year thereafter, the Employee shall not have any ownership interest in a Competitive Entity, whether as a shareholder, member, partner or otherwise, within the Restricted Area. Notwithstanding the foregoing, an ownership interest of less than 5% in a publicly traded company shall not violate this provision.

(*Id.* at 3, ¶ 6.)

155.     The Rosenberry Agreement also provides that if Rosenberry violates any of the restrictive covenants in the agreement, the term of all covenants is automatically extended for a

period of one year after either (a) Rosenberry ceases the violation or (b) a court order is entered enforcing the covenant. (*Id.* at 3, ¶ 11.)

156.    When Rosenberry executed the Rosenberry Agreement, he accepted a one-time conditional signing bonus, which totaled $35,000 (the "Rosenberry Bonus"). (*Id.* at 2, ¶ 3.) The Bonus was conditional in the sense that if Rosenberry did not remain employed with Union Home for two years after October 1, 2024, he would be required to repay the entire Rosenberry Bonus. (*Id.* at 2, ¶ 4.)

157.    The Rosenberry Agreement is a valid and enforceable contract between Union Home and Rosenberry.

158.    Union Home performed its material obligations under the Rosenberry Agreement.

159.    Rosenberry owed and continues to owe legal and contractual obligations to Union Home pursuant to the Rosenberry Agreement.

**B.    Blain Rosenberry voluntarily resigns from Union Home to join their former Regional Manager at a Direct Competitor.**

160.    Rosenberry voluntarily resigned from his employment with Union Home on January 31, 2025.

161.    Rosenberry resigned from his employment with Union Home prior to October 1, 2026.

162.    Rosenberry did not repay the portion of the Rosenberry Bonus due to Union Home.

163.    Rosenberry now works for American Pacific, a direct competitor to Union Home and Craig Franczak's current employer.

164.    On information and belief, Rosenberry is working for American Pacific in the same or similar capacity and in the same geographic area that he worked for Union Home, in violation of the Rosenberry Agreement's limited non-compete provision.  This breach has and will continue

to cause harm to Union Home's legitimate business interests, including its goodwill and confidential information, in an amount in excess of $75,000.

165.    Paragraph 16 of the Rosenberry Agreement that Rosenberry voluntarily entered into provides that Rosenberry would be responsible for Union Home's reasonable attorneys' fees incurred in conjunction with a successful suit to enforce the Rosenberry Agreement. (*Id.* at 4, ¶ 16.)

166.    Union Home has been required to retain the services of its undersigned counsel for the purposes of protecting its interests under the Rosenberry Agreement and has incurred and will continue to incur attorney fees in an amount yet to be determined as a result of Rosenberry's breach of the Rosenberry Agreement's limited non-compete provision and failure to properly repay the Rosenberry Bonus.

### George Tabora

**A.    George Tabora's employment and contractual obligations to Union Home.**

167.    Union Home hired George Tabora on or about September 25, 2023.

168.    In conjunction with Tabora's employment as a Loan Officer, he entered an employee agreement with Union Home on or about September 25, 2023 (the "Tabora Agreement"). A true and accurate copy of the Tabora Agreement is attached as **Exhibit I**.

169.    As a Loan Officer, Tabora's job duties included building a referral network through marketing and self-sourcing business to generate and originate loans.

170.    Tabora worked as part of a team led by former Union Home Regional Manager Craig Franczak. (*See* **Exhibit B**, Organizational Chart.)

171.    Tabora acquired confidential, proprietary, and trade secret information regarding, among other things, Union Home's customers, prospective customers, and referral sources, as well as Union Home's sales and marketing strategies, lending practices, and risk tolerances.

172.     Tabora was a trusted employee of Union Home, who was given access to the goodwill Union Home has developed with its customers, prospective customers, and referral sources, as well as Union Home's confidential and trade secret information, including confidential information about Union Home's customers, prospective customers, and referral sources.

173.     In the Tabora Agreement, Tabora acknowledged that:

> 2.     <u>Legitimate Interests</u>.  Due to the nature of the business of the Company, certain employees, including Employee, are provided access to confidential and/or "trade secret" information that is proprietary to the Company.  Likewise, via their employment, certain employees, including Employee, are introduced to, given the opportunity to develop personal contacts with, and actually develop an advantageous familiarity with the Company's customers, prospective customers, and referral sources.  If this confidential or "trade secret" information or these contacts and familiarity were made available to the Company's competitors or other individuals outside the Company, or otherwise used against the Company's interests, it would provide a competitor with an unfair competitive advantage and likely result in a loss of business or competitive position for the Company and/or harm the Company's goodwill and investment in developing and maintaining its business relationships.  The parties expressly agree that the terms of this Agreement are reasonable, enforceable, and necessary to protect the Company's interests and will not prevent Employee ability from earning a livelihood.

(Ex. I at 1, ¶ 2.).

174.     With respect to confidential information, Tabora agreed as follows:

> 11.     <u>Confidential Information</u>.  Employee shall not (i) use any Confidential Information for any purpose other than on behalf of the Company, or (ii) directly or indirectly disclose, divulge, reveal, report, publish or transfer, for any purpose whatsoever, any Confidential Information to any third party.  Employee agrees that all Confidential Information, however stored or memorialized, is the sole property of the Company and shall be immediately returned to the Company upon request or the termination of Employee's employment, whichever comes first, and no copies shall be retained by Employee.  For purposes of this Agreement, "Confidential Information" shall include confidential or proprietary information or trade secrets of the Company, including, but not limited to, written or electronic information: (i) disclosed to Employee or known by Employee as a result of his or her employment, (ii) which is not generally known, and (iii) which relates to or concerns the Company's business, technology, information systems, computer programs, software, customers, prospective customers, referral sources, pipelines, customer relationship management databases, suppliers, vendors, sales, marketing or finances.  Confidential Information shall also include all information and matters specifically designated as proprietary and/or confidential by the Company's customers, referral sources, or other business partners.

(*Id.* at 2, ¶ 11.)

175.     Tabora agreed to the following limited non-competition provision:

> 6. **Limited Non-Compete.** Employee agrees they will not engage in Competitive Activity on behalf of a Competitive Entity in the Restricted Area during the Restricted Period. For purposes of this Agreement, the "Restricted Period" shall be the period between the date this Agreement is executed and September 25, 2025; the "Restricted Area" shall mean any state in which Employee is legally able to originate or broker mortgages and has done so on behalf of the Company in the thirty-six (36) months preceding the termination of Employee's employment with the Company; a "Competitive Entity" shall be any entity that competes with the Company in the home mortgage banking or brokering business; and "Competitive Activity" shall be acting in the same or similar capacity in which Employee worked for the Company and shall include, but not be limited to performing the functions of a loan officer, such as by, directly or indirectly, originating or brokering mortgages for real estate located in the Restricted Area. For the avoidance of doubt, the fact that Employee's office after their employment with the Company concludes is located outside of the Restricted Area does not resolve whether Employee has engaged in Competitive Activity in violation of this covenant. Further, during the Restricted Period and for one year thereafter, Employee shall not have any ownership interest in a Competitive Entity, whether as a shareholder, member, partner or otherwise, within the Restricted Area. Moreover, notwithstanding anything in the foregoing, Employee shall have the option to opt-out and void the remainder of the Restricted Period by providing written notice of resignation of employment from September 15, 2024 – September 24, 2024; ("Notice Period"). If said notice is not provided within the required Notice Period, this Agreement shall continue in full force and effect. For the avoidance of doubt, nothing in this Section affects the vesting schedule provided in Section 4 of this Agreement. Notwithstanding, an ownership interest of less than 5% in a publicly traded company shall not violate this provision.

(*Id.* at 2, ¶ 6.)

176.    The Tabora Agreement also provides that if Tabora violates any of the restrictive covenants in the agreement, the term of all covenants is automatically extended for a period of one year after either (a) Tabora ceases the violation or (b) a court order is entered enforcing the covenant. (*Id.* at 3, ¶ 13.)

177.    When Tabora executed the Tabora Agreement, he accepted a one-time conditional signing bonus and a guarantee against commissions, combined totaling $26,000 (collectively, the "Tabora Bonus"). (*Id.* at 1, ¶ 3.) The Bonus was conditional in the sense that if Tabora did not remain employed with Union Home for two years after September 25, 2023, he would be required to repay a substantial portion of the Tabora Bonus. (*Id.* at 1, ¶ 4.)

178.    The Tabora Agreement further provides a vesting schedule and a provision requiring repayment of the unearned portion of the Bonus in the event Tabora did not remain employed with Union Home for two years:

> b.    Vesting Schedule.
>
> i.    25% of the paid amount shall be forgiven Six (6) Months after the Effective Date.
> ii.    50% of the paid amount shall be forgiven Twelve (12) Months after the Effective Date.
> iii.    75% of the paid amount shall be forgiven Eighteen (18) Months after the Effective Date.
> iv.    100% of the paid amount shall be forgiven Twenty-four (24) Months after the Effective Date.

(*Id.* at 2, ¶ 4(b).)

179.    The Tabora Agreement is a valid and enforceable contract between Union Home and Tabora.

180.    Union Home performed its material obligations under the Tabora Agreement.

181.    Tabora owed and continues to owe legal and contractual obligations to Union Home pursuant to the Tabora Agreement.

**B.      George Tabora voluntarily resigns from Union Home to join their former Regional Manager at a Direct Competitor.**

182.    Tabora voluntarily resigned from his employment with Union Home on January 9, 2025.

183.    Tabora resigned from Union Home prior to September 25, 2025.

184.    Tabora did not repay the portion of the Tabora Bonus due to Union Home.

185.    Tabora now works for American Pacific, a direct competitor to Union Home and Craig Franczak's current employer.

186.    On information and belief, Tabora is working for American Pacific in the same or similar capacity and in the same geographic area that he worked for Union Home, in violation of the Tabora Agreement's limited non-compete provision. This breach has and will continue to cause harm to Union Home's legitimate business interests, including its goodwill and confidential information, in an amount in excess of $75,000.

187.    Paragraph 18 of the Tabora Agreement that Tabora voluntarily entered into provides that Tabora would be responsible for Union Home's reasonable attorneys' fees incurred in conjunction with a successful suit to enforce the Tabora Agreement. (*Id.* at 3, ¶ 18.)

188.    Union Home has been required to retain the services of its undersigned counsel for the purposes of protecting its interests under the Tabora Agreement and has incurred and will

continue to incur attorney fees in an amount yet to be determined as a result of Tabora's breach of the Tabora Agreement's limited non-compete provision and failure to properly repay the Tabora Bonus.

*Robert Webb*

### A. Robert Webb's employment and contractual obligations to Union Home.

189.    Union Home hired Robert Webb on or about November 8, 2023.

190.    In conjunction with Rosenberry's employment as a Branch Manager, he entered an employee agreement with Union Home on or about November 8, 2023 (the "Webb Agreement"). A true and accurate copy of the Webb Agreement is attached as **Exhibit J.**

191.    As a Branch Manager, Webb's job duties included building a referral network through marketing and self-sourcing business to generate and originate loans. In addition, Webb was responsible for hiring, training, and directing the retail sales team to achieve growth and production goals while operating within Union Home's specific policies and procedures.

192.    Webb acquired confidential, proprietary, and trade secret information regarding, among other things, Union Home's customers, prospective customers, and referral sources, as well as Union Home's sales and marketing strategies, lending practices, and risk tolerances.

193.    Webb was a trusted employee of Union Home, who was given access to the goodwill Union Home has developed with its customers, prospective customers, and referral sources, as well as Union Home's confidential and trade secret information, including confidential information about Union Home's customers, prospective customers, and referral sources.

194.    As a Branch Manager, Webb also had access to confidential information regarding the other loan officers in his branch and the customers and prospects they were serving or pursuing and the referral sources upon which they relied.

195.    In the Webb Agreement, Webb acknowledged that:

> 2.    Legitimate Interests.    Due to the nature of the business of the Company, certain employees, including Employee, are provided access to confidential and/or "trade secret" information that is proprietary to the Company. Likewise, via their employment, certain employees, including Employee, are introduced to, given the opportunity to develop personal contacts with, and actually develop an advantageous familiarity with the Company's customers, prospective customers, and referral sources. If this confidential or "trade secret" information or these contacts and familiarity were made available to the Company's competitors or other individuals outside the Company, or otherwise used against the Company's interests, it would provide a competitor with an unfair competitive advantage and likely result in a loss of business or competitive position for the Company and/or harm the Company's goodwill and investment in developing and maintaining its business relationships. The parties expressly agree that the terms of this Agreement are reasonable, enforceable, and necessary to protect the Company's interests and will not prevent Employee ability from earning a livelihood.

(Ex. J at 1, ¶ 2.).

196.    With respect to confidential information, Webb agreed as follows:

> 10.    Confidential Information.    Employee shall not (i) use any Confidential Information for any purpose other than on behalf of the Company, or (ii) directly or indirectly disclose, divulge, reveal, report, publish or transfer, for any purpose whatsoever, any Confidential Information to any third party. Employee agrees that all Confidential Information, however stored or memorialized, is the sole property of the Company and shall be immediately returned to the Company upon request or the termination of Employee's employment, whichever comes first, and no copies shall be retained by Employee. For purposes of this Agreement, "Confidential Information" shall include confidential or proprietary information or trade secrets of the Company, including, but not limited to, written or electronic information: (i) disclosed to Employee or known by Employee as a result of his or her employment, (ii) which is not generally known, and (iii) which relates to or concerns the Company's business, technology, information systems, computer programs, software, customers, prospective customers, referral sources, pipelines, customer relationship management databases, suppliers, vendors, sales, marketing or finances. Confidential Information shall also include all information and matters specifically designated as proprietary and/or confidential by the Company's customers, referral sources, or other business partners.

(Id. at 2, ¶ 10.)

197.    Webb agreed to the following limited non-competition provision:

> 6.    Limited Non-Compete.    Employee agrees they will not engage in Competitive Activity on behalf of a Competitive Entity in the Restricted Area during the Restricted Period. For purposes of this Agreement, the "Restricted Period" shall be the period between the date this Agreement is executed and November 8, 2025; the "Restricted Area" shall mean any state in which Employee is legally able to originate or broker mortgages and has done so on behalf of the Company in the thirty-six (36) months preceding the termination of Employee's employment with the Company; a "Competitive Entity" shall be any entity that competes with the Company in the home mortgage banking or brokering business; and "Competitive Activity" shall be acting in the same or similar capacity in which Employee worked for the Company and shall include, but not be limited to performing the functions of a loan officer, such as by, directly or indirectly, originating or brokering mortgages for real estate located in the Restricted Area. For the avoidance of doubt, the fact that Employee's office after their employment with the Company concludes is located outside of the Restricted Area does not resolve whether Employee has engaged in Competitive Activity in violation of this covenant. Further, during the Restricted Period and for one year thereafter, Employee shall not have any ownership interest in a Competitive Entity, whether as a shareholder, member, partner or otherwise, within the Restricted Area. Moreover, notwithstanding anything in the foregoing, Employee shall have the option to opt-out and void the remainder of the Restricted Period by providing written notice of resignation of employment from October 29, 2024 – November 7, 2024; ("Notice Period"). If said notice is not provided within the required Notice Period, this Agreement shall continue in full force and effect. For the avoidance of doubt, nothing in this Section affects the vesting schedule provided in Section 4 of this Agreement. Notwithstanding, an ownership interest of less than 5% in a publicly traded company shall not violate this provision.

(Id. at 2, ¶ 6.)

198.     The Webb Agreement also provides that if Webb violates any of the restrictive covenants in the agreement, the term of all covenants is automatically extended for a period of one year after either (a) Webb ceases the violation or (b) a court order is entered enforcing the covenant. (*Id.* at 3, ¶ 12.)

199.     When Webb executed the Webb Agreement, he accepted a one-time conditional signing bonus and a guarantee plus commissions, combined totaling $140,000 (collectively, the "Webb Bonus"). (*Id.* at 1, ¶ 3.) The Bonus was conditional in the sense that if Webb did not remain employed with Union Home for two years after November 8, 2023, he would be required to repay a substantial portion of the Webb Bonus. (*Id.* at 1, ¶ 4.)

200.     The Webb Agreement further provides a vesting schedule and a provision requiring repayment of the unearned portion of the Bonus in the event Webb did not remain employed with Union Home for two years:

    b.   Vesting Schedule.

      i.  25% of the paid amount shall be forgiven Six (6) Months after the Effective Date.
     ii.  50% of the paid amount shall be forgiven Twelve (12) Months after the Effective Date.
   iii.  75% of the paid amount shall be forgiven Eighteen (18) Months after the Effective Date.
   iv.  100% of the paid amount shall be forgiven Twenty-four (24) Months after the Effective Date.

(*Id.* at 2, ¶ 4(b).)

201.     The Webb Agreement is a valid and enforceable contract between Union Home and Webb.

202.     Union Home performed its material obligations under the Webb Agreement.

203.     Webb owed and continues to owe legal and contractual obligations to Union Home pursuant to the Webb Agreement.

**B.     Robert Webb voluntarily resigns from Union Home to join the other Defendants at a Direct Competitor.**

204.    Webb voluntarily resigned from his employment with Union Home on January 31, 2025.

205.    Webb resigned from Union Home prior to November 8, 2025.

206.    Webb did not repay the portion of the Webb Bonus due to Union Home.

207.    Webb now works for American Pacific, a direct competitor to Union Home and the current employer of the other Defendants.

208.    On information and belief, Webb is working for American Pacific in the same or similar capacity and in the same geographic area that he worked for Union Home, in violation of the Webb Agreement's limited non-compete provision.  This breach has and will continue to cause harm to Union Home's legitimate business interests, including its goodwill and confidential information, in an amount in excess of $75,000.

209.    Paragraph 17 of the Webb Agreement that Webb voluntarily entered into provides that Webb would be responsible for Union Home's reasonable attorneys' fees incurred in conjunction with a successful suit to enforce the Webb Agreement. (*Id.* at 3, ¶ 17.)

210.    Union Home has been required to retain the services of its undersigned counsel for the purposes of protecting its interests under the Webb Agreement and has incurred and will continue to incur attorney fees in an amount yet to be determined as a result of Webb's breach of the Webb Agreement's limited non-compete provision and failure to properly repay the Webb Bonus.

***Union Home has not received repayment of the unearned portion of the Bonuses.***

211.    Pursuant to their respective employee agreements, Defendants Luu, Rosenberry, Tabora, and Webb ended their employment with Union Home before their Bonus vested and owe Union Home a portion of their respective Bonus as follows:

34

| Defendant | Amount of Bonus owed to Union Home |
|---|---|
| Bobby Luu | $36,872.90 |
| Blain Rosenberry | $22,178.79 |
| George Tabora | $7,300.90 |
| Robert Webb | $43,291.83 |

212.     None of the Defendants have repaid Union Home their unearned Bonus.

## COUNT I
### Breach of Contract, Non-Competition
### (All Defendants)

213.     Paragraphs 1–212 are incorporated herein by reference as if fully restated herein.

214.     The Ballew Agreement prohibits Ballew from engaging in certain competition with Union Home until April 30, 2025.

215.     The Berryman Agreement prohibits Berryman from engaging in certain competition with Union Home until November 30, 2025.

216.     The Gonzales Agreement prohibits Gonzales from engaging in certain competition with Union Home until December 31, 2025.

217.     The Gonzalez Agreement prohibits Gonzalez from engaging in certain competition with Union Home until December 31, 2025.

218.     The Lichwick Agreement prohibits Lichwick from engaging in certain competition with Union Home until April 30, 2025.

219.     The Luu Agreement prohibits Luu from engaging in certain competition with Union Home until October 2, 2026.

220.     The Rosenberry Agreement prohibits Rosenberry from engaging in certain competition with Union Home until September 30, 2026.

221.     The Tabora Agreement prohibits Tabora from engaging in certain competition with Union Home until September 25, 2025.

222.    The Webb Agreement prohibits Webb from engaging in certain competition with Union Home until November 8, 2025.

223.    The Defendants' direct or indirect competition with Union Home, through their employment with American Pacific, breached their contractual obligations to Union Home as stated in each of their respective employee agreements with Union Home.

224.    The Defendants breach of their respective Agreement's non-competition covenant has and will continue to cause Union Home irreparable injury, loss, and damage.

225.    As a result of the Defendants' breach, Union Home is entitled to an injunction, the recovery of damages, and its legal fees and costs, and all other relief deemed just and proper.

**COUNT II**
**Breach of Contractual Duty to Repay Unearned Bonus**
**(Defendants Luu, Rosenberry, Tabora, and Webb)**

226.    Paragraphs 1-225 are incorporated herein by reference as if fully restated herein.

227.    Defendants Luu, Rosenberry, Tabora, and Webb did not remain employed by Union Home for the requisite amount of time for their Bonus to fully vest:

| Defendant | Date required to remain employed with Union Home to retain entire bonus | Date of termination of employment with Union Home |
|---|---|---|
| Bobby Luu | December 2, 2026 | February 3, 2025 |
| Blain Rosenberry | October 1, 2026 | January 31, 2025 |
| George Tabora | September 25, 2025 | January 9, 2025 |
| Robert Webb | November 8, 2025 | January 31, 2025 |

228.    Defendants Luu, Rosenberry, Tabora, and Webb have not repaid to Union Home the portion of the Bonus owed to Union Home pursuant to their respective employee agreements.

229.    Defendant Luu's, Rosenberry's, Tabora's, and Webb's breach of their repayment obligations pursuant to the Agreements has caused Union Home financial harm.

36

230.    Union Home seeks damages for Defendant Luu's, Rosenberry's, Tabora's, and Webb's failure to repay the Bonus in the following amounts, reasonable attorney's fees incurred in conjunction with the enforcement of the Agreement, and any other relief just and proper in the circumstances.

| Defendant | Amount of Bonus owed to Union Home |
|---|---|
| Bobby Luu | $36,872.90 |
| Blain Rosenberry | $22,178.79 |
| George Tabora | $7,300.90 |
| Robert Webb | $43,291.83 |

**COUNT III**
**Unjust Enrichment**
**(Defendants Luu, Rosenberry, Tabora, and Webb)**

231.    Paragraphs 1-230 are incorporated herein by reference as if fully restated herein.

232.    Pursuant to their respective employee agreements, Defendants Luu, Rosenberry, Tabora, and Webb received contingent bonuses as follows:

| Defendant | Amount of Bonus |
|---|---|
| Bobby Luu | $60,000 |
| Blain Rosenberry | $35,000 |
| George Tabora | $26,000 |
| Robert Webb | $140,000 |

233.    Defendants Luu, Rosenberry, Tabora, and Webb separately agreed with Union Home that a significant portion of their respective Bonus was to be repaid if the Defendant did not remain employed by Union Home for the period required in their employee agreement.

234.    Defendants Luu, Rosenberry, Tabora, and Webb did not remain employed by Union Home for the requisite amount of time for their Bonus to fully vest:

| Defendant | Date required to remain employed with Union Home to retain entire bonus | Date of termination of employment with Union Home |
|---|---|---|
| Bobby Luu | December 2, 2026 | February 3, 2025 |

| | | |
|---|---|---|
| Blain Rosenberry | October 1, 2026 | January 31, 2025 |
| George Tabora | September 25, 2025 | January 9, 2025 |
| Robert Webb | November 8, 2025 | January 31, 2025 |

235.    Defendants Luu, Rosenberry, Tabora, and Webb have not repaid to Union Home the unearned portion of their respective Bonus owed to Union Home in the following amounts:

| Defendant | Amount of Bonus owed to Union Home |
|---|---|
| Bobby Luu | $36,872.90 |
| Blain Rosenberry | $22,178.79 |
| George Tabora | $7,300.90 |
| Robert Webb | $43,291.83 |

236.    Defendants Luu, Rosenberry, Tabora, and Webb have been unjustly enriched by Union Home's payment of their respective Bonus because they have not earned the full amount yet they have retained the full amount.

237.    Union Home has suffered financial harm by Defendant Luu's, Rosenberry's, Tabora's, and Webb's unjust enrichment.

238.    Union Home seeks damages for Defendant Luu's, Rosenberry's, Tabora's, and Webb's failure to repay the Bonus due, and any other relief just and proper in the circumstances.

**PRAYER FOR RELIEF**

WHEREFORE, Union Home respectfully requests that the Court grant the following relief in its favor:

1.    Issue a preliminary and then permanent injunction against the Defendants and all those in active concert or participation with them requiring specific performance of the terms and conditions of the Defendant's respective employee agreements:

a.    As a direct and proximate result of the Defendants' conduct, Union Home has suffered, and will continue to suffer, irreparable harm in the loss of business

opportunities as well as harm to its goodwill and confidential information in an amount that cannot be fully, completely, and adequately remedied at law.

b.      The Defendants have and continue to willfully violate their employee agreements through acts which include but are not limited to using or disclosing Union Home's confidential, proprietary, or trade secret information.

c.      Without injunctive relief against the Defendants and all those in active concert or participation with them, they will continue to disclose Union Home's confidential information, thereby causing Union Home immediate and irreparable harm. In contrast, no harm will accrue to the Defendants by entry of injunctive relief because they never had the right to violate their obligations to Union Home.

d.      Injunctive relief is appropriate because protection and maintenance of Union Home's confidential, proprietary, and trade secret information is a vital and legitimate business concern. In the absence of injunctive relief, it is highly unlikely that Union Home will have the ability to precisely calculate the extent of the harm caused by the Defendants' actions.

e.      In their employee agreements, the Defendants acknowledged and agreed that a remedy at law for any breach or threatened breach of the provisions of the agreement would be inadequate, thereby warranting issuance of injunctive relief.

f.      The public interest will not be harmed if an injunction is granted.

g.      Given the Defendants' willful and deliberate violations of his obligations, any bond required to be posted by Union Home should be *de minimis.*

2.      Enter judgment in favor of Union Home and against Defendants Luu, Rosenberry, Tabora, and Webb for violating their employee agreements and order them to repay Union Home the portion of their respective Bonus owed to Union Home;

3.      Enter judgment in favor of Union Home and against the Defendants on all counts in an amount to be determined at trial and order the Defendants to pay Union Home's reasonable attorneys' fees as required by the employee agreements;

4.      Enter judgment in favor of Union Home and against the Defendants on all counts in an amount to be determined at trial and order the Defendants to pay damages to Union Home, including, but not limited to, compensatory and punitive damages, costs, and interest as provided for by statute and common law; and

5.      Grant all other relief the Court deems just and proper in the circumstances.

Dated: February 17, 2025       Respectfully submitted,

**BARNES & THORNBURG LLP**

*/s/ Jason T. Clagg*
Jason T. Clagg, Ohio Atty. No. 97303
Cody D. Woods, Ohio Atty. No. 103642
888 S. Harrison St., Suite 600
Fort Wayne, Indiana 46802
Phone: 260-423-9440
Fax: 260-424-8316
jason.clagg@btlaw.com
cody.woods@btlaw.com

*Counsel for Plaintiff*
*Union Home Mortgage Corp.*