UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNION HOME MORTGAGE CORP., | ) | CASE NO.: 1:25-CV-00318 |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | JUDGE J. PHILIP CALABRESE |
| vs. | ) | |
| | ) | |
| MICHAEL BALLEW, ANDY (CARL) | ) | MAGISTRATE JUDGE JENNIFER |
| BERRYMAN, ELIAS GONZALES, | ) | DOWDELL ARMSTRONG |
| PEDRO GONZALEZ, NICHOLAS | ) | |
| LICHWICK, HONG (BOBBY) LUU, | ) | |
| BLAIN ROSENBERRY, GEORGE | ) | |
| TABORA, and ROBERT WEBB, | ) | |
| | ) | |
| *Defendants*. | ) | |

---

**DEFENDANTS' POST-HEARING BRIEF OPPOSING
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

**TABLE OF CONTENTS**

I.     STATEMENT OF ISSUES TO BE DECIDED .................................................. 1

II.    SUMMARY OF ARGUMENTS PRESENTED.................................................. 1

III.   STATEMENT OF FACTS ............................................................................... 3

     A.     Parties Work and Operate in Residential Mortgage Industry, Where Loan Providers Routinely Sell Loans After Closing with Customers............................. 3

     B.     Defendants Spend Significant Time Developing Their Own Business in the Industry Before Joining Union Home Who Forces Them to Sign Incredibly Overbroad and Restrictive Employment Agreements............................................ 4

          i.     The Employment Agreements.................................................... 4

          ii.    Offices. ..................................................................................... 6

     C.     At Union Home, Defendants Rely Upon Their Own Relationships, Experience, Efforts, and Self-Source Their Own Business. ...................................................... 6

     D.     Union Home Engages in Unethical, Illegal, and Concerning Practices During Defendants' Employment............................................................................... 8

          i.     Bond Program Restrictions. ..................................................... 8

          ii.    False Loan Source Classification. ............................................ 9

     E.     Defendants End Their Employment with Union Home in Their Own Manner and for Their Own Reasons. .......................................................................... 10

     F.     Defendants Leave in a Good Faith Manner and Do Not Use Any Confidential Information to Unfairly Compete. ...................................................... 13

     G.     Defendants Begin Employment with APM and Continue to Operate in a Good Faith Manner. .......................................................................................... 14

     H.     Union Home's Failure to Take Reasonable Steps to Protect Purported Confidential Information Further Apparent Through Data Breach and Response. ................... 15

IV.   LAW AND ARGUMENT ............................................................................ 15

     A.     Standard for Injunctive Relief............................................................. 15

     B.     Union Home Does Not Have a Strong Likelihood of Success on the Merits....... 16

          i.     Union Home Lacks Legitimate Business Interests to Protect.................. 17

          ii.    The Restrictive Covenants Are Not Otherwise Reasonable and Enforceable. ......................................................................... 21

C.    Union Home Will Not Suffer Irreparable Harm in the Absence of a Preliminary Injunction. ........................................................................................................ 26

D.    An Injunction Would Cause Harm to Third Parties and Not Serve the Public Interest. .................................................................................................................. 30

E.    If a Preliminary Injunction is Issued, Bond Should Be Set at $2 Million. ........... 31

V.    CONCLUSION ................................................................................................................ 32

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abney v. Amgen, Inc.*, 443 F.3d 540 (6th Cir. 2006) ...................................................................... 26

*Aero Fulfillment Servs., Inc. v. Tatar*, 2007-Ohio-174 .................................................................. 30

*Allied Erecting & Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.* 511 F. App'x 398 (6th Cir. 2013) ............................................................................................................................................ 29

*Arthur J. Gallagher & Co. v. Anthony*, No. 16-CV-00284, 2016 U.S. Dist. LEXIS 116384 (N.D. Ohio Aug. 30, 2016).................................................................................................. 17, 19, 21

*Automation & Modular Components, Inc. v. Blackford*, No. 23-cv-12420, 2023 U.S. Dist. LEXIS 198219 (E.D. Mich. Nov. 3, 2023) ........................................................................................... 28

*Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001) ........................................................................ 15

*Brentlinger Enterprises v. Curran*, 141 Ohio App.3d 640 (2001) ................................................ 17

*Brieger v. Telectronics, Inc.,* 816 F.2d 678, 1987 U.S. App. LEXIS 5101 (6th Cir. April 17, 1987) ............................................................................................................................................ 27

*Cbiz, Inc. v. Cryan*, No. 1:24-cv-1027, 2024 U.S. Dist. LEXIS 240910 (N.D. Ohio Jul. 23, 2024) .................................................................................................................................. 16, 17, 29

*Century Bus. Servs., Inc. v. Urban*, 179 Ohio App. 3d 111 (2008)............................................... 16

*Cenveo Corp. v. Southern Graphic Systems, Inc.*, No. 08-5521, 2009 U.S. Dist. LEXIS 4542 (D. Minn. Jan. 22, 2009) ................................................................................................................ 31

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535 (6th Cir. 2007) ............................................................................................................................................ 27

*Cretor Const. Equip. LLC v. Gibson*, 738 F.Supp. 3d 950 (S.D. Ohio Jul. 1, 2024) ........ 18, 20, 22

*D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324 (6th Cir. 2019)............................................................. 26

*Economou v. Physicians Weight Loss Centers of America*, 756 F. Supp. 1024 (N.D. Ohio 1991)27

*Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028 (N.D. Ohio 2003) ................. 30

*Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261 (6th Cir. 1985)................................... 30

*Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620 (6th Cir. 2000) ........................................ 16

*Hobbs v. Fifth Third Bank, N.A.*, No. 1:20-cv-1040, 2021 U.S. Dist. LEXIS 227661 (S.D. Ohio Nov. 29, 2021)............................................................................................................................ 17

*Indep. Stav Co. LLC v. Bethel*, No. 2:16-CV-31, 2016 U.S. Dist. LEXIS 10793 (S.D. Ohio Jan. 29, 2016) ................................................................................................................................... 17

*Jacono v. Invacare Corp.*, 2006-Ohio-1596 (8th Dist.) ................................................................ 24

*Jones v. Caruso*, 569 F.3d 258 (6th Cir. 2009) ................................................................................ 16

*Laukus v. Rio Brands, Inc.*, No. 5:07CV2331, 2007 U.S. Dist. LEXIS 119239 (N.D. Ohio Aug. 7, 2007) ............................................................................................................................................. 29

*Leary v. Daeschner*, 228 F.3d 729 (6th Cir. 2000) ......................................................................... 16

*Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566 (6th Cir. 2002) ........ 15

*Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964 (6th Cir. 2002) ............................................... 26

*Pitney Bowes Inc. v. Acevedo*, No. 08-21808, 2008 U.S. Dist. LEXIS 61194 (S.D. Fla. July 28, 2008) ............................................................................................................................................. 31

*Raimonde v. Van Vlerah*,325 N.E.2d 544 (Ohio 1975) ............................................. 17, 21, 22, 23

*Sampson v. Murray,* 415 U.S. 61, 90 (1974). ................................................................................. 26

*SAS Institute, Inc. v. World Programming Ltd.*, 874 F.3d 370 (4th Cir. 2017) ............................. 31

*Shepard & Assocs., Inc. v. Lokring Tech., LLC*, No. 1:20-cv-02488, 2022 WL 312711 (N.D. Ohio Feb. 2, 2022) ............................................................................................................................... 16

*Transtar Indus., LLC v. Lester*, No. 1:19cv1230, 2019 U.S. Dist. LEXIS 128001 (N.D. Ohio July 31, 2019) ..................................................................................................................................... 21

*Union Home Mtge. Corp. v. Fratelli*, No. 1:23-cv-857, 2025 U.S. Dist. LEXIS 35673 (N.D.Ohio Feb. 27, 2025) ............................................................................................................................. 31

*Vapor Technology Assn. v.* Taylor, No. 25-5137, 2025 U.S. App. LEXIS 8430 (6th Cir. Apr. 9, 2025) ............................................................................................................................................. 29

*Walther v. Fla. Tile, Inc.*, No. 3:17-cv-257, 2017 U.S. Dist. LEXIS 137531 (S.D. Ohio Aug. 28, 2017) ............................................................................................................................................. 16

**Statutes**

Federal Rule of Civil Procedure 65(c) ............................................................................................ 31

## I.  <u>STATEMENT OF ISSUES TO BE DECIDED</u>

Injunctive relief is an extraordinary remedy. To be entitled to such relief, Plaintiff Union Home Mortgage Corp. ("Union Home" or "Plaintiff") must demonstrate that: it is likely to succeed on the merits; it will suffer irreparable harm absent an injunction; the injunction will not cause substantial harm to others; and issuing the injunction will serve the public interest.

Here, Union Home seeks to enjoin eight former employees from working in the residential mortgage industry for another company. This is an industry in which Defendants had significant experience before joining Union Home, where they developed their skills, experience, relationships, referral sources, and books of business. It also is an industry in which Defendants self-source their own work, and for which Union Home provided little training or support. Indeed, Union Home gave the Defendants no leads, call lists, or referral sources. Despite this, and despite Defendants leaving Union Home for their own legitimate reasons (including issues with Union Home's unethical and illegal policies, failure to pay Defendants as promised, and a demotion), Union Home seeks to enforce overbroad and unreasonable restrictive covenants.

The issue is whether a preliminary injunction is justified where Plaintiff likely will be unsuccessful on the merits, has shown no irreparable harm, others will be unduly harmed, and the injunction will not serve the public interest.

## II.  <u>SUMMARY OF ARGUMENTS PRESENTED</u>

Union Home seeks to prevent Michael Ballew, Andy (Carl) Berryman, Elias Gonzales, Pedro Gonzalez, Hong (Bobby) Luu, Blain Rosenberry, George Tabora, and Robert Webb (the "Defendants" where appropriate) from continuing to work in the same industry and same or similar locations as they have for most of their careers.

Plaintiff cannot meet the requisite burden of proof for multiple reasons. First, Plaintiff cannot demonstrate a strong likelihood of success on the merits because it cannot show the

restrictive covenants are reasonable. Defendants have significant industry experience prior to their time at Union Home.  Most of the Defendants joined Union Home with a fully developed referral network and established book of business. Union Home does not have a protectable interest in Defendant's pre-employment referral sources and customers. Further, the information that Union Home deems "confidential" and "trade secret" is publicly available. Another significant component of this analysis is that Union Home sells mortgages to other lenders upon closing. In those sales agreements, Union Home agrees to not solicit those customers. Therefore, it defies law and logic that Union Home should assert an interest in Defendants' pre-existing relationships, information that is publicly available, and customers it has contractually agreed to not solicit.

Second, Plaintiff will not suffer irreparable harm. The record is utterly devoid of testimony or other evidence to support Plaintiff's claimed irreparable harm. To the contrary, Plaintiff has shown that calculating money damages is possible and will adequately compensate it. Union Home has not shown that any Defendant is using or disclosing any confidential information, nor has it demonstrated any harm to its goodwill. Defendants, however, all testified to the professional and good faith manner in which they left. They did not use or disclose any confidential information and have not taken any action to harm or disparage Union Home or its goodwill.

Finally, issuing an injunction would impose an undue hardship on Defendants, would harm third parties, and does not serve the public interests. Defendants would not be able to work in their communities, and community members would not have access to their preferred and trusted loan officers. Plaintiff does not seek to protect a legitimate business interest but instead attempts to punish Defendants and impermissibly eliminate fair competition. For all these reasons, and as more fully set forth herein, the Court should deny Plaintiff's Motion for Preliminary Injunction.

### III.    <u>STATEMENT OF FACTS</u>

####    A.    **Parties Work and Operate in Residential Mortgage Industry, Where Loan Providers Routinely Sell Loans After Closing with Customers.**

Union Home seeks to enjoin at least eight individuals from working in the residential mortgage business. These eight individuals are former employees who worked in Union Home's Eastern Division, led by Vice President of Retail Sales, Bryan Wright. (Testimony of Mr. Bryan Wright ("Wright Testimony"), ECF No. 49, PageID ## 834-835.)

Union Home and American Pacific Mortgage ("APM") are in the retail/residential home mortgage business. (Testimony of Mr. Blain Rosenberry ("Rosenberry Testimony"), ECF No. 49, PageID # 884.) Once Union Home's loan officers close loans, it sells these mortgages on the secondary market to larger lenders like Citi, Truist, Merchants Bank, and Fannie May. (Wright Testimony, ECF No. 49, PageID # 876.) Union Home's agreements with those lenders include "non solicitation by seller" provisions, with terms such as:

> The Initial Seller covenants and agrees that it will not take any action or permit or cause any action to be taken by any of its agents or Affiliates, to personally, by telephone, mail e-mail or otherwise, solicit the Mortgagor under any Mortgage Loan to refinance the Mortgage Loan, in whole or in part or provide information to any other entity to solicit the refinancing of any Mortgage Loan in whole or in part . . . .

(*Id.* at PageID #876, Exh. U-1.)[1] In selling the loans or the servicing portion of them, the lender is "selling the rights to those loans, and that would include the confidential information." (Testimony of Mr. Chuck Nugent ("Nugent Testimony"), ECF No. 50, PageID # 1165.) In other words, once Union Home sells a mortgage, it is no longer permitted to solicit that borrower.

---

[1]  This is one of five agreements Union Home produced, as representative examples of typical agreements into which they enter. The four other agreements produced contain similar provisions and can be found in Def.'s Exs. U-2 through U-5 (U-2, Truist Agreement, Section 7.21, p. 11; U-3, Merchants Bank Agreement, Section 9.d., p. 16; U-4, Chase Agreement, Section 7.6, p. 12, U-5, Fannie Mae Agreement, Section B2-1.3-04, p. 185.)

**B.      Defendants Spend Significant Time Developing Their Own Business in the Industry Before Joining Union Home Who Forces Them to Sign Incredibly Overbroad and Restrictive Employment Agreements.**

All the Defendants have significant experience working in the residential mortgage and finance industry. In fact, before joining Union Home, Defendants had between four (Tabora) and 27 (Webb) years of experience. (*See* ECF Nos. 49, 50, Page ID # 926, 978, 1001-02, 1025, 1046, 1089, 1120, 1145.) During this time, Defendants spent significant time and efforts developing their skills, relationships, experience, and business. For example, Mr. Rosenberry worked for one of the largest real estate offices in the country where he developed relationships with numerous real estate agents. (ECF No. 49, PageID # 926.) Similarly, during his decades in the residential mortgage industry, Mr. Webb developed his business by networking in the community. (ECF No. 50, PageID # 1121.)

When Defendants separately joined Union Home, the company required them to sign agreements containing restrictive covenants. These covenants included, among other provisions, broad non-competition, non-solicitation of customers, and non-solicitation of employees restrictions. (Wright Testimony, ECF No. 49, PageID # 838.) Union Home also required Mr. Rosenberry, Mr. Gonzales, and Mr. Gonzalez to sign new Agreements when it placed them on, and promised to compensate them in accordance with, a Profit and Loss model. (ECF No. 49, PageID ## 935-936, 1026, 1048.)

### i.      *The Employment Agreements.*

As noted above, the employment agreements (the "Agreements") contained numerous restrictive covenants, including non-compete provisions.  In most Agreements, the non-compete provisions restrict Defendants from engaging in "Competitive Activity on behalf of a Competitive Entity in the Restricted Area during the Restricted Period." (*See, e.g.,* Ballew Employment Agreement, Exhibit A, Plaintiff's Amended Complaint, ECF No. 51-1, PageID # 1249.)

4

"Competitive Activity" constitutes "acting in the same or similar capacity in which Employee worked for the Company and shall include, but not be limited to performing the functions of a loan officer. . ." (*Id.*) The "Restricted Area" is "any state in which Employee is legally able to originate or broker mortgages and has done so on behalf of the Company in the thirty-six (36) months preceding" termination employment.[2] (*Id.*)

The Agreements also contained non-solicitation of customers provisions. The most common of these provision purports to restrict not only direct and indirect solicitation of customers and employees, but also attempts to prohibit ***accepting*** business from borrowers: "(i) with whom Employee has taken a mortgage loan application while employed at UHM; or (ii) whose mortgage loan is serviced by the Company."[3] (*See, e.g.*, Berryman Employment Agreement, Pl.'s Am. Compl. Ex C, ECF No. 51-3, PageID # 1256.)

The Agreements further include non-solicitation of employees provisions, which uniformly state that "[d]uring the Restricted Period and for two (2) years thereafter, Employee shall not, directly or indirectly, on behalf of themselves or a Competitive Entity, employ or seek to employ any person who is employed by the Company or otherwise induce such person to leave his/her employment with the Company." (*See, e.g., Id.* at PageID # 1257.)

In addition to the aforementioned restrictions, Mr. Berryman's and Mr. Tabora's Agreements contain an extra provision that broadly restricts soliciting or accepting business from

---

[2] The Gonzales and Gonzalez Agreements contained even broader non-compete provisions, stating that "Employee will not become employed as an employee of a Competitive Entity or a vendor to the Company, in the same or similar capacity as the Employee is employed with the company." The provision continues, "[a]s Employee can perform virtually their entire job remotely from any physical location, this restriction shall apply throughout the United States…" (*See, e.g.*, Gonzales Employment Agreement, Pl.'s Am. Compl. Ex. D, ECF No. 51-4, PageID # 1263.)

[3] The Ballew, Tabora, and Webb Agreements prohibit accepting business "from any customer or identified prospective customer of the Company; (i) with whom Employee had contact; or (ii) about whom Employee obtained or had access to Confidential Information, in conjunction with their employment in the thirty-six (36) months preceding the termination of Employee's employment with the Company." (*See, e.g.* Pl.'s Am. Compl. Ex. A, ECF No. 51-1, PageID # 1249.)

any "Referral Source of the Company."[4] Union Home further defined "Referral Source" as "a realtor or builder who referred at least one customer to Employee that closed a loan with the Company in the twelve (12) months preceding the termination of Employee's employment with the Company." (*See, e.g., Id.* at PageID # 1256.)

### ii. Offices.

While at Union Home, Defendants worked at six different branch locations. Those branches included the: Staunton, Virgina branch (Mr. Ballew, sole loan originator at branch); Hanover, Pennsylvania branch (Mr. Berryman); Bethesda, Maryland branch (Mr. Gonzales, Mr. Gonzalez and Mr. Tabora); Vienna, Virginia branch (Mr. Luu); Chambersburg, Pennsylvania branch (Mr. Rosenberry) and Shelby, North Carolina branch (Mr. Webb).[5] (ECF Nos. 49, 50, PageID ## 890, 955, 992, 1016, 1039, 1075, 1114, 1133.)

### C. At Union Home, Defendants Rely Upon Their Own Relationships, Experience, Efforts, and Self-Source Their Own Business.

Defendants joined Union Home with their respective books of business. For example, Mr. Ballew not only self-sourced his entire business, but he also was the first and only Union Home branch in his area. (ECF No. 50, PageID # 1066.) Union Home had no presence in his area prior to his employment, and he "brought over [his] customer list, [his] referral partners, [his] book of business" when he affiliated with Union Home. (*Id.*) Likewise, Mr. Webb had been in this industry for over twenty-five years, developed his entire book of business before joining Union Home, and brought his business relationships with him. (*Id. at* PageID ## 1120-1121.)

---

[4] Union Home has not offered any explanation or legal justification to explain why only Mr. Berry and Mr. Tabora are subject to this additional restriction and the others are not.

[5] Incidentally, Mr. Webb did not know or have any contact with Mr. Franczak. (*See* Webb's Amended Answer to Am. Compl., ECF No. 65, PageID # 1688.)

Moreover, Defendants sourced their own business and developed their own referral sources during their time in the residential mortgage industry, including while at Union Home. Indeed, Union Home does not provide loan officers with leads. (*See, e.g.,* Ballew Testimony, ECF No. 50, PageID ## 1089-1090.) "They generate their business through referral partners, which would be real estate agents, builders, and then the relationships they would have with past clients." (Wright Testimony, ECF No. 49, PageID # 835.) Each Defendant confirmed that they developed their own business, referral sources, and relationships, mostly (or in whole) prior to their time at Union Home, and further testified that the company did not provide any leads, call lists, or referral sources. (ECF Nos. 49, 50, PageID ## 930, 978-79, 1002, 1025, 1047, 1089-90, 1121, 1146.)

Defendants developed their own business, referral sources, and relationships through activities like making phone calls, meeting people, and sponsoring events. For example, Mr. Gonzalez sourced business by making phone calls to realtors and inviting them for a meal or coffee. (ECF No. 49, PageID # 1047.) Mr. Ballew considered his business development efforts as lifelong, since he is related to or has known many customers and referral sources his entire life. (ECF No. 50, PageID # 1090.) Mr. Ballew also expended time and marketing efforts like charity sponsorships and affiliations with the Staunton Police Association, his former employer, to self-source and develop his own business.[6] (*Id.* at PageID #1099.) All of Mr. Rosenberry's business development "was a result of [him] meeting people or during any lunch-and-learn with them or during a first-time home buyer course for them. [He] never got any of that stuff from Union." (ECF No. 49, PageID # 925.)  Similarly, Mr. Gonzalez developed his business by making calls to relators and inviting them to a face-to-face meal or coffee. (*Id.* at PageID #1047.)

---

[6] Notably, Mr. Ballew was promised marketing reimbursement when he joined Union Home. However, Union Home did not pay the expenses Mr. Ballew submitted for reimbursement and told him that he was sponsoring events and marketing as a representative of himself, not Union Home. (ECF No. 50, PageID # 1099.)

### D.     Union Home Engages in Unethical, Illegal, and Concerning Practices During Defendants' Employment.

During Defendants' employment, Union Home engaged in unethical, illegal and otherwise concerning practices. Chief among those were restrictions related to bond programs for lower income borrowers and instructions on how to falsify the classification of loan sources.

#### i.     Bond Program Restrictions.

At a certain point, senior Union Home management issued a directive to limit the number of bond loans that loan originators could sell. (Ballew Testimony, ECF No. 50, PageID # 1093.) Bond loans are products offered for lower income borrows that may include benefits to the borrower like down payment assistance. (*Id*. at PageID # 1092.) However, these products are less profitable than other types of loans, so Union Home restricted access to the programs. (Wright Testimony, ECF No. 49, PageID # 859.) First, at a company event in Baltimore, Union Home President Bill Cosgrove warned loan officers that if they sold three (3) bond loans in a month, they would get a call from Mike Jones, National Sales President. (Ballew Testimony, ECF No. 50, PageID # 1093.) Further, if they sold four (4) bond loans in a month, they would get a call from Cosgrove himself, if they were still employed. (*Id*.) Then, to continue to discourage issuing bond loans, Union Home restricted loan originators from selling more than 20% of their monthly business as bond loans. (Wright Testimony, ECF No. 49, PageID # 859-860.)

This practice proved problematic for several Defendants, as they relied upon the bond programs to serve their customer base. This included Mr. Ballew and Mr. Tabora, who relied heavily on bond products. (ECF No. 50, PageID # 1092, 1147.) Additionally, Mr. Rosenberry had a loan officer in his branch, Cecilia Sensenig, who did about 33% of her business as bond loans. (ECF No. 49, PageID # 931.) In fact, Union Home actually locked Ms. Sensenig out of using the

bond program, something she learned when she trying to help a family through the preapproval process. (*Id*.)

By limiting loan officers' ability to use the bond programs, Union Home put the Defendants in an unethical and unlawful position. The loan officers were forced to choose which qualified customers would get access to the products because of the quota imposed by Union Home. (Ballew Testimony, ECF No. 50, PageID # 1094.) In doing so, the loan officers were forced to discriminate against certain customers. (*Id*.) As Mr. Ballew testified,

> [i]f you're going to have a program, you have to offer the program. Now, what Union Home Mortgage could have done is either terminated me if they feel like they're losing money based on the type of production I make or terminate the program in its entirety, but you can't put me in a position where I have to choose who gets the program because that is steering, and that is illegal.

(*Id*. at PageID ## 1094-1095.)

### ii.     *False Loan Source Classification.*

Another prevalent and problematic practice Union Home utilized was its directive to falsify a loan's source to obtain a lower rate for the consumer and generate additional business.  During a "daily huddle meeting," Senior Union Home executives Al Blank and Jim Ferriter instructed loan originators on how to change the designation of loans from "self-sourced" to either "company-generated" or "consumer direct" to offer customers a lower mortgage rate. (Wright Testimony, ECF No. 49, PageID ## 861-862.) This issue arose in the context of loan officers seeking price concessions to compete for business. (*Id*.) Mr. Blank and Mr. Ferriter told loan officers to change the loans designation from self-sourced to another classification instead of seeking price concessions or exceptions from the company. (*Id*.) By directing loan officers to change loan designations, Union Home was instructing them to falsify the loan's source. (Rosenberry Testimony, ECF No. 49, PageID # 945.)

This maneuver allowed the loan officer to give the borrower a better rate but created multiple issues. First, loan officers received lower commission rates for "company-generated" or "consumer direct" loans. (*Id*.)  As such, in cutting the loan rates, the loan officer's compensation was reduced. (Wright Testimony, ECF No. 49, PageID # 862.) In addition, the applicable branch no longer received commission for the loans, thus further reducing certain loan officers' compensation. As Mr. Rosenberry described it, "if you really needed to compete… you could send [the loan] over to consumer direct…put it in another loan officer's name… from a branch standpoint…I got no bonus on that." (ECF No. 49, PageID # 944.) Perhaps, more significantly, this practice allowed Union Home to side-step an important consumer protection law that prohibits paying loan officers varying rates based on loan profitability. 12 C.F.R. § 1026.36(d)-(e). Here, in cutting the rates for consumers, Union Home reduced the loan officers' compensation rather than the company's, which effectively paid loan officers based on the profitability of those individual loans. Union Home literally was making a profit at the loan officer's expense.

### E.    Defendants End Their Employment with Union Home in Their Own Manner and for Their Own Reasons.

Between January 9 and February 3, 2025, the Defendants ended their employment with Union Home and subsequently went to work for APM. (Wright Testimony, ECF No. 49, PageID # 838.) Each Defendant left Union Home for his own reasons in his own manner. Those reasons included:

- <u>Mr. Rosenberry</u> - Union Home's instructions regarding reclassifying loans, its failure to pay him in accordance with their compensation agreement, and their lack of communication. With respect to loan reclassification, Mr. Rosenberry took issue with the fact that loan officers and branches were paid less even though they self-sourced the business and performed all the work. (ECF No. 49, PageID ## 944-945.) As for his compensation agreement, Mr. Rosenberry was put on a Profit and Loss ("P&L") model. However, Union Home failed to provide him with reports in a timely manner, inexplicably told him he was losing money, and then changed the model to require three (3) months of reserves before he could be paid on branch profitability. (*Id*. at PageID

10

## 934, 935). Once his branch attained the required reserves, Union Home did not answer his questions or pay him any profit. (*Id.*) Instead, it required him to sign a new agreement, at which point he received a salary and was promised bonuses. (*Id.* at PageID ## 935-936.) However, Union Home then once again changed the program, requiring branch sales in excess of $50 million before Mr. Rosenberry would receive salary. (*Id.* at PageID # 936.) Mr. Rosenberry's concerns ultimately were never addressed and, once Mr. Franczak left, senior management barely communicated with him. (*Id.* at PageID ## 936-937.)

- <u>Mr. Berryman</u> - frustration with Union Home for almost a year before his departure. (ECF No. 49, PageID # 979.) Mr. Berryman was losing pre-existing business partners due to the lack of a bond program that: he was promised but never given access to; was essential to his job; and essential to his customers. (*Id.*) In addition, Mr. Berryman lost another significant and long-term referral partner after Union Home refused to hire (despite prior promises) her daughter, a new loan officer that he recruited, trained and assisted in attaining licensure. (*Id.* and PageID # 980.)

- <u>Mr. Luu</u> – felt Union Home was systematically targeting a large portion of his Vietnamese American clientele. (*Id.* at PageID ## 1004-1005.)  During Mr. Luu's tenure, another Vietnamese loan officer committed fraud. (*Id.* at PageID # 1003.) Although Mr. Luu was not associated or affiliated with this loan officer, Union Home subjected Mr. Luu to a series of investigation calls. In addition, Union Home began requiring potential borrowers with traditional Vietnamese names and/or professions to go through two or three additional reviews prior to closing. (*Id.* at PageID # 1003, 1004). In addition to feeling this discriminated against his clientele, it significantly slowed down the loan approval process. (*Id.*) This forced Mr. Luu to turn away some potential borrowers and impacted his pre-existing business overall, causing a decline in production. (*Id.* at PageID ## 1005-1006.)

- <u>Mr. Elias Gonzales and Mr. Pedro Gonzalez</u> - first considered leaving Union Home in or around June 2024 when their contracts were due to expire. (ECF No. 49, PageID ## 1025-1026.) To entice them to stay, their then Area Manager offered them the opportunity to change to a P&L compensation model, which should have provided higher compensation and bonus opportunities. (*Id.*) Based upon this promise, Mr. Gonzales and Mr. Gonzalez signed new agreements and stayed with Union Home. (*Id.*) However, Union Home subsequently failed to pay them according to the P&L agreement, a breach which cost them approximately $300,000. (*Id.* at PageID # 1027.)

- <u>Mr. Ballew</u> - like others, relied heavily on the bond programs to assist borrowers. He did so because the population he serves is small and lower income. (ECF No. 50, PageID # 1092.) Therefore, he helps borrowers access a Virginia bond program for down payment assistance. (*Id.*) However, Union Home's restrictions on using the bond program put him in the unethical and illegal position of having to select which potential borrowers could use the program. (*Id.* at PageID # 1094.) That occurred before Union Home completely cut him off from using the bond program in January 2025. (*Id.*)

11

Moreover, despite promises otherwise, Union Home failed to reimburse Mr. Ballew for expenses incurred in marketing himself in his community. (*Id*. at PageID # 1099.)

- <u>Mr. Tabora</u> – also served a population reliant on bond products. Prior to joining Union Home, Mr. Tabora branded himself as the "downpayment assistance guy." (*Id.* at PageID # 1147.) However, Union Home's bond program policy changes prevented him from continuing that model. (*Id*.) In fact, it hurt Mr. Tabora's business so much that Union Home demoted him to part time in mid-2024. (*Id*. at PageID # 1148.) In doing so, at a time when he had a one-year-old son and was the sole provider for his family, Union Home stripped Mr. Tabora of full-time work and critical compensation/benefits. (*Id*. at PageID # 1148.) Mr. Tabora ultimately left Union Home because working part-time with no clientele and no benefits was not a viable option. (*Id*.)

- <u>Mr. Webb</u> – frustration with Union Home's inability to close loans in an efficient manner. (ECF No. 50, PageID ## 1122-1123.) This negatively impacted Mr. Webb's business and reputation. (*Id*.) As a seasoned residential mortgage professional, Mr. Webb experienced frustrations with Union Home processes that he had not encountered in his prior 27 years in the industry. (*Id*.)  In fact, Mr. Webb lost: business during his 14 months with Union Home that he had spent years developing; and two integral members of his team due to their frustrations with Union Home's processing issues. (*Id*. at PageID # 1123.)

At the time they left Union Home, Defendants had the following tenures with Union Home and in the industry:

| Name | Industry Tenure Prior to Union Home | Tenure at Union Home |
|---|---|---|
| Mr. Ballew | 6 years | 3.5 years |
| Mr. Berryman | 16 years | 3 years, 3 months |
| Mr. Gonzales | 18 years | 2.5 years |
| Mr. Gonzalez | 12 years | 2.5 years |
| Mr. Luu | 11 years | 6 years |
| Mr. Rosenberry | 13 years | 8.5 years |
| Mr. Tabora | 4 years | 1.5 years |
| Mr. Webb | 27 years | 1 year, 2 months |

## F. Defendants Leave in a Good Faith Manner and Do Not Use Any Confidential Information to Unfairly Compete.

All the Defendants took conscientious steps to leave Union Home in a professional manner. First, none of them did anything to damage Union Home's reputation or disparage the company. (*See*, *e.g.*, Ballew Testimony, ECF No. 50, PageID ## 1101-1102.)

In addition, the Defendants did not take any confidential information to unfairly compete with Union Home. In fact, Mr. Wright testified that he knew of no evidence of any Defendants taking any confidential or proprietary information from Union Home. (EFC No. 49, PageID # 869.) Supporting this, Messrs. Ballew, Gonzales, Gonzalez, Luu, Rosenberry, and Webb confirmed that they did not take any customer lists, proprietary information, trade secrets, or otherwise confidential information from Union Home upon departure.[7] (*See* ECF Nos. 49, 50, PageID # 941-42, 1007-08, 1029, 1053, 1101, 1126.)

Further, in connection with Defendants' departure from Union Home, APM agreed to take over office leases and purchase office furniture from Union Home. (ECF Nos. 49, 50, PageID ## 940, 1028,1124.) Specifically, APM did this for several branches where Defendants worked including: the Hanover and Chambersburg, Pennsylvania branches; the Bethesda, Maryland branch; and the Shelby North Carolina branch. (*Id*.) Union Home and APM worked collectively to transition these leases, and Union Home did not object to these Defendants working in these locations.

---

[7] Mr. Berryman and Mr. Tabora admitted to taking a limited amount of customer information. (ECF Nos. 49, 50, PageID # 965, 1141.) However, they quarantined that information and voluntarily turned it over. (ECF Nos. 49, 50, PageID ## 982, 1144.) Mr. Berryman took screenshots of prospects he was working with at Union Home so that he could ensure that he acted in an appropriate manner if anyone on the list called him at APM. (*Id*.) Mr. Tabora sent himself four emails with open loan applications (ECF No. 50, PageID # 1141.) Mr. Tabora had done the same thing when he left his prior employer and joined Union Home. (*Id*.) However, Mr. Tabora never used or referenced any of the loan applications or information contained therein. (*Id*. at PageID ## 1144-1145.) Once he realized that he should not have sent himself the information, he disclosed his actions and turned everything over to counsel. (*Id*.)

### G.     Defendants Begin Employment with APM and Continue to Operate in a Good Faith Manner.

After starting with APM, Defendants continue to work in a good faith manner and avoid unfair competition with Union Home. For example, several Defendants testified as to their efforts to send active loan applicants back to Union Home. In Mr. Ballew's case, he had multiple clients reach out to him about refinancing, individuals he has known most of his life. (ECF No. 50, PageID # 1101.) In response to their inquiries, he told them: "I don't work at Union Home Mortgage; your loan is serviced by Union Home Mortgage; you need to contact them if you're interested in refinancing." (*Id.*) Mr. Rosenberry instructed individuals that contacted him for three pending construction loans to go back to Union Home. (ECF No. 49, PageID # 928.) To help facilitate, he even contacted a Union Home employee, explained the situations, and asked that they take care of the clients. (*Id.*) Mr. Luu was contacted by customers, many of whom only speak Vietnamese. (ECF No. 49, PageID # 1001.) Mr. Luu told his customers that he left Union Home and instructed them to contact Union Home. (*Id.*) However, Mr. Luu was Union Home's only Vietnamese speaking loan officer and, thus, Union Home could no longer help certain of these borrowers and prospects. (*Id.*) Mr. Gonzales likewise told individuals who contacted him that he no longer worked at Union Home, and they needed to contact Union Home. (ECF No. 49, PageID ## 1019-1020.)

As Defendants started their new jobs, APM instructed them to leave any customer lists with Union Home. (Nugent Testimony, ECF No. 50, PageID # 1166.) APM utilized software that searches public records and interfaces with TransUnion to generate new customer lists for the Defendants. (*Id.* at PageID # 1167.)[8]

Finally, as to Mr. Tabora, at APM he maintains an administrative role and currently is not competing against Union Home. (ECF No. 50, PageID # 1145.) In his job, Mr. Tabora assists his

---

[8] Mr. Wright described a similar software employed by Union Home. (ECF No. 49, PageID ## 843-844.)

branch managers and processes loans generated by other loan originators. (*Id*. at PageID # 1146.) While he has an active license, he currently is not originating loans. (*Id.*) He has closed one loan at APM, but it was in a county (Arlington County, Virginia) in which he never closed a loan while at Union Home. (*Id*. at PageID # 1138.)

### H.    Union Home's Failure to Take Reasonable Steps to Protect Purported Confidential Information Further Apparent Through Data Breach and Response.

Although Defendants have not used any Union Home confidential information to unfairly compete, Union Home has not taken reasonable steps to protect its purported confidential information. For example, Mr. Ballew testified that, "I believe that UHM attempts to keep information confidential. I'm not sure how successful they are with that, given the news recently." (ECF No. 50, PageID # 1067.) Mr. Ballew, of course, was referring to the fact that a third-party accessed Union Home's IT system on June 25, 2025, taking social security numbers, birthdays, and other personal information. In addition, Union Home waited over two months to notify affected individuals of the data breach. *See Jed Rudd, et al. v. Union Home Mortgage Corp*., Case No. 1: 25-cv-01874-SO. Many of the lawsuits stemming from this data breach have been filed in the Northern District of Ohio.

## IV.    <u>LAW AND ARGUMENT</u>

### A.    Standard for Injunctive Relief

A preliminary injunction is "an extraordinary measure" that is "one of the most drastic tools in the arsenal of judicial remedies." *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (internal citations omitted). Courts should apply this remedy only where "the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002).

In deciding whether to issue a preliminary injunction, the Court must consider four factors: 1) whether the movant has a strong likelihood of success on the merits; 2) whether the movant

would suffer irreparably harm absent issuance of the injunction; 3) whether issuing the injunction would cause substantial harm to others; and 4) whether issuing an injunction would serve the public interest. *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). While these factors should be balanced together, "a finding that there is no likelihood of irreparable harm or no likelihood of success on the merits is often fatal." *Walther v. Fla. Tile, Inc.*, No. 3:17-cv-257, 2017 U.S. Dist. LEXIS 137531, at *2-3 (S.D. Ohio Aug. 28, 2017) (*citing Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000)). The plaintiff bears the burden of establishing that a preliminary injunction should be issued. *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009). As demonstrated more fully herein, Plaintiff has failed to carry its burden. As such, this Court should deny Plaintiff's Motion for Preliminary Injunction.

### B. Union Home Does Not Have a Strong Likelihood of Success on the Merits.

Under Ohio law, "restrictive covenants in employment agreements have been disfavored by courts since such covenants are normally written by employers and are in restraint of trade and the right to livelihood." *Century Bus. Servs., Inc. v. Urban*, 179 Ohio App. 3d 111, 118 (2008). Before evaluating the likelihood of success on the merits, a court first must "assess whether the noncompete is enforceable under Ohio law." *Cbiz, Inc. v. Cryan*, No. 1:24-cv-1027, 2024 U.S. Dist. LEXIS 240910, at *27 (N.D. Ohio Jul. 23, 2024). "In Ohio, noncompete and nonsolicitation agreements that are reasonable are enforced." *Id.* (*quoting Shepard & Assocs., Inc. v. Lokring Tech., LLC*, No. 1:20-cv-02488, 2022 WL 312711, at *33 (N.D. Ohio Feb. 2, 2022)).

In their analysis, "Ohio courts compare the reasonableness of contractual restrictions against an employer's legitimate interests 'using three factors.'" *Total Quality Logistics, LLC v. Eda Logistics LLC*, No. 23-3713, 2024 U.S. App. LEXIS 25149, at *13 (6th Cir. Oct. 2, 2024). A court will find a restrictive covenant reasonable "only where the employer can show by clear and convincing evidence that the restrictions imposed . . . (1) are no greater than necessary for the

16

protection of the employer's legitimate business interest, (2) do not impose undue hardship on the employee, and (3) are not injurious to the public."[9] *Brentlinger Enterprises v. Curran*, 141 Ohio App.3d 640, 645 (2001) (*citing Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975)).

### i.    Union Home Lacks Legitimate Business Interests to Protect.

"A covenant is no greater than necessary where the restraints imposed are reasonably necessary to protect an employer's legitimate interests." *Cbiz, Inc.*, 2024 U.S. Dist. LEXIS 240910, at *28 (*quoting Brentlinger Enterprises*, 141 Ohio App. 3d at 645). Thus, to be enforceable in the first place, the plaintiff must have "legitimate business interest[s] to protect." *Hobbs v. Fifth Third Bank, N.A.*, No. 1:20-cv-1040, 2021 U.S. Dist. LEXIS 227661, at *25 (S.D. Ohio Nov. 29, 2021) (internal citations omitted). Here, Plaintiff has no legitimate business interest to protect.

First, Plaintiff seeks to enforce restrictive covenants that would impact client and referral relationships that pre-existed Defendants' employment relationship with Union Home. In such instances, Ohio courts find that no protectable interests exist. "[W]hen customers follow the employee, especially to a new employer, the former employer has less claim to a protectable interest in the customer's account." *Arthur J. Gallagher & Co. v. Anthony*, No. 16-CV-00284, 2016 U.S. Dist. LEXIS 116384, at *32 (N.D. Ohio Aug. 30, 2016). The *Anthony* Court found the company showed "little evidence of a protectable interest sufficient to support its restrictive covenant[,]" noting that the insurance broker brought most of the accounts to the company. *Id.* at *36, 38. *See also, Indep. Stav Co. LLC v. Bethel*, No. 2:16-CV-31, 2016 U.S. Dist. LEXIS 10793, *18-19 (S.D. Ohio Jan. 29, 2016) (finding that plaintiff failed to show a protectable interest in customer contacts given defendants' "pre-existing relationship with nearly all of those

---

[9] To the extent Defendant does not include arguments concerning Plaintiff's inability to meet all three of these factors or all nine of the *Raimonde* factors, they do so for efficiency purposes. Defendants reserve the right to contest application of any of these factors at a later date.

customers."); *Cretor Const. Equip. LLC v. Gibson*, 738 F.Supp. 3d 950, 966 (S.D. Ohio Jul. 1, 2024) (holding that where the defendant "brought his long-time customers from [his previous company] to Cretor, and that Cretor's principal concern is that [the defendant] will now take his pre-existing book of business elsewhere…[t]he Court struggles to credit that concern as a protectable interest.").

Here, Defendants developed client and referral relationships during their extensive experience before joining Union Home and brought those relationships with them to Union Home. Indeed, Defendants had between four (Tabora) and 27 (Webb) years of experience before joining Union Home. During that time, they self-sourced and developed their own business. For example, Mr. Ballew was the first and only Union Home branch in his area. Similarly, Mr. Webb entirely developed his book of business prior to joining Union Home.

Defendants developed their own client and referral relationships due to the self-sourced nature of the business. As part of this, Defendants received little, if any, training or substantive support from Union Home. Indeed, each Defendant confirmed that they developed their own business, referral sources, and relationships, and further testified that Union Home provided them with no leads, no call lists, and no referral sources.

The self-sourced nature of the work meant that customers and referral sources build relationships with and follow the loans officers, not the mortgage providers. As Mr. Nugent testified "consumers overwhelmingly are choosing a loan officer, not a company. . . they want to continue to work with the person [with whom] they've always done business." (ECF No. 50, PageID # 1177.) Similarly, Mr. Rosenberry developed business through activities like meeting people, lunch and learns, or first-time home buyer courses. "[He] never got any of that stuff from Union." (ECF No. 49, PageID # 925.) Even at times where Union Home could have promoted

18

itself, it instead put the burden on the loan officers themselves. For example, in declining a sponsorship reimbursement request, Union Home told Mr. Ballew that he was sponsoring events and marketing as a representative of *himself*, not Union Home. (ECF No. 50, PageID # 1099.)

The reality that customers and referral sources follow loans officers (not companies) only further demonstrates the absence of a valid protectable interest. Indeed,

> Employers have a stronger protectable interest when the customers are more customers of the firm rather than customers who came to the firm because of the employee. Protectable interests can arise when the employee works with the employer's long-time customers, especially customers who came to the employer before the employee came on the scene. Similarly, where many employees service the customer, the employer has more protectable interest. But when the firm has little or no effect on bringing the customer to the firm, we find little protectable interest.

*Arthur J. Gallagher & Co*, No. 2016 U.S. Dist. LEXIS 116384, at *31-32. In *Anthony*, the Court found little protectable interest in the brokers' business relationships where: he did not start his career at Gallagher; and Gallagher "gave him no real training, did not introduce [him] to preexisting Gallagher customers, and provided minimal direction." *Id.* at *32. As demonstrated above, the same factors are present here. As such, this further demonstrates the lack of a protectable interest for Union Home.

Moreover, Union Home failed to demonstrate that, for purported customers/prospects with whom Defendants closed or anticipating closing loans at APM, Defendants developed those relationships while at Union Home. Indeed, Union Home's list of "suspected" customers/prospects with whom Defendants have worked since joining APM was based on last names alone. To the extent Defendants stated they had closed any loans at APM with purported Union Home customers/prospects, Plaintiff failed to establish that Defendants did not develop those relationships before joining Union Home. Indeed, when questioned, Defendants explained the pre-existing nature of the relationships. For example, Mr. Rosenberry testified that Ms. Kaitlynn

19

Couch, whom Union Home identified as a prospect and with whom Rosenberry closed a loan at APM, is a realtor he had been working with for about a decade (pre-dating his time at Union Home). (ECF No. 49, PageID # 903.) Under such circumstances, Union Home cannot show that it possesses legitimate, protectable interests. *See, e.g., Cretor Const. Equip. LLC*, 738 F.Supp. 3d at 964 (Court concluded that mere testimony that the former employee had met a few new customers, without evidence about the role his employment played in helping him develop those relationships, was "too thin a reed to support enforcement of a broad noncompetition provision.")

Union Home further lacks a legitimate protectable interest because it is contractually prohibited from soliciting the very customers whom it seeks to prevent Defendants from working with or soliciting. Indeed, once Union Home's loan officers close loans, it sells the mortgages on the secondary market to larger lenders. As part of its agreement with those lenders, Union Home agrees to not solicit the "Mortgagor" from refinancing the loan sold. (*See* Defs. Ex. U-1 – U-5.)

Moreover, through its restrictive covenants, Union Home seeks to protect publicly available information. Both Union Home and APM described software systems they utilize which pull publicly available data regarding mortgages. (Wright Testimony, ECF No. 49, PageID # 865; Nugent Testimony, ECF No. 50, PageID # 1167.) In fact, when Defendants started working for APM, the company utilized its software to generate new customer lists for Defendants through this publicly available information. (Nugent Testimony, *Id*. at PageID # 1167.) The fact that this information is publicly available, and Defendants developed customer lists through publicly available information at APM, further demonstrates the lack of a protectable interest concerning customer information on Union Home's part.[10] *See Arthur J. Gallagher & Co.*, 2016 U.S. Dist.

---

[10] The lack of a protectable interest in Union Home's customer information further is made apparent by its failure to take reasonable steps to protect that information. Such failure is apparent given the recent data breach and delay by Union Home in notifying customers.

LEXIS 116384, at *53 (Court agreed that "Gallagher's customer information was not a trade secret because much of the information is easily re-creatable from public sources on the internet or from customers themselves."); *Transtar Indus., LLC v. Lester*, No. 1:19cv1230, 2019 U.S. Dist. LEXIS 128001, at *17-18 (N.D. Ohio July 31, 2019) (Court found credible the defendants testimony that they "relied on TranzDepot's own system for tracking customer needs, prices, and inventory, rather than using information they obtained while working at Transtar.")

As demonstrated herein, the restrictive covenants are not enforceable in the first place given Union Home's lack of legitimate protectable interests.

### ii.     The Restrictive Covenants Are Not Otherwise Reasonable and Enforceable.

Plaintiff has cited to the Ohio Supreme Court's *Raimonde* factors for determining whether the restrictive covenants are reasonable and enforceable. (*See* Plaintiff's Memorandum, ECF No. 23, Page ID# 478-82). While Defendants do not dispute the *Raimonde* factors' general application, the factors show that the restrictive covenants are not reasonable and enforceable.

First, the temporal restrictions are greater than necessary to protect any legitimate business interests. As an initial matter, the restrictive covenants are anything but "limited" as the Agreements described. While Plaintiff undoubtedly will point to the restrictions' length from the dates of signing, the reality is that Plaintiff seeks to enforce the restrictions *post-employment*. When viewed in that manner, it is indisputable the agreements include a broad range of temporal restrictions. Those are:

| Defendant | Job Title | Noncompete Expiration | Post-Employment Duration |
|---|---|---|---|
| Mr. Ballew | Loan Officer Branch Manager | April 30, 2025 | 3 months |
| Mr. Tabora | Loan Officer | September 25, 2025 | 8.5 months |
| Mr. Webb | Branch Manager | November 8, 2025 | 9 months |
| Mr. Berryman | Area Sales Manager | November 30, 2025 | 10 months |
| Mr. Elias Gonzales | Branch Manager | December 31, 2025 | 11 months |
| Mr. Pedro Gonzalez | Branch Manager | December 31, 2025 | 11 months |
| Mr. Luu | Team Lead | October 2, 2026 | 20 months |
| Mr. Rosenberry | Branch Manager | September 30, 2026 | 20 months |

(Compl. Exs. A, C, D, E, F, G, H, I, and J; ECF Nos. 1-1, 1-3, 1-4, 1-5, 1-6, 1-7, 1-8, 1-9, and 1-10). Tellingly, the above demonstrates that the temporal restrictions are not tied to specific positions as, for example, the post-employment restrictions last: between three (3) and twenty (20) months for Branch Managers; and three (3) and eight and one-half (8.5) months for Loan Officers. If three months is all that is necessary to protect Union Home in the case of Mr. Ballew, then any restriction beyond three months for any other Defendant is greater than necessary to protect Union Home's legitimate business interests. As such, the temporal restrictions are greater than necessary to protect legitimate business interests.

With respect to the third *Raimonde* factor, Ohio courts find no protectable interest where the purported confidential information relates to former employees' pre-existing customers. For example, in *Cretor Constr. Equip. LLC v. Gibson,* the Court found that the former employee already had the customer information when he started working for the plaintiff. 738 F. Supp. 3d 950, 963 (S.D. Ohio 2024). "The evidence showed that [former employee] had been working with almost all the customers he serviced at [plaintiff] long before he arrived there." *Id.* Further, the Court noted that the former employee "must have had" contact information of "those customers with whom he had pre-existing relationships." *Id.* Thus, "[c]ustomer contact information and the jobs that [plaintiff] was pursuing" did not help the plaintiff. *Id.*

22

Here, Defendants developed their customer bases, referral sources, relationships, and networks during their years (between 4 and 27) of experience before joining Union Home. The Defendants also brought these relationships and their books of business with them to Union Home. For example, Mr. Ballew testified that "I opened the branch and brought over my customer list, my referral partners, my book of business." (ECF No. 50, PageID # 1066.) In fact, some Defendants testified that they did not grow, but rather, lost business while at Union Home. That included: Mr. Ballew (did not develop new referral partners, lost business); Mr. Webb (business suffered drastically); Mr. Tabora (lost referral partners and demoted to part-time); Mr. Luu (production dropped year over year at Union Home); and Mr. Berryman (lost a substantial chunk of business when referral source left over Union Home's actions). (ECF Nos. 49, 50, Page ID ## 980, 1005, 1069, 1070, 1120, 1147-1148.) Thus, and for the reasons further described in Section IV.B.i. above, Union Home lacks a protectable interest in much of the purported confidential information it seeks to protect. As such, this *Raimonde* factor likewise weighs against Union Home.

In considering the fourth *Raimonde* factor, the restrictive covenants here seek to eliminate ordinary, instead of unfair, competition. Indeed, if enforced, the restrictive covenants would prevent Defendants from working with pre-existing customers and referral sources that they self-sourced. In addition, Union Home itself cannot solicit some of the very customers it seeks to prohibit Defendants from soliciting. Thus, these restrictions would be unfair to the Defendants. This holds particularly true for Mr. Ballew given the lack of Union Home's presence in his area. Union Home had no branch in Staunton, VA before he joined and, since he left, has not sought to open a new branch or otherwise fill his position. (ECF No. 50, PageID # 1066.)

23

The restrictive covenants at issue further would improperly stifle Defendants' inherent skill and experience. As described previously, Defendants had between 4 and 27 years of experience before joining Union Home. During that time, they self-sourced and developed their own business. In fact, as evident by the chart below, Defendants spent more time, if not significantly more time, working in financial services than they did working for Union Home.

| Name | Industry Tenure Prior to Union Home | Tenure at Union Home |
|------|-------------------------------------|----------------------|
| Mr. Ballew | 6 years | 3.5 years |
| Mr. Berryman | 16 years | 3 years, 3 months |
| Mr. Gonzales | 18 years | 2.5 years |
| Mr. Gonzalez | 12 years | 2.5 years |
| Mr. Luu | 11 years | 6 years |
| Mr. Rosenberry | 13 years | 8.5 years |
| Mr. Tabora | 4 Years | 1.5 years |
| Mr. Webb | 27 Years | 1 year, 2 months |

(ECF Nos. 49, 50, PageID ## 1089, 978, 1024-1025, 1046, 926, 1145, 1120.)  Given the skills they developed before joining Union Home, the restrictive covenants impermissibly seek to stifle Defendants' inherent skills and experiences. *See Jacono v. Invacare Corp*., 2006-Ohio-1596, ¶29 (8th Dist.) (In finding restrictive covenant unenforceable, court found employee had developed certain skills prior to her employment). Indeed, Union Home provided Defendants no leads, call lists, or referral sources.

Moreover, the benefit to Union Home is disproportionate to the harm to the Defendants. Each Defendant testified to the significant harm they will suffer if enjoined:

- Mr. Ballew – a single father, responsible for child support, and an injunction would affect not only his income but also his custody and ability to see his children. (ECF No. 50, PageID # 1104.)

- Mr. Berryman –the primary earner, has a second mortgage, and has grandchildren that do not live locally that he would not be able to visit. (ECF No. 49, PageID # 983.)

- Mr. Gonzales – an injunction would be "catastrophic" as he is the sole earner and financially supports his elderly parents in Peru. (ECF No. 49 PageID # 1030.)

- Mr. Gonzalez –the sole earner and has two small children to provide for. (ECF No. 49, PageID # 1055.)

- Mr. Luu –will not be able to support his son with college tuition and expenses or cover his own living expenses if prohibited from pursuing his profession. (ECF No. 49, PageID #1008.)

- Mr. Rosenberry – a single father to three sons, two in college, who he supports, in addition to his normal financial responsibilities. (ECF No. 49, PageID # 947.)

- Mr. Tabora – married with two small children to support. (ECF 50, PageID # 1148.)

- Mr. Webb –the sole earner and supports his family as his wife has not been able to work since suffering a stroke in 2009. (ECF No. 50 PageID ## 1126-1127.)

The impact of an injunction on Defendants would last far beyond the 14 months (or more) that Plaintiff seeks. As multiple witnesses testified, it is a relationship business. Preventing Defendants from working with the relationships they've developed over their career would have the practical impact of forcing them to start over. (Ballew Testimony, ECF No. 50, PageID # 1081.) In other words, referral partners will find alternative loan officers to service their customers. Moreover, one must consider the fact that many, if not all, of the Defendants resigned in whole or in part due to Union Home's unethical and illegal practices. As such, allowing Union Home to engage in these practices while enforcing overbroad and unreasonable restrictive covenants only further demonstrates the disproportionate nature of the harm to the Defendants.

The proposed injunctions also would have the effect of barring Defendants' sole means of support. While some agreements are geographically limited to the counties within which they work, the counties are where the loan officers' entire business is based. If they cannot operate in those counties, they cannot operate in the United States. (*Id.* at PageID # 1079.)

Finally, Union Home utterly failed to demonstrate that Defendants' talents which it seeks to suppress were developed during Defendants' employment. Defendants self-sourced their own

business and received no leads, call lists, or referral sources from Union Home. Indeed, the record is utterly devoid of training or other resources that Union Home provided to help Defendants develop their talents during their employment. Some Defendants (Mr. Ballew, Mr. Webb, Mr. Berryman) even testified to losing business while at Union Home, and Mr. Tabora both lost referral partners and was demoted. Courts have found applicable restrictions unenforceable based upon far more evidence/allegations of a company's training/investment into employees. *See Total Quality Logistics, LLC v. Eda Logistics LLC*, No. 23-3713, 2024 U.S. App. LEXIS 25149, at *14 (6th Cir. Oct. 2, 2024) (Sixth Circuit upheld lower court's determination that the employer fell "short of providing by clear and convincing evidence it had 'provided . . . access to sufficient training or information to support'" to enforce scope of noncompete band).

For all these reasons, the restrictive covenants are not reasonable or enforceable and, as such, Union Home does not have a strong likelihood of success on the merits.

### C. Union Home Will Not Suffer Irreparable Harm in the Absence of a Preliminary Injunction.

Among the applicable factors, demonstrating irreparable injury is "a *sine qua non* for issuance of an injunction." *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002). To demonstrate irreparable injury, a plaintiff must show that it "will suffer 'actual and imminent' harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Moreover, "the possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray,* 415 U.S. 61, 90 (1974). Without an irreparable injury, there is "no need to grant relief now as opposed to at the end of the lawsuit." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).

As an initial matter, Union Home barely even attempted to introduce evidence that irreparable harm exists. During the preliminary injunction hearing itself, the word "irreparable" was not uttered once. (*See, generally*, Transcript, ECF Nos. 49 and 50.) Moreover, no Union Home witness even referenced goodwill, let alone attempted to claim the loss of goodwill with customers or referral sources. (*Id.*) Instead, Defendants testified they that have not attempted to harm the goodwill of Union Home. (*Id.* at PageID ## 942, 983, 1008, 1030, 1054, 1102, and 1150.) Union Home likely largely avoided this topic during the evidentiary hearing because it has not suffered, and will not suffer, irreparable harm.

Irreparable harm does not exist where the alleged damages are compensable through other means, and a "remedy of money damages is well suited to redress" the injury. *Brieger v. Telectronics, Inc.,* 816 F.2d 678, 1987 U.S. App. LEXIS 5101, at *3 (6th Cir. April 17, 1987); *see also, Economou v. Physicians Weight Loss Centers of America*, 756 F. Supp. 1024, 1039 (N.D. Ohio 1991) (Irreparable harm did not exist where the party failed to show that "any harm to the business would not be quantifiable in terms of money damages."). "[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007).

Here, it remains abundantly clear that money damages will redress Plaintiff's claimed injuries, and those money damages are not difficult to calculate. Indeed, the Court need look no further than the Declarations of Ms. Cribari and Mr. Clagg, submitted in support of Plaintiff's Response in Opposition to Defendants' Motion to Dismiss. (*See* ECF Nos. 21-1 and 21-2, PageID ## 444-51). In her declaration, Ms. Cribari calculated the "minimum floor of damages" for each Defendant, based upon an estimated lost profit of 2.5% and 2024 total loan volume. (ECF No. 21-

2, PageID # 450, at ¶5.) Those specific, calculable, estimated damages ranged between $72,377 and $944,987 per Defendant. (*Id.*) In his declaration, Mr. Clagg provides specific, calculable amounts of attorneys' fees which Union Home continues to seek as damages. (ECF No. 21-1, PageID # 445-448; Pl.'s Am. Compl., ECF No. 51, PageID # 1246, Fn.2.) At the hearing, Mr. Wright testified that 2.5% is a "very close average" of the profit Union Home makes on the sale of a loan. (ECF No. 49, PageID # 869-70.) In addition, in Exhibit Nos. 65 and 66, Union Home calculated the total amount of loans each Defendant had closed, or anticipated closing, at APM. (*See* Pl.'s Exhibits 65 and 66.) In other words, although Defendants dispute the amount of damages, Union Home can calculate its claimed damages based upon information in its possession or available during discovery.

Defendants presume Plaintiff will continue to claim it suffers irreparable harm based upon: interference with customer relationships; loss of customer goodwill; and misappropriation of confidential information. (*See* ECF No. 23, PageID # 484.) However, as noted previously, Union Home lacks a protectable interest in customer relationships as they relate to pre-existing relationships, Defendants' self-source their work, and much of the information is publicly available.  In addition, Plaintiff has presented no evidence of the loss of goodwill. Moreover, Plaintiff's representative, Mr. Wright, testified that he had no "testimony, proof, [or] documents" which proved the eight Defendants took confidential information. (*See* ECF No. 49, PageID # 96.) With the exception of Mr. Tabora and Mr. Berryman, that likely is because Defendants took nothing. (Transcript, ECF Nos. 49, 50, PageID ## 974, 1141.) To the extent Mr. Tabora and Mr. Berryman took any information, they did not use it to unfairly compete with Plaintiff. (ECF Nos. 49, 50, PageID # 982, 1142.) Thus, Plaintiff fails to sufficiently support these claimed damages for purposes of considering irreparable harm. *See Automation & Modular Components,*

*Inc. v. Blackford*, No. 23-cv-12420, 2023 U.S. Dist. LEXIS 198219, at *15 (E.D. Mich. Nov. 3, 2023) (The Company failed "to adequately support its claims of loss of customer goodwill, relying on a tenuous possibility of harm in the form of losing customers to Defendants.").

As a practical matter, all the Defendants left their employment with Union Home and began working with APM in January or February of 2025, nine months ago. Yet, after filing the complaint on February 17, Plaintiff waited approximately two and one-half months to file its Preliminary Injunction Motion on May 1. Notably, Plaintiff introduced no new facts or allegations regarding Defendants' activities during that timeframe. Instead, the only significant development between February 17 and May 1 was Defendants filing their Motion to Dismiss. Moreover, at this point, by the time briefing is concluded, nearly a year will have passed since the lawsuit's filing.

Thus, maintaining the status quo and Plaintiff's delay in filing undermine its claim of irreparable harm. *See Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 526 (6th Cir. 2017) ("A preliminary injunction is an extraordinary remedy reserved only for cases where it is necessary to preserve the status quo until trial."); *Vapor Technology Assn. v.* Taylor, No. 25-5137, 2025 U.S. App. LEXIS 8430, at *5 (6th Cir. Apr. 9, 2025) ("[A]ny such presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief."). Here, the "status quo" is Defendants continuing to work in good faith in the industry, and Plaintiff's "own delay casts serious doubt as to the urgency of the requested relief." *Laukus v. Rio Brands, Inc.*, No. 5:07CV2331, 2007 U.S. Dist. LEXIS 119239, at *22 (N.D. Ohio Aug. 7, 2007); *see also, Allied Erecting & Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.* 511 F. App'x 398, 405 (6th Cir. 2013) ("an unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm.").

Finally, any contractual provisions regarding irreparable harm do not negate Plaintiff's burden of proof. Indeed, as this very Court has held "[n]otwithstanding the parties' agreements, the law requires proof of harm, even where a contract states otherwise." *Cbiz, Inc. v. Cryan*, No. 1:24-cv-1027, 2024 U.S. Dist. LEXIS 240910, at *38 (N.D. Ohio Jul. 23, 2024).

Ultimately, Plaintiff has done nothing more than make unsubstantiated allegations that it will suffer irreparable harm absent injunctive relief. Such baseless and conclusory assertions simply are insufficient. *See Aero Fulfillment Servs., Inc. v. Tatar*, 2007-Ohio-174, ¶¶ 26 ("In an action for injunctive relief, where the threat of harm is speculative, the moving party must do more than make a conclusory allegation of the threat of harm. There must be evidence to support that allegation."). As such, and for all the reasons described herein, Plaintiff is unable to demonstrate that it will suffer irreparable harm in the absence of a preliminary injunction, and Plaintiff's motion should be denied on this basis alone.

**D.     An Injunction Would Cause Harm to Third Parties and Not Serve the Public Interest.**

In their analysis, courts "must consider whether the preliminary injunction would harm the party enjoined or others, and if so, whether such harm outweighs any irreparable harm established by the party seeking the injunction." *Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028, 1045 (N.D. Ohio 2003). "Where harm to others exists from an injunction, the party seeking the injunction must make an even stronger showing on the other factors to justify its issuance." *Id.* (*citing Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1270 (6th Cir. 1985)).

Third parties would be harmed by issuance of an injunction in this matter. While aimed at forcing Defendants out of work for a significant period, an injunction also would prohibit customers, prospective customers, and referral partners from working with Defendants. Mr. Wright testified that relationships are important in the mortgage industry. (ECF No. 49, PageID # 835.)

The Defendants all spent significant time and energy developing these relationships, primarily prior to their time at Union Home. These referral partners and past customers are often family members, high school friends, and community members with their respective loan officers. Thus, these third parties will be adversely impacted by a prohibition against working with their trusted friends and neighbors.

These facts weigh against the requested injunction. *See, e.g., SAS Institute, Inc. v. World Programming Ltd.*, 874 F.3d 370, 388 (4th Cir. 2017) ("Direct effects on innocent third parties have frequently grounded courts' denials of injunctions. This is especially so where the public interests weighing in favor of an injunction rely on broad, abstract rule of law concerns.") (collecting cases); *Cenveo Corp. v. Southern Graphic Systems, Inc.*, No. 08-5521, 2009 U.S. Dist. LEXIS 4542, at *11 (D. Minn. Jan. 22, 2009) (finding that "third-party clients[] would be most harmed by the injunctive relief" and it was unreasonable that the court "would be limiting those clients' right to work with a vendor of their choosing.").

Furthermore, given that Defendants acted in a good faith and professional manner, are not unfairly competing, and the restrictive covenants are unreasonable, enforcing the restrictive covenants would injure the public without protecting any legitimate interests of Plaintiff.

### E.    If a Preliminary Injunction is Issued, Bond Should Be Set at $2 Million.

Federal Rule of Civil Procedure 65(c) requires that, where a court issues a preliminary injunction, the movant "gives security in the amount that the court considers proper to pay the costs and damages sustained by any party to have been wrongfully enjoined or restrained." "Generally, the amount of bond in a non-compete/non-solicitation case should reflect 'the potential loss of salary reduced by the possibility of other employment opportunities in non-restricted areas and other mitigating factors.'" *Union Home Mtge. Corp. v. Fratelli*, No. 1:23-cv-857, 2025 U.S.

Dist. LEXIS 35673, at *61 (N.D. Ohio Feb. 27, 2025) (*citing Pitney Bowes Inc. v. Acevedo*, No. 08-21808, 2008 U.S. Dist. LEXIS 61194, at *17 (S.D. Fla. July 28, 2008)).

Here, the injunction Plaintiff seeks would impose significant harm on the individual Defendants. The shortest injunction Union Home seeks is fourteen (14) months. (Pl.'s Resp. in Opp'n to Defs.' Mot. to Dismiss, ECF No. 21, PageID # 8.) Thus, it is necessary to consider the loss of 14 months' salary for each of the eight Defendants. At the hearing, Mr. Wright testified that although he was not sure of each individual Defendants' 2024 compensation, the average was close to $250,000 per person. (ECF No. 40, PageID # 837.) Thus, over a 14-month span, each Defendant will suffer on average $291,666 in harm. Extrapolating this to all Defendants over a 14-month period equates to over $2.3 million in harm.[11] Therefore, Defendants estimate that a bond of $2 million would be appropriate should the Court issue an injunction in this case.

## V.   <u>CONCLUSION</u>

Union Home cannot meet its burden of proving any of the four elements necessary for a preliminary injunction. Given that failure to prove either the likelihood of success on the merits or irreparable harm are fatal to a motion, Defendants respectfully requests that this Court deny Union Home's motion.  A contrary decision would undermine the well-established principle that Ohio courts do not permit unnecessary and unreasonable restraints on trade.

---

[11] To arrive at this number, Defendants first calculated the monthly harm on average to each defendant which is $20,833. Defendants then applied that to eight Defendants (as Mr. Wright did not testify as to newly added Defendant Craig Franczak who is not calculated here but would only serve to increase the amount). The monthly amount then being $166,666, multiplied by the 14 months sought in the injunction.

Respectfully submitted,

*/s/ Michael P. O'Donnell*
Michael P. O'Donnell (0078390)
Andrew J. Cleves (0089680)
Lauri P. Hartmann (0105246)
acleves@frantward.com
FRANTZ WARD LLP
200 Public Square, Suite 3000
Cleveland, OH 44114
Telephone: (216) 515-1660
modonnell@frantzward.com
acleves@frantzward.com
lhartmann@frantzward.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

A copy of the foregoing was served via electronic mail on the following counsel for

Defendant on October 31, 2025:

Jason T. Clagg
Cody D. Woods
jason.clagg@btlaw.com
cwoods@btlaw.com

*Attorneys for Plaintiff*

*/s/ Michael P. O'Donnell*
*One of the Attorneys for Defendant*