# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNION HOME MORTGAGE CORP., | ) | Case No. 1:25-cv-00318 |
| | ) | |
| | ) | Judge J. Philip Calabrese |
| Plaintiff and | ) | |
| Counter-Defendant, | ) | Magistrate Judge |
| | ) | Jennifer Dowdell Armstrong |
| v. | ) | |
| | ) | |
| MICHAEL BALLEW, *et al.*, | ) | |
| | ) | |
| Defendants and | ) | |
| Counter-Claimants. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiff Union Home Mortgage Corporation provides prospective home buyers and homeowners with loans and other products for financing or refinancing residential home mortgages. After one of its regional sales managers left the company to work for a competitor, eight of Union Home Mortgage's employees resigned from the company to work for the same competitor. Union Home Mortgage seeks a preliminary injunction against these eight employees to prevent further alleged breaches of the provisions in their employment agreements and to protect its confidential, propriety, and trade secret information. Over two days, the Court held a preliminary injunction hearing. Then, the parties submitted post-hearing briefs. For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** the motion for a preliminary injunction.

### FINDINGS OF FACT

Over the course of the preliminary injunction hearing, the Court heard testimony from the following witnesses:  Alex Cribari, Brian Wright, Blain Rosenberry, Andy (Carl) Berryman, Hong (Bobby) Luu, Elias Gonzales, Pedro Gonzalez, Michael Ballew, Robert Webb, George Tabora, and Chuck Nugent. Further, the Court admitted Plaintiff's Exhibits 42–45, 47–51, 59, 62–71, 73–74, 77–79, and 83–84 and Defendants' Exhibits L, U-1, U-2, U-3, U-4, and U-5.  (ECF No. 48.)

Based on the record and the evidence adduced at the hearing on the motion for a preliminary injunction, the Court makes the following findings of fact for purposes of Plaintiff's motion for a preliminary injunction.  These facts are subject to change as the parties engage in further discovery.

### A.     Union Home Mortgage's Business

Plaintiff Union Home Mortgage provides prospective home buyers and homeowners refinance and mortgage loan products.  (ECF No. 1, ¶ 16, PageID #3; ECF No. 51, ¶ 19, PageID #1195–96.)  Union Home Mortgage hired Defendants Michael Ballew, Andy (Carl) Berryman, Elias Gonzales, Pedro Gonzalez, Hong (Bobby) Luu, Blain Rosenberry, George Tabora, and Robert Webb to work in various roles as branch managers, area sales managers, team leads, and loan officers.  (ECF No. 1, ¶¶ 29, 48, 67, 86, 124, 146, 168 & 190, PageID #5–31; ECF No. 51, ¶¶ 41, 60, 81, 101, 121, 141, 166 & 187, PageID #1198–1225.)  According to Union Home Mortgage, these positions constitute "the face of the company" and "cultivate much of the goodwill that the company has with its clients and referral sources" on which the

2

business relies.  (ECF No. 1, ¶¶ 18 & 20, PageID #3–4; ECF No. 51, ¶¶ 21 & 23, PageID #1196.)  Further, Union Home Mortgage "invests significant time, effort, and resources into recruiting, training, and retaining its staff."  (ECF No. 1, ¶ 17, PageID #3; ECF No. 51, ¶ 20, PageID #1196.)

Union Home Mortgage claims to have developed confidential, proprietary, and trade secret information regarding its mortgage services "through substantial time, effort, and resources."  (ECF No. 1, ¶ 19, Page ID #3; ECF No. 51, ¶ 22, PageID #1196.) These services include strategic plans for marketing and recruitment, sales data, training materials, and information pertaining to customers and referral sources, which it keeps private "solely for its business purposes."  (ECF No. 1, ¶ 19, Page ID #3; ECF No. 51, ¶ 22, PageID #1196.)  To protect this information, Union Home Mortgage employs physical and electronic security measures and requires its employees to sign agreements which contain restrictive covenants.  (ECF No. 1, ¶ 21, PageID #4; ECF No. 51, ¶ 24, PageID #1196–97.)

At the preliminary injunction hearing, Brian Wright, the vice president of retail sales for the east division of Union Home Mortgage, testified that employees are required to complete mandatory training regarding the "Union Home Mortgage Information and Cyber Security Policy."  (ECF No. 49, PageID #839–40.)  Pursuant to the policy, borrower information, information about prospects, and "[a]ny information pertaining to mortgage borrowers who have closed loans with the company" are considered confidential information.  (*Id.*, PageID #840–41.)  Further, Wright testified that Union Home Mortgage provides its employees with password-

3

protected computers and email addresses.  (*Id.*, PageID #841.)  He testified that customer information is stored on the company's loan origination software, Encompass, which is also password-protected.  (*Id.*, PageID #841–42.)  According to Wright, Defendants had access to all of the information regarding their customers, include bank accounts and personal information, as well as various meetings regarding what was happening internally at the company and best practices, such as product training and preparations of loans.  (*Id.*, PageID #842.)  Further, he testified that there was no publicly available system for uncovering the list of customers that an employee is working to get approved to close a loan, referred to as a "pipeline." (*Id.*, PageID #843.)

### B. Employment Agreements

Between August 2016 and November 2023, Union Home Mortgage hired Defendants to serve in various positions as branch managers, area sales managers, team leads, and loan officers in offices across several States.  (ECF No. 1, ¶¶ 28, 47, 66, 85, 123, 145, 167 & 189, PageID #5–31; ECF No. 23-1, ¶¶ 6–14, PageID #490–94; ECF No. 51, ¶¶ 39, 59, 80, 100, 120, 140, 165 & 186, PageID #1198–1225.)  Each Defendant entered into an employment agreement with Union Home Mortgage which contained, among other things, limited non-competition provisions.  (ECF No. 51-1; ECF No. 51-3; ECF No. 51-4; ECF No. 51-5; ECF No. 51-7; ECF No. 51-8; ECF No. 51-9; ECF No. 51-10.)

### B.1. Michael Ballew

### B.1.a. Mr. Ballew's Employment

At the preliminary injunction hearing, Mr. Ballew testified that he worked for Union Home Mortgage for about three years as a branch manager, where he originated loans. (ECF No. 50, PageID #1065.) Union Home Mortgage "had a footprint in [his] area when [he] opened the branch" in Virginia. (*Id.*, PageID #1066.) Mr. Ballew "opened the branch and brought over [his] customer list, [his] referral partners, [and his] book of business." (*Id.*) Then, when Mr. Ballew left, he maintained that Union Home Mortgage had not attempted to "open a branch there or fill that position behind [him]." (*Id.*)

While he was employed at Union Home Mortgage, Mr. Ballew had direct contact with customers, prospects, and referral sources. (*Id.*, PageID #1069.) However, he did not develop those relationships at Union Home Mortgage, but claimed instead that he lost business while he worked there. (*Id.*, PageID #1069–70.) Mr. Ballew spent roughly nine and a half years in the mortgage industry, the last three at Union Home Mortgage. (*Id.*, PageID #1105.)

Mr. Ballew started his career at Union Home Mortgage as a branch manager in Fredericksburg, Virginia, then went to Staunton, Virginia, and finally Roanoke, Virginia. (*Id.*, PageID #1075–76.) He clarified that he "was not actually in Fredericksburg," but that it "was the office that [he] fell under until [his] branch office became licensed." (*Id.*, PageID #1075.) Then, Union Home Mortgage "rolled [him] under Roanoke just to be close" because they had sold their office space, which "coincided with the expiration of their lease." (*Id.*, PageID #1076.) In Roanoke, he

5

"didn't manage anyone there" and "did [not do] any business down there."  (*Id.*)  An organizational chart lists Mr. Ballew as the branch manager of the Roanoke office. (ECF No. 51-2, PageID #1254.)

### C.1.b. Mr. Ballew's Non-Compete

Mr. Ballew signed his employment agreement on June 20, 2023.  (ECF No. 51-1, PageID #1251.)  The non-competition provision in Mr. Ballew's agreement prevents him from "acting in the same or similar capacity in which [he] worked for the Company" on behalf of "any entity that competes with the Company in the home mortgage banking or brokering business" in "any state in which [he] is legally able to originate or broker mortgages and ha[d] done so on behalf of the Company in the thirty-six (36) months preceding the termination of [his] employment with the Company" until April 30, 2025.  (ECF No. 51-1, ¶ 3, PageID #1249.)  Because Mr. Ballew resigned on January 31, 2025 (ECF No. 1, ¶ 42, PageID #7; ECF No. 51, ¶ 54, PageID #1201), these terms restrict him from working in a similar capacity for any competing home mortgage banking or brokering business in any State in which he had brokered loans on behalf of Union Home Mortgage in the preceding three years for roughly three months.  Mr. Ballew testified that he is a single father who pays child support to his ex-wife and that a preliminary injunction could adversely impact his child custody and income.  (ECF No. 50, PageID #1104.)

### B.2.   Carl Berryman

### B.2.a. Mr. Berryman's Employment

At the preliminary injunction hearing, Mr. Berryman testified that he started at Union Home Mortgage on November 1, 2021 as a loan officer in Hanover,

Pennsylvania.  (ECF No. 49, PageID #954.)  Initially, he worked out of the Chambersburg office "until they got the Hanover branch running."  (*Id.*, PageID #955.)  Mr. Berryman became the sales manager at the Hanover office and served in that role until his departure in January 2025.  (*Id.*)  An organizational chart lists Mr. Berryman as the area sales manager of the Hanover office.  (ECF No. 51-2, PageID #1254.)  Of the almost 20 years that he worked in the mortgage business, Mr. Berryman spent roughly three and a half years at Union Home Mortgage.  (ECF No. 49, PageID #986.)

Mr. Berryman testified that, in both of his positions at Union Home Mortgage, he originated loans and had direct contact with customers, prospects, and referral sources, some of whom he had not met before.  (*Id.*, PageID #956–57.)  He sourced all of his business while he was employed with Union Home Mortgage.  (*Id.*, PageID #979.)  Further, Mr. Berryman testified that he developed no new referral sources while at Union Home Mortgage and lost business during his employment.  (*Id.*, PageID #986–87.)

### B.2.b. Mr. Berryman's Non-Compete

Mr. Berryman signed his employment agreement on October 14, 2024.  (ECF No. 51-3, PageID #1259.)  Its non-competition provision prevents him from "acting in the same or similar capacity in which [he] worked for the Company" on behalf of "any entity that competes with the Company in the home mortgage banking or brokering business" in "any state in which [he] is legally able to originate or broker mortgages and ha[d] done so on behalf of the Company in the thirty-six (36) months preceding the termination of [his] employment with the Company" until November 30, 2025.

(ECF No. 51-3, ¶ 3, PageID #1256.)  Because Mr. Berryman resigned on January 31, 2025 (ECF No. 1, ¶ 61, PageID #10; ECF No. 51, ¶ 74, PageID #1204), this provision restricts him from working in a similar capacity for any competing home mortgage banking or brokering business in any State in which he had brokered loans on behalf of Union Home Mortgage in the preceding three years for roughly 10 months. Mr. Berryman testified that, should a preliminary injunction be enforced, it will adversely affect his ability to pay his second mortgage and a lot of bills, as well as to afford to travel to Florida to see his granddaughters.  (ECF No. 49, PageID #983.)

### B.3.    Elias Gonzales

### B.3.a. Mr. Gonzales's Employment

Mr. Gonzales started working for Union Home Mortgage in July 2022 as a loan officer in its branch in Rockville, Maryland.  (ECF No. 49, PageID #1015.)  Originally, he was hired as a branch manager for the Bethesda office, but he stayed as a loan officer at the Rockville branch "until they got the office set up."  (*Id.*, PageID #1015.) Of the almost 20 years that Mr. Gonzales worked in the mortgage business, he worked for Union Home Mortgage for roughly two and a half years.  (*Id.*, PageID #1012.)  In his later role as a branch manager, he originated loans.  (*Id.*, PageID #1012–13.)  An organizational chart lists Mr. Gonzales as the branch manager of the Bethesda office. (ECF No. 51-2, PageID #1254.)

While employed at Union Home Mortgage, Mr. Gonzales had direct contact with customers, prospective customers, and referral sources.  (ECF No. 49, PageID #1014.)  Although he developed some of his referral sources while he was at Union Home Mortgage, Mr. Gonzales brought many referrals from his previous business.

(*Id.*)  Mr. Gonzales generated most of his leads and referral sources in the roughly 18 years that preceded his time at Union Home Mortgage.  (*Id.*, PageID #1025.)

### B.3.b. Mr. Gonzales's Non-Compete

Mr. Gonzales signed his employment agreement on July 1, 2024.  (ECF No. 51-4, PageID #1265.)  Its non-competition provision prevents him from being "employed as an employee" of a "business operating or competing with the Company in the residential mortgage banking industry" or a "vendor to the Company, in the same or similar capacity as [he was] employed with the Company," to be enforced "throughout the United States, including, but not limited to any state in which the Company does business or within 100 miles of any of the Company's offices," until December 31, 2025.  (ECF No. 51-4, ¶ 3, PageID #1263.)  Because Mr. Gonzales resigned on January 31, 2025 (ECF No. 1, ¶ 80, PageID #13; ECF No. 51, ¶ 95, PageID #1207), this provision restricts him from working in a similar capacity for any competing home mortgage banking or brokering business in the United States for roughly eleven months.  Mr. Gonzales testified that he is the only earner in his household and supports his elderly parents in Peru, so a preliminary injunction would be a "catastrophe" for him and his family.  (ECF No. 49, PageID #1030.)

### B.4.    Pedro Gonzalez

### B.4.a. Mr. Gonzalez's Employment

Mr. Gonzalez worked for Union Home Mortgage for roughly two and a half years, starting in August 2022, as a loan officer and branch manager at the Rockville, Maryland office, and later as a sales team lead and branch manager at the Bethesda, Maryland office.  (ECF No. 49, PageID #1034–35 & #1038.)  In those roles,

Mr. Gonzalez originated loans for Union Home Mortgage.  (*Id.*, PageID #1035.)  An organizational chart lists Mr. Gonzalez as the branch manager of the Bethesda office. (ECF No. 51-2, PageID #1254.)  He spent a total of about fourteen years in the mortgage business.  (ECF No. 49, PageID #1046.)

Mr. Gonzalez had direct contact with customers, prospects, and referral sources and developed new relationships.  (*Id.*, PageID #1037–38.)  According to Mr. Gonzalez, he had worked in the mortgage business for 14 years, spending roughly two and a half years at Union Home Mortgage.  (*Id.*, PageID #1046.)  Generally, he developed his business relationships before his time at Union Home Mortgage.  (*Id.*, PageID #1046–47.)

### B.4.b. Mr. Gonzalez's Non-Compete

Mr. Gonzalez signed his employment agreement on July 1, 2024.  (ECF No. 51-5, PageID #1273.)  The non-competition provision in Mr. Gonzalez's agreement prevents him from being "employed as an employee" of a "business operating or competing with the Company in the residential mortgage banking industry" or a "vendor to the Company, in the same or similar capacity as [he was] employed with the Company," to be enforced "throughout the United States, including, but not limited to any state in which the Company does business or within 100 miles of any of the Company's offices," until December 31, 2025.  (ECF No. 51-5, ¶ 3, PageID #1270.)  Because Mr. Gonzalez resigned on January 31, 2025 (ECF No. 1, ¶ 99, PageID #16; ECF No. 51, ¶ 115, PageID #1211), this provision restricts him from working in a similar capacity for any competing home mortgage banking or brokering business in the United States for roughly eleven months.  Mr. Gonzalez testified that

a preliminary injunction would adversely affect his family because he is the sole earner with two young children and his job "is all [he] know[s] how to do."  (ECF No. 49, PageID #1055.)

### B.5.    Bobby Luu

### B.5.a. Mr. Luu's Employment

Mr. Luu testified that he was employed with Union Home Mortgage for roughly six and a half years as a brand sales team lead starting in October 2018 as a branch manager in Fairfax, Virginia.  (ECF No. 49, PageID #989–92.)  Then, he worked as a branch manager and sales team lead in Vienna, Virginia.  (*Id.*, PageID #992.)  In all three of these positions, Mr. Luu originated loans for Union Home Mortgage.  (*Id.*, PageID #992–93.)  An organizational chart lists Mr. Luu as the sales team lead of the Vienna office.  (ECF No. 51-2, PageID #1254.)  He worked in the mortgage industry for about 11 years.  (ECF No. 49, PageID #1001.)

Mr. Luu had direct contact with customers, prospects, and referral sources during his employment with Union Home Mortgage and developed new relationships and improved old relationships during his time there.  (*Id.*, PageID #993.)  Further, he spent eleven years in the mortgage industry and developed some of his client relationships both before and during his employment with Union Home Mortgage, but the majority came before his employment with Union Home Mortgage.  (*Id.*, PageID #1001–02.)

### B.5.b. Mr. Luu's Non-Compete

Mr. Luu signed his employment agreement on December 2, 2024.  (ECF No. 51-7, PageID #1286.)  The non-competition provision prevents him from "acting in the

same or similar capacity in which [he] worked for the Company" on behalf of "any entity that competes with the Company in the home mortgage banking or brokering business" in "any state in which [he] is legally able to originate or broker mortgages and ha[d] done so on behalf of the Company in the thirty-six (36) months preceding the termination of [his] employment with the Company or 100 miles within the office to which [he was] assigned during [his] employment with Company" until October 2, 2026.  (ECF No. 51-7, ¶ 6, PageID #1284.)  Because Mr. Luu resigned on February 3, 2025 (ECF No. 1, ¶ 138, PageID #23; ECF No. 51, ¶ 135, PageID #1214), this provision restricts him from working in a similar capacity for any competing home mortgage banking or brokering business in any State in which he had brokered loans on behalf of Union Home Mortgage in the preceding three years or 100 miles within the office to which he was assigned for roughly a year and eight months.  Mr. Luu testified that a preliminary injunction would prevent him from being able to pay his mortgage or help his son with college tuition.  (ECF No. 49, PageID #1008.)

### B.6.    Blain Rosenberry

### B.6.a. Mr. Rosenberry's Employment

Starting in August 2016, Mr. Rosenberry worked at Union Home Mortgage for roughly eight and a half years as a loan officer and branch manager, working out of York, Pennsylvania and eventually Chambersburg, Pennsylvania.  (ECF No. 49, PageID #883–84 & #890.)  He spent over 21 years in the mortgage industry.  (*Id.*, PageID #885.)  An organizational chart lists Mr. Rosenberry as the branch manager of the Chambersburg office.  (ECF No. 51-2, PageID #1254.)

Mr. Rosenberry had direct contact with customers, prospective customers, and referral sources and developed business relationships during his employment.  (ECF No. 49, PageID #887.)  He claims that Union Home Mortgage "did nothing" to help him develop relationships, and it "was solely [his] development."  (*Id.*, PageID #925.)  Of the 21 years he had spent in the mortgage industry, Mr. Rosenberry spent roughly eight and a half at Union Home Mortgage.  (*Id.*, PageID #925–26.)  He claimed that the majority of his business relationships were developed before he went to Union Home Mortgage.  (*Id.*, PageID #926.)

### C.6.b. Mr. Rosenberry's Non-Compete

Mr. Rosenberry signed his employment agreement on October 1, 2024.  (ECF No. 51-8, PageID #1292.)  Its non-competition provision prevents him from "acting in the same or similar capacity in which [he] worked for the Company" on behalf of "any entity that competes with the Company in the home mortgage banking or brokering business" in "any state in which [he] is legally able to originate or broker mortgages and ha[d] done so on behalf of the Company in the thirty-six (36) months preceding the termination of [his] employment with the Company or 100 miles within the office to which [he was] assigned during [his] employment with Company" until September 30, 2026.  (ECF No. 51-8, ¶ 6, PageID #1290.)  Because Mr. Rosenberry resigned on January 31, 2025 (ECF No. 1, ¶ 160, PageID #26; ECF No. 51, ¶ 158, PageID #1218), this provision restricts him from working in a similar capacity for any competing home mortgage banking or brokering business in any State in which he had brokered loans on behalf of Union Home Mortgage in the preceding three years or 100 miles within the office to which he was assigned for roughly a year and eight months.

13

Mr. Rosenberry testified that he was a single father with three sons and that a preliminary injunction would adversely affect him because "[i]t's all [he's] ever done." (ECF No. 49, PageID #947.)

### B.7. George Tabora

### B.7.a. Mr. Tabora's Employment

Starting in September 2023, Mr. Tabora worked at Union Home Mortgage for roughly a year and a half as a loan officer at the Bethesda, Maryland branch. (ECF No. 50, PageID #1129 & #1133.) He spent five years in the mortgage business. (*Id.*, PageID #1145.) An organizational chart lists Mr. Tabora as a loan officer at this branch. (ECF No. 51-2, PageID #1254.)

During his employment with Union Home Mortgage, Mr. Tabora had direct contact with customers, prospective customers, and referral sources. (ECF No. 50, PageID #1131.) Although he claimed to have developed new customers during his employment, Mr. Tabora alleged that his referral sources came from business relationships predating his employment with Union Home Mortgage. (*Id.*, PageID #1131–32.) Mr. Tabora worked in the mortgage industry for three years before coming to Union Home Mortgage. (*Id.*, PageID #1150.)

### B.7.b. Mr. Tabora's Non-Compete

Mr. Tabora signed his employment agreement on September 25, 2023. (ECF No. 51-9, PageID #1297.) The non-competition provision prevents him from "acting in the same or similar capacity in which [he] worked for the Company" on behalf of "any entity that competes with the Company in the home mortgage banking or brokering business" in "any state in which [he] is legally able to originate or broker

mortgages and ha[d] done so on behalf of the Company in the thirty-six (36) months preceding the termination of [his] employment with the Company" until September 25, 2025. (ECF No. 51-9, ¶ 6, PageID #1295.) Because Mr. Tabora resigned on January 9, 2025 (ECF No. 1, ¶ 182, PageID #30; ECF No. 51, ¶ 180, PageID #1222), this provision restricts him from working in a similar capacity for any competing home mortgage banking or brokering business in any State in which he had brokered loans on behalf of Union Home Mortgage in the preceding three years for roughly eight months and two weeks. Mr. Tabora testified that he is married with two sons to support. (ECF No. 50, PageID #1148.)

### B.8. Robert Webb

### B.8.a. Mr. Webb's Employment

Mr. Webb worked at Union Home Mortgage for roughly 14 months as a branch manager and loan officer. (ECF No. 50, PageID #1110.) In these roles, he originated loans. (*Id.*, PageID #1111.) Originally, Mr. Webb served as the branch manager at the Belmont, North Carolina office, but he was not physically there, then he was assigned to the Shelby, North Carolina branch. (*Id.*, PageID #1113–14.) He spent over 28 years in the mortgage industry. (*Id.*, PageID #1120.)

During his employment with Union Home Mortgage, Mr. Webb had direct contact with customers, prospects, and referral sources. (*Id.*, PageID #1112.) He brought business relationships to Union Home Mortgage that he established before his employment. (*Id.*) Of the 28 years that he spent in the mortgage industry, Mr. Webb spent 14 months at Union Home Mortgage. (*Id.*, PageID #1120.)

15

### B.8.b. Mr. Webb's Non-Compete

Mr. Webb signed his employment agreement on November 8, 2023.  (ECF No. 51-10, PageID #1302.)  Its non-competition provision prevents him from "acting in the same or similar capacity in which [he] worked for the Company" on behalf of "any entity that competes with the Company in the home mortgage banking or brokering business" in "any state in which [he] is legally able to originate or broker mortgages and ha[d] done so on behalf of the Company in the thirty-six (36) months preceding the termination of [his] employment with the Company" until November 8, 2025.  (ECF No. 51-10, ¶ 6, PageID #1300.)  Because Mr. Webb resigned on January 31, 2025 (ECF No. 1, ¶ 204, PageID #34; ECF No. 51, ¶ 200, PageID #1225), this provision restricts him from working in a similar capacity for any competing home mortgage banking or brokering business in any State in which he had brokered loans on behalf of Union Home Mortgage in the preceding three years for roughly nine months and one week.  He testified that, if he was enjoined, it "would be catastrophic" because he takes care of his wife who had a stroke and cannot work.  (ECF No. 50, PageID #1126–27.)

## C.    Other Contractual Provisions

### C.1.    Non-Solicitation of Customers

In their separate agreements, Defendants agreed to provisions that restrict them from direct and indirect solicitation of customers for the same length of time as their non-compete plus an additional two years.  (ECF No. 51-1, ¶ 4, PageID #1249; ECF No. 51-3, ¶ 4, PageID #1256; ECF No. 51-4, ¶ 4, PageID #1263; ECF No. 51-5,

16

¶ 4, PageID #1270; No. 51-7, ¶ 7, PageID #1284; ECF No. 51-8, ¶ 7, PageID #1290;
ECF No. 51-9, ¶ 7, PageID #1295; ECF No. 51-10, ¶ 7, PageID #1300.)

For Mr. Ballew, Mr. Berryman, Mr. Tabora, and Mr. Webb, these provisions
further restrict them from acceptance of competitive business from any customer or
prospective customer of Union Home Mortgage in the thirty-six months preceding
their termination with the company (1) "with whom [the Defendant] had contact" or
(2) "about whom [the Defendant] obtained or had access to Confidential Information."
(ECF No. 51-1, ¶ 4, PageID #1249; ECF No. 51-3, ¶ 4, PageID #1256; ECF No. 51-9,
¶ 7, PageID #1295; ECF No. 51-10, ¶ 7, PageID #1300.)

For Mr. Gonzales, Mr. Gonzalez, Mr. Luu, and Mr. Rosenberry, these
provisions further restrict them from accepting business from borrowers (1) "with
whom [the Defendant] has taken a mortgage loan application while employed at
UHM" or (2) "whose mortgage loan is serviced by the Company." (ECF No. 51-4, ¶ 4,
PageID #1263; ECF No. 51-5, ¶ 4, PageID #1270; ECF No. 51-7, ¶ 7, PageID #1284;
ECF No. 51-8, ¶ 7, PageID #1290.)

### C.2.    Non-Solicitation of Employees

Defendants agreed to provisions forbidding the solicitation of employees of
Union Home Mortgage for the same length of time as their non-compete plus two
additional years for all but Mr. Tabora and Mr. Webb, for whom this restriction runs
for one additional year. (ECF No. 51-1, ¶ 5, PageID #1249; ECF No. 51-3, ¶ 6, PageID
#1257; ECF No. 51-4, ¶ 5, PageID #1263; ECF No. 51-5, ¶ 5, PageID #1270; ECF
No. 51-7, ¶ 8, PageID #1284; ECF No. 51-8, ¶ 8, PageID #1290; ECF No. 51-9, ¶ 9,
PageID #1295; ECF No. 51-10, ¶ 8, PageID #1300.)

Additionally, Mr. Berryman and Mr. Tabora agreed to not solicit referral sources, restricting them from direct or indirect solicitation or acceptance of competitive business from any referral source of Union Home Mortgage who referred a customer to them and closed a loan in the twelve months preceding their termination with the company for the same length of time as their non-compete period.  (ECF No. 51-3, ¶ 5, PageID #1256; ECF No. 51-9, ¶ 8, PageID #1295.)

### C.3.  Legitimate Interests

All Defendants agreed to a provision acknowledging the protection of Union Home Mortgage's legitimate interests and their ability to earn a livelihood.  (*See, e.g.*, ECF No. 51-1, ¶ 2, PageID #1249.)  These provisions state that, during the course of their employment, employees "are introduced to, given the opportunity to develop personal contacts with, and actually develop an advantageous familiarity with the Company's customers, prospective customers, and referral sources."  (*Id.*)  They characterize this information as "confidential or 'trade secret' information" that, if made available to Union Home Mortgage's competitors, "would provide a competitor with an unfair competitive advantage and likely result in a loss of business or competitive position" for Union Home Mortgage and harm the company's goodwill and "investment in developing and maintaining its business relationships.  (*Id.*)

These provisions concluded that "[t]he parties expressly agree that the terms of this Agreement are reasonable, enforceable, and necessary to protect the Company's interests and will not prevent Employee ability from earning a livelihood." (ECF No. 51-1, ¶ 2, PageID #1249; ECF No. 51-3, ¶ 2, PageID #1256; ECF No. 51-4, ¶ 2, PageID #1263; ECF No. 51-5, ¶ 2, PageID #1270; ECF No. 51-7, ¶ 2, PageID

18

#1283; ECF No. 51-8, ¶ 2, PageID #1289; ECF No. 51-9, ¶ 2, PageID #1294; ECF

No. 51-10, ¶ 2, PageID #1299.)

### C.4. Extension and Judicial Modification

All Defendants agreed that their employment agreements automatically

extend for one year if violated:

> In the event Employee violates any covenant in this Agreement, the
> term of all covenants contained herein shall automatically be extended
> for a period of one (1) year after the later of (a) the date on which
> Employee ceases such violation; or (b) the date of the entry of a court
> order enforcing such covenant. Further the parties desire that the
> covenants contained herein be enforced to their full extent.

(*See, e.g.*, ECF No. 51-1, ¶ 8, PageID #1250.)

Also, the provision included language that a court may modify a covenant if it

determines that a provision is "overly broad or otherwise unenforceable as written":

> However, in the event a court of competent jurisdiction determines such
> a covenant to be overly broad or otherwise unenforceable as written, the
> parties respectfully request that the restriction be enforced to the
> maximum extent permitted by law, and Employee hereby consents and
> agrees that the scope of such covenant may be judicially modified.

(ECF No. 51-1, ¶ 8, PageID #1250; ECF No. 51-3, ¶ 10, PageID #1257; ECF No. 51-4,

¶ 8, PageID #1264; ECF No. 51-5, ¶ 8, PageID #1271; ECF No. 51-7, ¶ 11, PageID

#1284; ECF No. 51-8, ¶ 11, PageID #1290; ECF No. 51-9, ¶ 13, PageID #1296; ECF

No. 51-10, ¶ 12, PageID #1301.)

### C.5. Remedies

All Defendants agreed that a violation of the employment agreements will

cause irreparable harm and consented to the issuance of a "restraining order and/or

injunction." (*See, e.g.*, ECF No. 51-1, ¶ 13, PageID #1250–51.) Further, the provision

represented that (1) the employee is liable for any attorneys' fees expenses, (2) Union

Home Mortgage does not waive any right by a failure or delay to exercise it, and (3)

the remedies are cumulative and not exclusive of other remedies.  (ECF No. 51-1,

¶ 13, PageID #1250–51; ECF No. 51-3, ¶ 15, PageID #1258; ECF No. 51-4, ¶ 13,

PageID #1264–65; ECF No. 51-5, ¶ 13, PageID #1271–72; ECF No. 51-7, ¶ 16, PageID

#1285; ECF No. 51-8, ¶ 16, PageID #1291; ECF No. 51-9, ¶ 18, PageID #1296–97;

ECF No. 51-10, ¶ 17, PageID #1301.)

### C.6.   Confidential Information

Defendants agreed to provisions restricting them from disclosure of any

confidential information to a third party and defined confidential information

broadly:

> Confidential or proprietary information or trade secrets of the Company,
> including, but not limited to, written or electronic information:  (i)
> disclosed to Employee or known by Employee as a result of his or her
> employment, (ii) which is not generally known, and (iii) which relates to
> or concerns the Company's business, technology, information systems,
> computer programs, software, customers, prospective customers,
> referral sources, pipelines, customer relationship management
> databases, suppliers, vendors, sales, marketing or finances.
> Confidential Information shall also include all information and matters
> specifically designated as proprietary and/or confidential by the
> Company's customers, referral sources, or other business partners.

(ECF No. 51-1, ¶ 6, PageID #1249–50; ECF No. 51-3, ¶ 8, PageID #1257; ECF

No. 51-4, ¶ 6, PageID #1263; ECF No. 51-5, ¶ 6, PageID #1270; ECF No. 51-7, ¶ 9,

PageID #1284; ECF No. 51-8, ¶ 9, PageID #1290; ECF No. 51-9, ¶ 11, PageID #1295–

96; ECF No. 51-10, ¶ 10, PageID #1300.)

### C.7.    Alleged Breach

Defendants agreed to provisions that "any claim or cause of action by Employee against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of the covenants in this Agreement."  (ECF No. 51-1, ¶ 12, PageID #1250; ECF No. 51-3, ¶ 14, PageID #1258; ECF No. 51-4, ¶ 12, PageID #1264; ECF No. 51-5, ¶ 12, PageID #1271; ECF No. 51-7, ¶ 15, PageID #1285; ECF No. 51-8, ¶ 15, PageID #1291; ECF No. 51-9, ¶ 17, PageID #1296; ECF No. 51-10, ¶ 16, PageID #1301.)

### C.8.    Choice of Law

Finally, all of the employment agreements contain a choice of law clause providing that Ohio law governs the agreements and a venue provision that any "claims arising under this Agreement . . . shall be filed in a state or federal court in Ohio."  (ECF No. 51-1, ¶ 14, PageID #1251; ECF No. 51-3, ¶ 16, PageID #1258; ECF No. 51-4, ¶ 14, PageID #1265; ECF No. 51-5, ¶ 14, PageID #1272; ECF No. 51-7, ¶ 17, PageID #1285; ECF No. 51-8, ¶ 17, PageID #1291; ECF No. 51-9, ¶ 19, PageID #1297; ECF No. 51-10, ¶ 18, PageID #1301–02.)

### D.    The Events Leading to This Litigation

With the exception of Mr. Webb, each Defendant worked as part of a team led by Craig Franczak, a former Union Home Mortgage regional manager who allegedly "had detailed and confidential information regarding their Agreements, their performance, and their client and referral source relationships."  (ECF No. 1-2, PageID #48; ECF No. 23-1, ¶ 3, PageID #489–90; ECF No. 51-2, PageID #1254.)

21

Mr. Franczak had his own employment agreement with Union Home Mortgage subject to non-competition and non-solicitation provisions.  (ECF No. 51-11.)

### D.1.    The Resignations

On January 2, 2025, Mr. Franczak abruptly resigned from Union Home Mortgage and immediately joined American Pacific Mortgage Corporation, a direct competitor to Union Home Mortgage, as a regional sales manager.  (ECF No. 1, ¶¶ 23–24, PageID #4; ECF No. 23-1, ¶ 3, PageID #489–90; ECF No. 51, ¶¶ 32–33, PageID #1197.)  Union Home Mortgage sent Mr. Franczak a letter reminding him of his contractual obligations not to solicit its employees.  (ECF No. 51-12.)

On January 9, 2025, Mr. Tabora resigned from Union Home Mortgage.  (ECF No. 1, ¶ 182, PageID #30; ECF No. 51, ¶ 180, PageID #1222.)  Then, on January 31, 2025, Mr. Ballew, Mr. Berryman, Mr. Gonzales, Mr. Gonzalez, Mr. Rosenberry, and Mr. Webb resigned.  (ECF No. 1, ¶¶ 42, 61, 80, 99, 160, 182, 204, PageID #7–34; ECF No. 51, ¶¶ 54, 74, 95, 115, 158, 180, 200, PageID #1201–25.)  On February 3, 2025, Mr. Luu resigned.  (ECF No. 1, ¶ 138, PageID #23; ECF No. 51, ¶ 135, PageID #1214.)  All of these Defendants resigned prior to the expiration of their non-compete dates.  (ECF No. 51-1; ECF No. 51-3; ECF No. 51-4; ECF No. 51-5; ECF No. 51-7; ECF No. 51-8; ECF No. 51-9; ECF No. 51-10.)

At the preliminary injunction hearing, Defendants articulated a variety of reasons why they resigned from Union Home Mortgage, including the limitation of bond programs for low-income customers, limiting their ability to sell mortgages in their communities, improper payments under their profit and loss payment plans, loss of loans and business, mistreatment of Vietnamese employees, encouragement

22

to falsify the sources of leads, violations of loan officer compensation rules, and procedural barriers to closing loans.  (ECF No. 49, PageID #930–40, #979–81, #1003–07, #1025–28, #1048–52; ECF No. 50, PageID #1090–1100, #1122–23, #1146–47.)

According to Kevin Caruana, the vice president for retail production at American Pacific, he learned that Defendants resigned in part because they "believed that UHM actively engaged in compensation practices that were both unlawful and denied them compensation that they were owed pursuant to their employment agreements with UHM."  (ECF No. 27-1, ¶ 6, PageID #588.)  Further, Mr. Caruana claims that he "learned that UHM required originators to pay for loan price concessions by reducing their own commissions on the loans, and that UHM conceals this practice by directing the originators to improperly designate the loans as 'direct-to-consumer' loans," which he alleges violated federal law.  (*Id.*)

According to Mr. Caruana, he "verified that all Defendants that had outstanding unvested bonuses have repaid the portion of those bonuses that had not vested."  (*Id.*, ¶ 7, PageID #588–89.)  Also, Mr. Caruana testified that Defendants turned down opportunities to speak with other Union Home Mortgage employees who wanted to join American Pacific and asked American Pacific to accept outstanding Union Home Mortgage office leases and "purchase all office equipment and furniture utilized by Defendants in their former UHM offices."  (*Id.*, ¶¶ 8–9, PageID #589.)

### D.2.   Employment with American Pacific

According to Union Home Mortgage, Defendants began competing against it on behalf of American Pacific, despite their non-competes.  (ECF No. 1, ¶¶ 43, 62, 81,

100, 141, 163, 185 & 207, PageID #7–34; ECF No. 51, ¶¶ 55, 75, 96, 116, 136, 160, 181 & 201, PageID #1201–25.)  Based on the Nationwide Multistate Licensing System and Registry, Union Home Mortgage represents that Defendants attached their licenses to American Pacific, in several instances in the same jurisdiction where they worked for Union Home Mortgage.  (ECF No. 23-1, ¶¶ 4–9, 11–14, PageID #490–94.) In some instances, American Pacific agreed to take over certain office leases and purchased furniture from Union Home Mortgage in the Shelby, North Carolina branch, the Hanover and Chambersburg, Pennsylvania branches, and the Bethesda, Maryland branch.  (ECF No. 49, PageID #940 & #1028; ECF No. 50, PageID #1124.) Union Home Mortgage claims that several of the Defendants promote themselves on social media as American Pacific employees and are listed on its website.  (ECF No. 23-1, ¶¶ 15–16, PageID #494–95.)  Defendants testified that American Pacific asked them to leave their customer lists with Union Home Mortgage.  (ECF No. 50, PageID #1166–67.)

### D.3.   Alleged Competition and Solicitation

Each Defendant testified that he originated loans or anticipated loans in the same geographic area in which he had originated loans for Union Home Mortgage. (ECF No. 49, PageID #895, #899, #907, #960–61, #963, #971, #996, #1018, #1020, #1023–24, #1041 & #1044–45; ECF No. 50, PageID #1079, #1084, #1117, #1136 & #1138–39.)  Further, Charles Nugent, the general counsel for American Pacific, testified that Defendants were competing with Union Home Mortgage on behalf of American Pacific.  (ECF No. 50, PageID #1162.)

According to Union Home Mortgage, Defendants provided it with a list of loans closed by July 2025 and expected to be closed in the months that followed.  (ECF No. 67, PageID #1772; Pl. Ex. 63–66.)  Wright testified that, of the 148 loans that Defendants closed, eleven were suspected of being prospective customers of Union Home Mortgage and 58 were suspected of being current customers of Union Home Mortgage.  (ECF No. 49, PageID #849–50.)  He based this assessment on the last names of the customers listed.  (*Id.*, PageID #850.)  Of the 83 anticipated loans in their pipeline, Wright testified that two were suspected of being prospective customers and 34 were suspected of being current customers of Union Home Mortgage.  (*Id.*, PageID #851.)

At the preliminary injunction hearing, multiple Defendants, including Mr. Rosenberry, Mr. Berryman, Mr. Luu, Mr. Gonzales, Mr. Gonzalez, and Mr. Ballew, indicated that they communicated with previous customers or prospective customers of Union Home Mortgage following their employment with American Pacific.  (ECF No. 49, PageID #903, #967, #998–99, #1021–22 & #1044; ECF No. 50, PageID #1083–84.)  Mr. Webb could not recall, but indicated that, of the eight matching last names, they "look[ed] familiar."  (ECF No. 50, PageID #1118–19.)  Mr. Tabora claimed that the matching last names for his anticipated loans were not started at Union Home Mortgage to his recollection.  (*Id.*, PageID #1339–40.)

Further, Mr. Berryman testified that he took a picture of his list of prospects in Encompass, which Union Home Mortgage claimed was confidential information. (ECF No. 49, PageID #965–66.)  He testified that he went on to work with some of

those prospects while at American Pacific.  (*Id.*, PageID #968–71.)  Mr. Tabora
testified that he sent himself four emails the day that he resigned from Union Home
Mortgage with attachments of screenshots of loan applications, which he
acknowledged were confidential.  (ECF No. 50, PageID #1141–42.)

In the separation letter to Mr. Berryman, and allegedly in similar letters to the
other Defendants, Nugent represented that American Pacific "will defend and
indemnify you and your staff against any and all legal claims arising out of your
separation and/or your onboarding at APM."  (ECF No. 51-13, PageID #1313; ECF
No. 50, PageID #1155.)  In that letter, Nugent directed Defendants not to engage in
solicitation and provided a sample template to send to Union Home Mortgage
employees to inform them that they were going to leave the company.  (ECF
No. 51-13, PageID #1313.)  Then, he wrote that anyone who contacts them in
"response to the . . . correspondence and expresses interest in employment at APM
can then be recruited."  (*Id.*, PageID #1314.)

### STATEMENT OF THE CASE

On February 17, 2025, Plaintiff filed suit against Defendants.  (ECF No. 1.)
Initially, Plaintiff asserted claims against nine of its former employees:  Mr. Ballew,
Mr. Berryman, Mr. Gonzales, Mr. Gonzalez, Mr. Luu, Mr. Rosenberry, Mr. Tabora,
Mr. Webb, and a ninth former employee, Nicholas Lichwick.  (*Id.*)  Plaintiff brought
a claim against all Defendants for breach of contract, non-competition (Count I),
alleging that "[t]he Defendants' direct or indirect competition with Union Home,
through their employment with American Pacific, breached their contractual

26

obligations to Union Home as stated in each of their respective employee agreements with Union Home." (*Id.*, ¶¶ 213–23, PageID #35–36.)  Against Mr. Luu, Mr. Rosenberry, Mr. Tabora, and Mr. Webb, Plaintiff asserted claims for breach of contractual duty to repay unearned bonus (Count II) and unjust enrichment (Count III).  (*Id.*, ¶¶ 226–238, PageID #36–38.)

1.     **Motions and Hearing**

On April 14, 2025, Defendants moved to dismiss for lack of subject-matter jurisdiction.  (ECF No. 8.)  On May 1, 2025, Plaintiff moved for a preliminary injunction, seeking to enjoin Defendants from working in similar capacities for American Pacific in "the same jurisdictions, geographies, and locations the Defendants previously performed work for Union Home for a specific period of time or until further order of the Court."  (ECF No. 23, PageID #486–87.)

Specifically, as provided in Defendants' employment agreements, Plaintiff asks the Court to "extend the term of Defendants' limited non-competes by one (1) year from the entry of the Court's order, and enjoin Defendants *and those acting in concert with them* from":  (1) "[c]ompeting with Union Home in the home mortgage banking or brokering business as a loan officer or any similar role . . . in the Counties . . . each Defendant originated and/or generated loans on behalf of Union Home for a 36-month period immediately preceding the end of each Defendant's employment"; (2) "[s]oliciting or accepting business from Union Home's customers, prospective customers, and referral sources with whom each Defendant previously had contact or about whom they obtained confidential information"; and (3) "[u]sing and/or disclosing Union Home's confidential and/or trade secret information, including but

not limited to information regarding referral sources and customers or prospective customers." (*Id.*, PageID #487.)

On August 21, 2025, the Court held a hearing and oral argument on Defendants' motion to dismiss for lack of jurisdiction and Plaintiff's motion for a preliminary injunction.  After taking testimony, the Court granted in part and denied in part Defendants' motion to dismiss, determining that it lacked subject-matter jurisdiction over Plaintiff's claims against Mr. Lichwick.  (ECF No. 45.)  Therefore, the Court severed and dismissed Plaintiff's claims against him.  (*Id.*)  Then, the Court held a two-day preliminary injunction hearing.  Following the testimony, the Court ordered Plaintiff to make any amendment to its pleadings by September 8, 2025, ordered the parties to submit simultaneous closing briefs, and referred the parties to private mediation, which proved unsuccessful.

### 2.      Amended Complaint and Closing Briefs

On September 8, 2025, Plaintiff amended its complaint, dropping Mr. Lichwick as a Defendant and adding Craig Franczak, Union Home Mortgage's former regional manager.  (ECF No. 51.)  Also, Plaintiff dropped its claims for breach of contractual duty to repay unearned bonus and unjust enrichment.  (*Id.*)  Plaintiff maintained its claim of breach of contract, non-competition against all Defendants except Mr. Franczak (Count I).  (*Id.*, ¶¶ 222–36, PageID #1229–30.)  In addition, Plaintiff brought nine additional claims against various Defendants for breach of contract and contractual duties, civil conspiracy, tortious interference, and violations of federal and State trade secrets acts.  (*Id.*, ¶¶ 237–319, PageID #1230–43.)

28

Seven Defendants—Mr. Berryman, Mr. Ballew, Mr. Gonzalez, Mr. Gonzales, Mr. Rosenberry, Mr. Tabora, and Mr. Luu—brought various counterclaims against Plaintiff, including wrongful constructive discharge, breach of contract, unjust enrichment, action on account, and promissory estoppel.  (ECF No. 55; ECF No. 56; ECF No. 57; ECF No. 58; ECF No. 59; ECF No. 60; ECF No. 61.)

On October 31, 2025, the parties submitted their closing briefs.  (ECF No. 66; ECF No. 67.)  On November 14, 2025, the parties submitted their replies to their closing briefs.  (ECF No. 69; ECF No. 70.)  In mid-November 2025, the parties reached an impasse in mediation.

## ANALYSIS

When a party seeks a preliminary injunction, a district court balances the following factors:  (1) the movant's likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without an injunction; (3) whether the injunction would cause "substantial harm" to others; and (4) whether the public interest is served.  *See Wilson v. Williams*, 961 F.3d 829, 836 (6th Cir. 2020); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  As the movant, Plaintiff bears "the burden of justifying such relief."  *Wilson*, 961 F.3d at 837 (*citing American Civ. Liberties Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015)).

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  While the movant need not proffer "irrefutable

proof" or "prove his case in full at a preliminary injunction hearing" to merit his requested relief, *In re DeLorean Motor Co.*, 755 F.2d 1223, 1230 (6th Cir. 1985), the movant must still furnish sufficient evidence to make a "clear showing" that the balance of factors favors the issuance of a preliminary injunction. *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020).

## I.    Likelihood of Success on the Merits

"The likelihood of success on the merits is typically the most important factor of a preliminary injunction analysis." *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 409 (6th Cir. 2024) (citing *Sunless, Inc. v. Palm Beach Tan, Inc.*, 33 F.4th 866, 871 (6th Cir. 2022)). As the movant, Plaintiff need not demonstrate a likelihood of success on the merits of every claim. Plaintiff need only "show a likelihood of success on the merits of at least one of [its] claims." *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019); *see also Transtex Composite, Inc. v. Laydon Composite, Ltd.*, No. 12–150–C, 2012 WL 5362191, at *2 (W.D. Ky. Oct. 30, 2022). Where there is no likelihood of success on the merits, an injunction is unwarranted. *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 367 (6th Cir. 2022) (citing *Southern Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017)).

A federal court exercising diversity jurisdiction must apply the choice-of-law rules of the forum State. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). Ohio law strongly favors upholding the parties' chosen law in a contract. *Wise v. Zwicker & Assocs.*, 780 F.3d 710, 715 (6th Cir. 2015) (citation omitted). All eight employment agreements between Plaintiff and Defendants

provide that Ohio law governs.  (ECF No. 51-1, ¶ 14, PageID #1251; ECF No. 51-3, ¶ 16, PageID #1258; ECF No. 51-4, ¶ 14, PageID #1265; ECF No. 51-5, ¶ 14, PageID #1272; ECF No. 51-7, ¶ 17, PageID #1285; ECF No. 51-8, ¶17, PageID #1291; ECF No. 51-9, ¶ 19, PageID #1297; ECF No. 51-10, ¶ 18, PageID #1301–02.)  Therefore, Ohio law controls.

## I.A.    Subject-Matter Jurisdiction

Because the Court already ruled on Defendants' motion to dismiss for lack of jurisdiction (ECF No. 45), it need not address Defendants' threshold argument regarding subject-matter jurisdiction referencing their argument in their motion to dismiss.  (ECF No. 27, PageID #574; ECF No. 8.)  For the reasons stated in its previous ruling and on the record (ECF No. 45; ECF No. 49, PageID #817–18), the Court is satisfied that it has subject-matter jurisdiction over the remaining Defendants, and it will proceed to assess the substantive merits of Plaintiff's motion for a preliminary injunction.

## I.B.    Enforceability of Non-Competes

Under Ohio law, "[t]o establish a claim for breach of contract, a plaintiff must prove:  (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach."  *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019) (citing *Claris, Ltd. v. Hotel Dev. Servs., LLC*, 2018-Ohio-2602, 104 N.E.3d 1076, ¶ 28 (Ohio Ct. App.)).  It is undisputed that all Defendants signed and executed employment agreements with Union Home Mortgage.  Primarily, the parties' dispute turns on the enforceability of those agreements and whether Defendants breached their contracts.

31

### I.B.1. Restraints of Trade Under Ohio Law

The parties cite several Sixth Circuit and Northern District decisions regarding restraints of trade.  (ECF No. 23, PageID #477–83; ECF No. 27, PageID #575–80; ECF No. 30, PageID #612–19; ECF No. 66, PageID #1740–50; ECF No. 67, PageID #1779–88; ECF No. 69, PageID #1803–10; ECF No. 70, PageID #1820–28.)  But the Court's analysis focuses on Ohio statutory law and how the Ohio Supreme Court applies it.  So, the Court begins there.

### I.B.1.a. Evolution from English Common Law

In 1853, the Ohio Supreme Court heard an appeal from a judgment enforcing a covenant not to compete between former business partners, one of whom sold his interest to the other.  Their agreement foreclosed the defendant from entering the same business anywhere in the United States and contained a liquidated damages clause in an amount just over a third of the total consideration paid.  *Lange v. Werk*, 2 Ohio St. 519, 520–22 (1853).

To decide the validity of the judgment, the Ohio Supreme Court began by recognizing that, "[f]rom a very early period in the history of common law, contracts imposing a general restraint on trade were declared void."  *Id.* at 526.  Surveying English common law, it determined that "[t]hese cases fully justify the conclusion, that a contract in restraint of trade can only be enforced, when it is made to appear from the pleadings and proofs:  (1) that the restraint is partial; (2) that it is founded upon a valuable consideration; and (3) that it is reasonable and not oppressive."  *Id.* at 528 (citation modified); *see also id.* at 519, syllabus.  Regarding the last factor, the Ohio Supreme Court emphasized that "[w]hatever restraint is larger than the

32

necessary protection of the party, can be of no benefit to either; it can only be oppressive, and if oppressive, it is in the eye of the law unreasonable." *Id.* at 529 (citation omitted).

Applying these principles, the Ohio Supreme Court concluded that, "the covenant before [it was] clearly illegal and void, in so far as it extends to the prohibition of the whole United States." *Id.* at 530; *see also id.* at 520, syllabus.  It reasoned that "[n]o case is to be found where such a contract has been upheld, which covered the whole of England or a state of this Union; and for much stronger reasons, it must be void when extended over a country many times larger than either." *Id.* at 530–31.  However, it determined that "the covenant is *divisible*, and may be enforced for a breach committed in [a certain] county, provided the other requisites to its validity exist." *Id.* at 531; *see also id.* at 520, syllabus.  In other words, it concluded that, although the restraints on business anywhere in the United States were void, the restraints confined to a certain county where the party performed might not be if the agreement was otherwise enforceable. *Id.*  Still, the Ohio Supreme Court reversed the judgment enforcing the covenant and remanded for further proceedings. *Id.* at 535.

Although *Lange* is over 170 years old, the Ohio Supreme Court has long followed its core holding that "[a]ll contracts in general restraint of trade are opposed to public policy and void; and those in partial restraint are also illegal, except when founded upon a valuable consideration, and when good reasons appear for entering into the contract." *Id.* at 519, syllabus.  For well over a century, the Ohio Supreme

33

Court has cited *Lange* as "the leading [case] on the subject."  *Lufkin Rule Co. v. Fringeli*, 57 Ohio St. 596, 602, 49 N.E. 1030, 1032 (1898) ("It is the settled rule in this state that all agreements in general restraint of trade are against public policy and void; but it is held that agreements that only impose a partial restraint . . . and are reasonable, and not oppressive, may be enforced."); *see also Morgan v. Perhamus*, 36 Ohio St. 517, 521 (1881) (acknowledging that a restraint limited to business in the same town was valid); *Thomas v. Miles' Adm'r*, 3 Ohio St. 274, 276 (1854) (determining that a restraint limited to the city of Cincinnati was reasonable, but not to the extent that it would prevent the party from competing with any branch that might be established elsewhere); *cf. Boone Coleman Constr., Inc. v. Village of Piketon*, 145 Ohio St. 3d 450, 2016-Ohio-628, 50 N.E.3d 502, ¶ 28 (recognizing the continuing validity of *Lange* for liquidated damages provisions).

In *Lufkin*, the Ohio Supreme Court followed the reasoning in *Lange* and determined that an agreement with a restraint that applied to the entire State of Ohio was "not capable of such a division as under any circumstances [that] would make it a valid one" and was a "general restraint of trade."  57 Ohio St. at 603–04. Further, it held that "contracts whereby men are purchased out of their business, and restrained from carrying it on anywhere else, should receive no aid from the courts." *Id.* at 609.

### I.B.1.b. Blue Pencil Test

By the middle of the twentieth century, the Ohio Supreme Court applied these principles using the "blue pencil" test.  *See Briggs v. Butler*, 140 Ohio St. 499, 507–10, 45 N.E.2d 757, 761–62 (1942); *Extine v. Williamson Midwest, Inc.*, 176 Ohio St. 403,

34

405–06, 200 N.E.2d 297, 299 (1964).  "The 'blue pencil' test provides that if unreasonable provisions exist in [an employment] contract, they may be stricken, if divisible, but not amended or modified" and "if restrictions are unreasonable and indivisible, the entire contract fails." *Raimonde v. Van Vlerah*, 42 Ohio St. 2d 21, 23, 325 N.E.2d 544, 546 (1975).

This approach rests on the premise that a "business is built upon the confidence of its customers and the employee gains acquaintances and sells the customers by using the good will of the employer." *Briggs*, 140 Ohio St. at 509. Through his dealings with customers, the employee obtains "confidential knowledge that should not be divulged or used for his own benefit." *Id.* "It is by reason of this personal, if not confidential, relationship which the parties sustain that contracts to protect the employer by restriction of subsequent employment within reasonable limits of time and of space are permitted and sanctioned." *Id.* at 509–10. If enforceable, the Ohio Supreme Court recognizes that "[t]he near unanimous view recognized by the courts today concerning trade restraints" is the principle that "the restriction is such only as to afford fair protection to the interests of the covenantee and not so large as to interfere with the public interests or impose undue hardship on the party restricted." *Extine*, 176 Ohio St. at 405–06 (citing 17 C.J.S. Contracts § 247, p. 1121 (1963)).

### I.B.1.c. Reasonableness Test

In *Raimonde*, 42 Ohio St. 2d at 24, the Ohio Supreme Court abandoned the "blue pencil" test, determining that it "produced both arbitrary and inconsistent results."  It observed that "many courts have abandoned the 'blue pencil' test in favor

of 'reasonableness,' which permits courts to determine, on the basis of all available evidence, what restrictions would be reasonable between the parties." *Id.* at 24–25. This general test of reasonableness differs from the "blue pencil" test "only in the manner of modification allowed" because it "permits courts to fashion a contract reasonable between the parties, in accord with their intention at the time of contracting, and enables them to evaluate all the factors comprising 'reasonableness' in the context of employee covenants." *Id.* at 25.

Therefore, the Ohio Supreme Court held that a "covenant not to compete which imposes unreasonable restrictions upon an employee will be enforced to the extent necessary to protect the employer's legitimate interests." *Id.* at 26.  Such a covenant is reasonable if it:  (1) "is no greater than is required for the protection of the employer"; (2) "does not impose undue hardship on the employee"; and (3) "is not injurious to the public." *Id.*; *see also id.* at 21, paragraph two of the syllabus.  To that end, "[c]ourts are empowered to modify or amend employment agreements to achieve such results." *Id.*

To determine reasonableness, the Ohio Supreme Court identified a non-exhaustive list of factors for courts to consider:  (1) "[t]he absence or presence of limitations as to time and space"; (2) "whether the employee represents the sole contact with the customer"; (3) "whether the employee is possessed with confidential information or trade secrets"; (4) "whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition"; (5) "whether the covenant seeks to stifle the inherent skill and

experience of the employee"; (6) "whether the benefit to the employer is disproportional to the detriment to the employee"; (7) "whether the covenant operates as a bar to the employee's sole means of support"; (8) "whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment"; and (9) "whether the forbidden employment is merely incidental to the main employment." *Id.* at 25 (quoting *Extine*, 176 Ohio St. at 406).

In *Raimonde*, 42 Ohio St. 2d at 28, the Ohio Supreme Court determined that the trial court exercised its discretion properly to enjoin an employee from competing within an 18-mile radius for three years from the date of the court's order—as opposed to the 30-mile radius for three years from the date of termination as set out in the contract. It observed that the "court [was] now specifically empowered to construct a reasonable covenant between the parties, and to grant injunctive relief, if appropriate, for the period of time to which appellant may be entitled." *Id.*

### I.B.1.d. Modern Application

The Ohio Supreme Court continues to follow the reasonableness test set out in *Raimonde*. *See, e.g.*, *Acordia of Ohio, L.L.C. v. Fishel*, 133 Ohio St. 3d 356, 2012-Ohio-4648, 978 N.E.2d 823, ¶ 10 (observing that, "[i]n determining the reasonableness of a noncompete agreement, we have stated that courts must determine whether the restraints and resultant hardships on the employee exceed what is reasonable to protect the employer's legitimate business interests") (citing *Rogers v. Runfola & Assoc., Inc.*, 57 Ohio St. 3d 5, 8, 565 N.E.2d 540, 543 (1991)); *see also* § 38:1. Introduction, Baldwin's Oh. Prac. Tort L. § 38:1 (2d ed.) (2025) (observing that *Raimonde* has "become the foundation of litigation surrounding covenants not to

37

compete" and that it "expressly allows for modification of the agreement to the extent necessary to render it enforceable").

Since its adoption of the reasonableness test, the Ohio Supreme Court has observed that "[m]odern economic realities . . . do not justify a strict prohibition of noncompetition agreements between employer and employee in an at-will relationship." *Lake Land Emp. Group of Akron, LLC v. Columber*, 2004-Ohio-786, 191 Ohio St. 3d 242, 804 N.E.2d 27, ¶ 8.  It observed that it has "long recognized the validity of agreements that restrict competition by an ex-employee if they contain reasonable geographical and temporal restrictions." *Id.* at ¶ 9 (citing *Briggs*, 140 Ohio St. at 507).  Such restrictions are permissible so long as they are "reasonably necessary for the protection of the employer's business, and not unreasonably restrictive upon the rights of the employee." *Id.* (citing *Briggs*, 140 Ohio St. at 508).

### I.B.2. *Raimonde* Factors

Against this background, the Court turns to application of the reasonableness test of Ohio law to the parties' employment agreements to determine whether each: (1) "is no greater than is required for the protection of the employer"; (2) "does not impose undue hardship on the employee"; and (3) "is not injurious to the public." *Raimonde*, 42 Ohio St. 2d at 26.  Plaintiff "is required to adduce clear and convincing evidence as to each of these factors." *Levine v. Beckman*, 48 Ohio App. 3d 24, 27, 548 N.E.2d 267, 270 (1988).  In reaching this determination, the Court addresses the relevant *Raimonde* factors, 42 Ohio St. 2d at 25 (quoting *Extine*, 176 Ohio St. at 406). Where any of the employment agreements fail the reasonableness test, the Court is

38

"empowered to modify or amend [the] employment agreements to achieve such results." *Id.* at 26.

### I.B.2.a. Legitimate Business Interests

As a threshold matter, before turning to the *Raimonde* factors, the Court addresses the parties' arguments over whether Union Home Mortgage has a legitimate business interest to protect. (ECF No. 66, PageID #1741–45; ECF No. 67, PageID #1780; ECF No. 69, PageID #1803–07; ECF No. 70, PageID #1820–25.) Defendants argue that Union Home Mortgage lacks a legitimate business interest because (1) Defendants' customer and referral relationships predated their time at Union Home Mortgage, (2) Union Home Mortgage is contractually prohibited from soliciting customers after loan officers close loans, and (3) Plaintiff's software systems "pull publicly available data regarding mortgages" which cannot be protected. (ECF No. 66, PageID #1741–45; ECF No. 69, PageID #1803–07.)

### I.B.2.a.i. Goodwill and Confidential Information

Defendants argue that "Plaintiff seeks to enforce restrictive covenants that would impact client and referral relationships that pre-existed Defendants' employment relationship with Union Home," claiming that Ohio courts have found that no "protectable interests" exist in such circumstances. (ECF No. 66, PageID #1741 (citing *Arthur J. Gallagher & Co. v. Anthony*, No. 16-cv-00284, 2016 WL 4523104, at *11 (N.D. Ohio Aug. 30, 2016); *Independent Stave Co., LLC v. Bethel*, No. 2:16-cv-31, 2016 WL 362313, at *5 (S.D. Ohio Jan. 29, 2016); *Cretor Constr. Equip. LLC v. Gibson*, 738 F. Supp. 3d 950, 966 (S.D. Ohio 2024)); ECF No. 69, PageID

#1804.) Plaintiff argues that its agreements with Defendants are "designed to protect Union Home's goodwill *and* confidential information." (ECF No. 70, PageID #1823.)

In *Rogers*, 57 Ohio St. 3d at 8–9, the Ohio Supreme Court determined that the business attempting to enforce restrictive covenants had a "legitimate commercial interest to protect" in part because the business "played a large role in [the former employees'] development," the former employees "gained valuable experience in the business" through their employment, the business "invested time and money in equipment, facilities, support staff and training," the former employees had direct contact with a clientele that the business developed, and the former employees' "assignments were taken under [the business's] name."

Here, the evidence at the preliminary injunction hearing makes out a case less strong than *Rogers*. The record establishes that Union Home Mortgage played a large role in the development of each Defendant in one way or another. Some spent a considerable portion of their career with the company. Others had important positions that allowed them to develop their business or to capitalize on their years of experience in the mortgage business even if at Union Home Mortgage for only a relatively short time. Further, the record shows that Union Home Mortgage invested in the offices for Defendants, though it transferred some of those leases to American Pacific. And Defendants did business in Union Home Mortgage's name and secured new referral sources during their employment at Union Home Mortgage based on data from the company's software. (ECF No. 49, PageID #835–36.) But the record shows that Defendants largely did business based on their own connections, contacts,

40

and networks to a greater extent than the benefit that they derived from the Union Home Mortgage brand or resources. As for goodwill, Plaintiff failed to present evidence from which the Court can find or determine the goodwill of Union Home Mortgage at stake. To the extent Plaintiff pins its argument on a combination of goodwill and confidential information, that position is not well taken on the record presented.

At bottom, though weaker than the case in *Rogers*, Union Home Mortgage unquestionably has a legitimate interest in its own business and all the confidential and proprietary information regarding internal practices, product training, preparation of loans, and Encompass that goes along with it. Defendants had access to and used this information during their employment. (ECF No. 49, PageID #842.) "[A]n employer has a legitimate interest in preventing a former employee from using the skill, experience, training, and confidential information the former employee has acquired during the employee's tenure with his employer in a manner advantageous to a competitor in attracting business, regardless of whether it was an already established customer of the former employer." *UZ Engineered Prods. Co. v. Midwest Motor Supply Co.*, 147 Ohio App. 3d 382, 2001-Ohio-8779, 770 N.E.2d 1068, ¶ 39 (Ohio Ct. App.) (citing *Rogers*, 57 Ohio St. 3d at 8–9); *see also Union Home Mortg. Corp. v. Fratelli*, No. 1:23-cv-857, 2025 WL 639315, at *7 (N.D. Ohio Feb. 27, 2025); *Union Home Mortg. Corp. v. Payne*, No. 1:20-cv-26, 2020 WL 4282309, at *9 (N.D. Ohio Mar. 9, 2020) (determining that the former Union Home Mortgage employee

"was exposed to [the company's] confidential and proprietary information in the form of the [company's] meetings, programs, and strategies").

This information constitutes a legitimate business interest because it is an "insider perspective into the policies and strategies of a successful company" which would be "very valuable to a competitor." *Payne*, 2020 WL 4282309, at *9 (quoting *FirstEnergy Sols. Corp. v. Flerick*, 521 F. App'x 521, 527 (6th Cir. 2013)).  Accordingly, access to such information provided "the employee[s] [with] confidential knowledge that should not be divulged or used for his own benefit," which Union Home Mortgage had a legitimate business interest in protecting. *Briggs*, 140 Ohio St. at 509.  At the same time, Union Home Mortgage does not have a legitimate interest in the relationships that Defendants brought to the company that predated their relationships with Union Home Mortgage.

### I.B.2.a.ii. Solicitation

Next, Defendants argue that "Union Home further lacks a legitimate protectable interest because it is contractually prohibited from soliciting the very customers whom it seeks to prevent Defendants from working with or soliciting" because "once Union Home's loan officers close loans, it sells the mortgages on the secondary market to larger lenders" with whom "Union Home agrees to not solicit the 'Mortgagor' from refinancing the loan sold."  (ECF No. 66, PageID #1744.)  Plaintiff claims that this assertion is incorrect because such loans only restrict Union Home Mortgage from soliciting a borrower to refinance a loan, not originate a new loan. (ECF No. 70, PageID #1825.)  Defendants provide nothing to contradict the testimony of Mr. Wright that Union Home Mortgage "sells a lot of mortgages not pursuant to

an agreement," and, when it does, it "is not to solicit any of those customers for a refinance," and these comprise a "very small percentage" of their agreements.  (ECF No. 49, PageID #856 & #873.)  In any event, Defendants' argument is inapposite to Plaintiff's interest in protecting the confidential information its employees gain during their employment.  *Briggs*, 140 Ohio St. at 509.

### I.B.2.a.iii. Public Information

Finally, Defendants claim that "Union Home seeks to protect publicly available information" because its software "pull[s] publicly available data regarding mortgages."  (ECF No. 66, PageID #1744–45 (citing *Arthur J. Gallagher & Co.*, 2016 WL 4523104, at *19; *Transtar Indus., LLC v. Lester*, No. 1:19-cv-1230, 2019 WL 3458456, at *6 (N.D. Ohio July 31, 2019)).  Plaintiff contends that this contradicts the testimony at the preliminary injunction hearing and is incorrect.  (ECF No. 70, PageID #1823–24.)  Indeed, Mr. Wright testified that there was no publicly available system for uncovering the list of customers that an employee is working to get approved to close a loan, referred to as a "pipeline."  (ECF No. 49, PageID #843.)  And no evidence in the record suggests otherwise.

Even where "prospective customer lists were based on public information," former employees may still be properly deemed to have been "privy to confidential information" based on training and access to "complex systems" and "pricing scheme[s]," "participat[ion] in weekly meetings in which the company's short- and long-term strategy was discussed," and being provided with an "insider perspective into the [company's] policies and strategies."  *FirstEnergy Sols. Corp.*, 521 F. App'x at 526–27.   Courts follow a similar reasoning in application to Union Home

Mortgage's customers lists, determining that, "even though much of the information comprising those lists is publicly available, a third party would not necessarily be able to identify Union Home's current and prospective customers without access to Union Home's internal, password protected database." *Fratelli*, 2025 WL 639315, at *7.

Defendants rely on authorities that address information that is either easily re-creatable or instances where a defendant relied on information outside of the company. *Arthur J. Gallagher*, 2016 WL 4523104, at *19; *Transtar Indus.*, 2019 WL 3458456, at *6. Neither circumstance applies here. Therefore, the Court determines that Union Home Mortgage has a legitimate business interest in its customer lists and other policies and strategies, even if some of the information is based on publicly available information. *FirstEnergy Sols. Corp.*, 521 F. App'x at 526–27.

*    *    *

For these reasons, the Court determines that Union Home Mortgage has a legitimate business interest in its confidential information. *Briggs*, 140 Ohio St. at 509. Accordingly, the Court turns to the *Raimonde* factors.

### I.B.2.b. Geographic and Temporal Restrictions

Plaintiff argues that Defendants' employment agreements "specifically identify and narrowly define the activities, entities, time periods, and jurisdictions, geographies, and locations Defendants are restricted from competing in." (ECF No. 23, PageID #479; ECF No. 67, PageID #1782–84.) The Court addresses both the geographic and temporal aspects of these restrictions under the first *Raimonde* factor. 42 Ohio St. 2d at 25.

### I.B.2.b.i. Territorial Restrictions

The employment agreements have various geographic restrictions, ranging from 100 miles within the office to which the employee worked, to any State in which an employee originated loans on behalf of the company, to anywhere in the United States.  (ECF No. 51-1, ¶ 3, PageID #1249; ECF No. 51-3, ¶ 3, PageID #1256; ECF No. 51-4, ¶ 3, PageID #1263; ECF No. 51-5, ¶ 3, PageID #1270; ECF No. 51-7, ¶ 6, PageID #1284; ECF No. 51-8, ¶ 6, PageID #1290; ECF No. 51-9, ¶ 6, PageID #1295; 51-10, ¶ 6, PageID #1300.)

Regarding the State-wide and nationwide restrictions, Plaintiff offers no explanation or justification for such a broad prohibition on Defendants' business. Under Ohio law, a restraint of trade cannot be reasonable "in so far as it extends to the prohibition of the whole United States" or "cover[s] the whole of . . . a state of this Union."  *Lange*, 2 Ohio St. at 530–31.  A nationwide restriction is especially unreasonable given the fact that Plaintiff does not even have a branch in every State. *See Find a Loan Officer or Branch*, Union Home Mortgage (last visited Dec. 8, 2025), https://www.uhm.com/branches/; *see also Extine*, 176 Ohio St. at 406–07 (holding restraints unreasonable that apply to locations where "the employer-appellee has no activity whatsoever and may never intend to engage in any activity in such a location").  Further, Ohio courts view State-wide restrictions as general restraints of trade that are invalid and unenforceable.  *See, e.g.*, *Lufkin*, 57 Ohio St. at 603–04.

Anticipating this defect in the agreements, Plaintiff proposes limiting the non-competes geographically to restrict Defendants from competing on behalf of a competitor in "the city/counties in which Defendants originated loans on behalf of

Union Home." (ECF No. 67, PageID #1782; ECF No. 23, PageID #480; ECF No. 30, PageID #613.) However, in its terms of the requested preliminary injunction, Plaintiff lists multiple cities and counties for each Defendant. (ECF No. 67, PageID #1795–98.) And the record provides no indication that some of these have any direct relation to where each Defendant worked during their employment with Union Home Mortgage.

In *Rogers*, 57 Ohio St. 3d at 8, the Ohio Supreme Court determined that "the restraints and resultant hardships on [the former employees] . . . exceed[ed] that which [was] reasonable to protect [the employer's] legitimate business interests." It reached this conclusion in part after observing that the employees, who had spent "most of their adult lives" in their profession, which was "the only profession in which they ha[d] become proficient," faced unreasonable geographical and temporal restrictions from a contract that prohibited them from pursuing their profession in an entire county after working in a particular city. *Id.* Therefore, the Ohio Supreme Court limited the geographical restriction to the city limits of the city in which the former employees worked. *Id.* at 9.

As discussed, Ohio law empowers courts to make such a limitation on geographical restrictions to ensure "reasonable geographical and temporal restrictions." *Lake Land*, 2004-Ohio-786, at ¶ 9 (citing *Briggs*, 140 Ohio St. at 507); *Raimonde*, 42 Ohio St. 2d at 28. So too have the parties. (*See, e.g.*, ECF No. 51-1, ¶ 8, PageID #1250.) Against this framework, and in the absence of any argument in the record regarding the majority of the cities and counties listed in Plaintiff's

46

proposed preliminary injunction, the Court determines that it is reasonable to limit each Defendant's geographical restriction to the limits of the cities or boroughs in which the record demonstrates he actually worked. Such a limitation is "reasonably necessary for the protection of the employer's business, and not unreasonably restrictive upon the rights of the employee." *Lake Land*, 2004-Ohio-786, ¶ 9 (citing *Briggs*, 140 Ohio St. at 507); *Rogers*, 57 Ohio St. 3d at 544; *Raimonde*, 42 Ohio St. 2d at 28. If the record reflects that Defendant worked in a city or borough that Plaintiff did not list in its proposed injunction, such as Fredericksburg, Virginia in the case of Mr. Ballew, then the Court finds that Plaintiff waived a limitation in such a case. (*Compare* ECF No. 50, PageID #1075–76 *with* ECF No. 67, PageID #1795.)

### I.B.2.b.ii. Temporal Restrictions

Defendants' employment agreements contain various temporal restrictions, ranging from three months to a year and eight months. (*See, e.g.*, ECF No. 51-1, ¶ 3, PageID #1249.) Defendants argue that "the temporal restrictions are not tied to specific positions"; therefore, "the temporal restrictions are greater than necessary to protect legitimate business interests." (ECF No. 66, PageID #1746; ECF No. 69, PageID #1807.) For example, although Mr. Ballew served as a branch manager and faces a restriction of three months (ECF No. 51-1, ¶ 3, PageID #1249), Mr. Rosenberry also served as a branch manager but faces a restriction of roughly a year and eight months (ECF No. 51-8, ¶ 6, PageID #1290). Plaintiff clarifies that, when viewed in the context of when each Defendant signed his respective employment agreement, the temporal duration of the restricted period is more consistent for each position but

47

does not explain or justify why one agreement should be more restrictive than another for the same role.  (ECF No. 30, PageID #613–14.)

Plaintiff proposes limiting each Defendant to a one-year period in which he will not compete against Union Home Mortgage or solicit its current customers, prospective customers, and employees.  (ECF No. 23, PageID #487; ECF No. 67, PageID #1783–84 & #1795–98.)  Ohio courts have determined that restrictions of one year or more are reasonable depending on the context.  *See, e.g.*, *MetroHealth Sys. v. Khandelwal*, 2022-Ohio-77, 183 N.E.3d 590, ¶ 24 (Ohio Ct. App.) (determining that the temporal restriction in the employment agreement should be reduced from two years to one year); *see also Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 998 (6th Cir. 2007) (collecting cases); *Procter & Gamble Co. v. Stoneham*, 140 Ohio App. 3d 260, 747 N.E.2d 268, 276 (2000) (determining that a restrictive covenant lasting for three years was reasonable).

But applying a restriction of one year to every Defendant creates its own set of incongruities given the fact that certain Defendants were merely loan officers.  Others served as branch managers, and certain Defendants had less than one year remaining on the temporal restrictions in their covenants.  For example, Mr. Ballew only had three months remaining.  (ECF No. 51-1, ¶ 3, PageID #1249.)  Ohio courts have acknowledged that, "when analyzing whether the time restraint is enforceable, courts should analyze on a case-by-case basis."  *MetroHealth*, 2022-Ohio-77, at ¶ 24.  The Court discerns no articulable rationale why a former employee such as Mr. Webb, with 28 years of experience in the mortgage industry and only 14 months at Union

Home Mortgage, should be restricted for nearly the entire length of the time of his employment.  (ECF No. 50, PageID #1120.)  Nor is it clear to the Court how it is reasonable or proportional for a former employee such as Mr. Webb to be restricted for the same period of time as Mr. Rosenberry, who spent roughly eight and a half years at Union Home Mortgage.  (ECF No. 49, PageID #883–84 & #890.)

A "non-compete contract cannot expire while its signatories litigate its enforceability."  *MP TotalCare Servs., Inc. v. Mattimoe*, 648 F. Supp. 2d 956, 964 n.6 (N.D. Ohio 2009) (citing *Homan, Inc. v. A1 AG Servs., L.L.C.*, 175 Ohio App. 3d 51, 2008-Ohio-277, ¶ 17 (Ohio Ct. App.); *Trim-Line of Toledo v. Carroll*, No. L-86-176, 1987 WL 7056, at *2 (Ohio Ct. App. Feb. 25, 1987)).  But *Raimonde* permits the Court in its discretion to run the temporal restrictions for a covenant from "the date of the court's order."  42 Ohio St. 2d at 28.

Plaintiff maintains that its initial restrictions were reasonable.  Therefore, the Court will not exercise its discretion to extend those terms lasting less than one year.  (ECF No. 23, PageID #487; ECF No. 67, PageID #1783–84 & #1795–98.)  That is, the Court will not extend the length of a covenant beyond its original terms.  Accordingly, in the interest of ensuring temporal restrictions that are "reasonably necessary for the protection of the employer's business, and not unreasonably restrictive upon the rights of the employee," the Court preserves the post-employment duration of every Defendant with restrictions running less than one year from the date of this Order (Mr. Ballew, Mr. Berryman, Mr. Gonzales, Mr. Gonzalez, Mr. Tabora, and Mr. Webb).  *Lake Land*, 2004-Ohio-786, ¶ 9 (citing *Briggs*, 140 Ohio St. at 507); *Rogers*, 57 Ohio

St. 3d at 544; *Raimonde*, 42 Ohio St. 2d at 28.  For the two Defendants with restrictions running longer than a year (Mr. Luu and Mr. Rosenberry), the Court accepts Plaintiff's proposal of a restriction of one year from the date of this Order.

To the extent that Plaintiff argues that its proposed restriction of one year results from an automatic contractual extension based on a violation (*see, e.g.*, ECF No. 1-1, ¶ 8, PageID #44), Ohio law "permits courts to fashion a contract reasonable between the parties." *Raimonde*, 42 Ohio St. 2d at 25.  In the interest of uniformity, and to ensure that the parties are not "left to guess about [the] intended duration" of the preliminary injunction, the Court foregoes application of that provision and runs the restrictive covenant from the date of this Order.  *Cromer*, 31 F.4th at 364.  In other words, the Court determines that all restrictive covenants will run from the date of this Order for the lengths previously indicated and that longer restrictions amount to invalid restraints on trade.

Regarding the non-solicitation provisions for customers and Union Home Mortgage employees, the Court enforces the proposed restriction of one year as reasonably necessary for the protection of Union Home Mortgage's business and not unreasonably restrictive on Defendants.  *Lake Land*, 2004-Ohio-786, ¶ 9 (citing *Briggs*, 140 Ohio St. at 507).  However, because only Mr. Berryman and Mr. Tabora were subject to a provision for the non-solicitation of referral sources, they will remain the only Defendants subject to such a restriction.  (ECF No. 51-3, ¶ 5, PageID #1256; ECF No. 51-9, ¶ 8, PageID #1295.)

### I.B.2.c. Sole Contact with the Customer

Plaintiff argues that Defendants "were often—and sometimes always—the sole contact with its customers and referral sources in Defendants' jurisdictions, geographic areas, and locations." (ECF No. 23, PageID #481.)  Defendants do not contend otherwise.  Indeed, the evidence at the preliminary injunction hearing supports these facts.  For example, Mr. Rosenberry testified that Union Home Mortgage did nothing to help him develop client relationships, and "the development of it itself was solely [his] development." (ECF No. 49, PageID #925.)  Therefore, this factor supports reasonable restrictions.

### I.B.2.d. Possession of Confidential Information

Plaintiff claims that Defendants "had continuous and unfettered access to Union Home's confidential information and trade secrets," which would result in "significant inequity and unfair competition" should they be allowed to work for American Pacific, a competitor.  (ECF No. 23, PageID #481; ECF No. 67, PageID #1784–85.)  Defendants argue that "Ohio courts find no protectable interest where the purported confidential information relates to former employees' pre-existing customers." (ECF No. 66, PageID #1746.)

The Court already addressed this factor in determining whether Union Home Mortgage has a legitimate business interest to protect through a restrictive covenant. In short, access to prospective customer lists, even when based in part on public information, participation in strategy meetings, access to complex systems and pricing schemes, and an "insider perspective into the [company's] policies and strategies" constitute confidential information. *FirstEnergy Sols.*, 521 F. App'x at

51

526–27.  The same goes for Union Home Mortgage's customers lists and password-protected databases.  *Fratelli*, 2025 WL 639315, at *7.  Through its relationship with their employer and customers, an employee may acquire "confidential knowledge that should not be divulged or used for his own benefit."  *Briggs*, 140 Ohio St. at 509.

Further, "[c]ourts have found that an actual threat of harm exists when the employee possesses knowledge of the employer's trade secrets and begins working in a position that causes [him] to compete directly with the employer."  *Try Hours, Inc. v. Douville*, 2013-Ohio-53, 985 N.E.2d 955, ¶ 35 (Ohio Ct. App.) (citation omitted); *see also AK Steel Corp. v. Miskovich*, No. 1:14-cv-174, 2014 WL 11881029, at *17 (S.D. Ohio Apr. 17, 2014) (determining that the plaintiff "put forth sufficient information that [the defendant] possesse[d] intimate knowledge of [the plaintiff's] confidential pricing and service strategies and ha[d] developed a significant relationship . . . while employed").  Evidence of possession of intimate knowledge of and access to this information, as well as any training or participation regarding this information, suffices for purposes of possession of confidential information.  *Id.*; *FirstEnergy Sols. Corp.*, 521 F. App'x at 526–27.

Again, this factor and interest do not encompass the relationships that each Defendant brought to his position with Union Home Mortgage.  Still, this factor supports reasonable restrictions.

### I.B.2.e. Unfair or Ordinary Competition

Plaintiff argues that, "[w]ithout the protection of the restrictive covenants in the Agreements, Union Home's competitors could raid its loan officers and trade upon the confidential information they possess and the relationships they have cultivated

to unfairly compete with Union Home." (ECF No. 67, PageID #1785.) Defendants claim that the restrictive covenants merely seek to eliminate "ordinary, instead of unfair, competition" because they "would prevent Defendants from working with pre-existing customers and referral sources that they self-sourced." (ECF No. 66, PageID #1747; ECF No. 69, PageID #1809.) Defendants have the better of this argument.

The Sixth Circuit has determined that it "would be unfair for a former employee who was privy to confidential strategies developed by a . . . company in a competitive industry to resign, immediately begin working for a direct competitor, and target his former clients." *FirstEnergy Sols.*, 521 F. App'x at 527. There, the Sixth Circuit upheld the district court's determination that "[t]his is the exact [type of] unfair competition the clause clearly seeks to eliminate." *Id.* But *First Energy Solutions* involved a mid-level salesman. *Id.* at 522. Most Defendants in this case did not have even that lofty status or access to the sort of confidential information involving strategies or other sensitive business information that could work actual competitive harm on Union Home Mortgage. Indeed, much of the confidential information at issue in this case involves customers, prospective customers, and referral sources that Defendants developed before they came to work for Union Home Mortgage. On the record presented, this fact predominates and shows that Plaintiff seeks to restrict ordinary competition—not unfair competition. On balance, this factor cuts against any restriction on Defendant's post-separate work in the same industry and market.

### I.B.2.f. Stifling Inherent Skills or Experience

Plaintiff claims that it is not seeking to eliminate all competition or stifle inherent skills or experience of Defendants, but only as it pertains to Union Home Mortgage's goodwill and confidential information.  (ECF No. 23, PageID #482; ECF No. 67, PageID #1786.)  Defendants claim that they had "spent more time, if not significantly more time, working in financial services than they did working for Plaintiff," and so "the restrictive covenants impermissibly seek to stifle Defendants' inherent skills and experience in the industry, which they developed well before working for Plaintiff."  (ECF No. 27, PageID #578–79; ECF No. 66, PageID #1748; ECF No. 69, PageID #1809–10.)

For the reasons already discussed, Plaintiff's proposed terms in the preliminary injunction it seeks are overly broad, geographically and temporally. (ECF No. 67, PageID #1795–98.) Also, they sweep beyond the interests Plaintiff seeks to protect.  The record shows that Defendants spent "most of their adult lives" in their profession, which may be "the only profession in which they ha[d] become proficient" and, therefore, face unreasonable geographic and temporal restrictions.  *Rogers*, 57 Ohio St. 3d at 544.  This holds particularly true in the case of a former employee like Mr. Webb, who testified that he spent 28 years in the mortgage industry and only roughly 14 months at Union Home Mortgage.   (ECF No. 50, PageID #1120.) Accordingly, this factor supports the Court modifying or amending the employment agreements to achieve a reasonable restriction, as *Raimonde*, 42 Ohio St. 2d at 26, empowers it to do.

54

### I.B.2.g. Proportional Benefit and Detriment

Plaintiff claims that its benefit is not disproportionate to the detriment of the restrictive covenants to the Defendants and that Defendants can "take on a similar role in the same industry outside the restricted area or can work in a different role within that area."  (ECF No. 23, PageID #482; ECF No. 67, PageID #1786.)

Defendants testified to the personal hardships each faces from restrictions on their employment, ranging from child support and custody, mortgages and second mortgages, bills, ability to afford travel to visit family, ability to support elderly parents, ability to support young children, college tuition, and the ability to support ill family members.  (ECF No. 49, PageID #947, #983, #1008, #1030 & #1050; ECF No. 50, PageID #1104, #1126–27 & #1148.)  The benefit to Union Home Mortgage from the expansive geographic and temporal restrictions it seeks is disproportionate to the adverse effects on Defendants, several of whom testified that this work "is all [they] know how to do" (ECF No. 49, PageID #1055) or that "[i]t's all [they have] ever done" (*Id.*, PageID #947).

Therefore, to ensure proportional outcomes, the Court modifies the restrictions to ensure that the geographic and temporal restrictions are not overly broad. *Raimonde*, 42 Ohio St. 2d at 26.

### I.B.2.h. Sole Means of Support

Plaintiff's argument that Defendants have "ample experience originating loans, so they are no doubt able to obtain new customers and referral sources in city/counties not covered by the requested injunction" is unavailing given the breadth of the proposed geographic and temporal restrictions.  (ECF No. 67, PageID #1786.)

Certain Defendants would be deprived of working in places where they spent their entire careers, while others are restricted from locations where there is no evidence in the record that they worked while at Union Home Mortgage.  As the Ohio Supreme Court observed in *Rogers*, 57 Ohio St. 3d at 8, "restraints and resultant hardships" on former employees "do exceed that which is reasonable to protect [a business's] legitimate business interests" where they have worked in that profession "for most of their adult lives" and it is "the only profession in which they have become proficient." Multiple Defendants testified that this work "is all [they] know how to do" (ECF No. 49, PageID #1055) or that "[i]t's all [they have] ever done" (*Id.*, PageID #947). Accordingly, this factor counsels against enforcement of the restrictive covenants for the sorts of lower level, front-line employees largely among Defendants in this case. *Raimonde*, 42 Ohio St. 2d at 25.

### I.B.2.i. Developed Talent

Defendants argue that "Union Home utterly failed to demonstrate that Defendants' talents which it seeks to suppress were developed during Defendants' employment." (ECF No. 66, PageID #1749.)  The record amply supports this claim. Many Defendants testified that most of the direct contact that they had with customers, prospects, and referral sources at Union Home Mortgage came from prior business relationships and contacts.  Some even lost business while they worked there. (*See, e.g.*, ECF No. 50, PageID #1069–70.)  Although Mr. Wright testified that employees are required to complete mandatory trainings and attend various meetings regarding best practices, such as product training and preparations of loans (ECF No. 49, PageID #839–42), the record at this stage does not make clear what specific

skills and experience Defendants developed during their employment at Union Home Mortgage.  Accordingly, this factor militates against post-employment restrictions.

### I.B.2.j. Incidental Employment

Neither party addressed the final *Raimonde* factor, "[w]hether the forbidden employment is merely incidental to the main employment."  42 Ohio St. 2d at 25.  Accordingly, the Court gives it no further attention.

*     *     *

Based on the Court's assessment of the *Raimonde* factors as applied to the employment agreements in this case, the Court determines that a few factors suggest that the restrictive covenants should not receive judicial enforcement at all and others demonstrate that the covenants are "greater than is required for the protection of the employer" and "impose undue hardship on the employee" that may be "injurious to the public."  *Raimonde*, 42 Ohio St. 2d at 26.  In the Court's view, however, the most important factors on the record presented support enforcement of reasonable, tailored restrictions.  Accordingly, for the reasons discussed, where the geographic and temporal restrictions fail to meet Ohio's reasonableness test, the record supports modification that will make the covenants enforceable.  *Id.*

### I.C.   Breach

Plaintiff claims that there "is no doubt Defendants have breached their limited noncompetes" and "[d]iscovery will demonstrate the full breadth and depth of Defendants' breaches."  (ECF No. 23, PageID #483; ECF No. 67, PageID #1787–88.) Specifically, it asserts that the NMLS lists all Defendants as working for American Pacific, "Union Home's direct competitor."  (ECF No. 23, PageID #483.)  Further,

Plaintiff argues that "some of the Defendants actively are promoting their American Pacific employment and touting American Pacific's mortgage products as better than Union Home's products." (*Id.*)

Although the geographic and temporal restrictions in each Defendant's employment agreement vary, all Defendants went to work for American Pacific before the expiration of their non-competes. (*Id.*, PageID #473–74.) In many cases, they worked in the same location where they did at Union Home Mortgage. (*Id.*, PageID #474–75.) Defendants do not dispute this. Indeed, in Defendants' responses to Plaintiff's requests for admission, every Defendant admitted to working in the same or similar capacity for American Pacific as they did for Union Home Mortgage, and all admitted to originating at least one loan for American Pacific. (ECF No. 30-1, PageID #628–29, #635–36, #642–43, #649–50; #663–64; #671; #677–78 & #684–85.) Further, at the preliminary injunction hearing, each Defendant testified that he would originate loans in the same area where he worked for Union Home Mortgage. (ECF No. 49, PageID #895, #899, #907, #960-61, #963, #971, #996, #1018, #1020, #1023–24, #1041 & #1044–45; ECF No. 50, PageID #1079, #1084, #1117, #1136 & #1138–39.) And Nugent testified that Defendants were competing with Union Home Mortgage on behalf of American Pacific. (ECF No. 50, PageID #1162.)

Further, Mr. Rosenberry, Mr. Berryman, Mr. Luu, Mr. Gonzales, Mr. Gonzalez, and Mr. Ballew indicated that, following their employment with American Pacific, each communicated with those who had been customers or

prospective customers of Union Home Mortgage.  (ECF No. 49, PageID #903, #967, #998–99, #1021–22 & #1044; ECF No. 50, PageID #1083–84.)

In addition, Mr. Berryman testified that he took a picture of his list of prospects in Encompass, which houses confidential information belonging to Union Home Mortgage.  (ECF No. 49, PageID #965–66.)  He testified that he went on to work with some of those prospects while at American Pacific.  (*Id.*, PageID #968–71.) Mr. Tabora testified that he sent himself four emails the day he resigned from Union Home Mortgage attaching screenshots of loan applications, which he acknowledged were confidential.  (ECF No. 50, PageID #1141–42.)  Mr. Rosenberry testified that he emailed with Mr. Berryman about American Pacific and Mr. Berryman asked him where he was going and "[w]ho [he] need[ed] to talk to."  (ECF No. 49, PageID #913.)

This testimony demonstrates that Plaintiff is likely to succeed on its breach of contract claim with respect to its non-compete provisions for each Defendant, as well as its non-solicitation and confidentiality provisions for some.

\*     \*     \*

For these reasons, the Court determines that Plaintiff has demonstrated a likelihood of success on the merits.  *Wilson*, 961 F.3d at 836.

## II.    Irreparable Harm

The remedies provision of each employment agreement provides that, "[i]n the event Employee violates any covenant set forth herein, Employee agrees that such violation will cause irreparable harm to Company and Employee consents to the issuance of a restraining order and/or an injunction."  (ECF No. 1-1, ¶ 13, PageID #44–45; ECF No. 1-3, ¶ 15, PageID #52; ECF No. 1-4, ¶ 13, PageID #58–59; ECF

No. 1-5, ¶ 13, PageID #65–66; ECF No. 1-6, ¶ 13, PageID #74; ECF No. 1-7, ¶ 16, PageID #79; ECF No. 1-8, ¶ 16, PageID #85; ECF No. 1-9, ¶ 18, PageID #90–91; ECF No. 1-10, ¶ 17, PageID #95.)

Although the parties' agreement might satisfy the additional requirements for the issuance of an injunction, the law does not presume injury and requires proof of harm, even where a contract provides otherwise.  *See, e.g.*, *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 970 (6th Cir. 2002); *TGR Ents., Inc. v. Kozhev*, 167 Ohio App. 3d 29, 2006-Ohio-2915, 853 N.E.2d 739, ¶ 36 (Ohio Ct. App.).  Therefore, the Court analyzes the other requirements for issuance of an injunction without regard to the contract.

### II.A.  Irreparable Injury

Plaintiff bears the burden of establishing that, in the absence of an injunction barring Defendants from violating the restrictive covenants in their respective employment agreements, they will suffer "actual and imminent" harm, not just harm that is speculative or unsubstantiated.  *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).  A showing of some irreparable injury "is the *sine qua non* for issuance of an injunction." *Patio Enclosures*, 39 F. App'x at 967 (citing *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)).  Absent an irreparable injury, "there's no need to grant relief now as opposed to at the end of the lawsuit." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).  "[A]lthough the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory." *Id*.

60

Harm is irreparable where money damages do not fully compensate for the injury. *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (quoting *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)). Usually, money does not fully compensate a party where the nature of the loss makes damages difficult to calculate. *Id.* (citations omitted).

Defendants contend that Plaintiff's injury, if any, is fully compensable with an award of monetary damages because Plaintiff "detailed 'each component of what is at issue in this case' and included retention bonuses, existing and anticipated harm, and attorneys' fees," as well as declarations calculating the minimum floor of damages for each Defendant. (ECF No. 27, PageID #581–82; ECF No. 66, PageID #1751–52.) Further, Defendants argue that, because Plaintiff calculated "the total amount of loans each Defendant had closed, or anticipated closing," at American Pacific, Plaintiff can calculate damages. (ECF No. 66, PageID #1752.)

However, this argument does not account for the confidential information that it has to protect. In short, Defendants benefitted from the Union Home Mortgage name during their employment, and Plaintiff has a "legitimate interest in preventing a former employee from using the skill, experience, training, and confidential information the former employee has acquired" from being used to the advantage of a competitor, including customer lists, meetings, programs, and strategies. *UZ Engineered Prods.*, 2001-Ohio-8779, at ¶ 39 (citing *Rogers*, 57 Ohio St. 3d at 8–9);

61

*Briggs*, 140 Ohio St. at 509; *Fratelli*, 2025 WL 639315, at *7; *Payne*, 2020 WL 4282309, at *9; *FirstEnergy Sols. Corp*, 521 F. App'x at 527.

In *FirstEnergy Solutions*, 521 F. App'x at 529, the Sixth Circuit determined that there was a risk of irreparable injury because the defendant contacted customers after joining a competitor.  So too here.  There is evidence in the record that, after beginning their employment with American Pacific, multiple Defendants communicated with those who were customers or prospective customers of Union Home Mortgage.  (ECF No. 49, PageID #903, #967, #998–99, #1021–22 & #1044; ECF No. 50, PageID #1083–84.)

Regarding confidential information, "an actual threat of harm exists when the employee possesses knowledge of the employer's trade secrets and begins working in a position that causes [him] to compete directly with the employer."  *Try Hours*, 2013-Ohio-53, at ¶ 35 (citation omitted); *see also AK Steel Corp.*, 2014 WL 11881029, at *17.  Proof of actual theft or improper use is not required, even though two Defendants testified to taking information that Union Home Mortgage deems confidential.  (ECF No. 49, PageID #965–71; ECF No. 50, PageID #1141–42.)

Here, Plaintiff demonstrated irreparable injury.  Though on this record that injury is intangible and difficult to quantify, that is the point.  Otherwise, Plaintiff could receive an award of damages instead at the close of the litigation.

## II.B.  Delay

Defendants argue that "Plaintiff's claim of irreparable harm further is undermined by its delay in seeking a preliminary injunction."  (ECF No. 27, PageID #583; ECF No. 66, PageID #1753.)  Although Plaintiff did not file its motion for

preliminary injunction until roughly two and a half months after filing suit, it did so two weeks after Defendants appeared.  (ECF No. 11; ECF No. 12; ECF No. 13; ECF No. 14; ECF No. 15; ECF NO. 16; ECF No. 17; ECF No. 18.)

According to Plaintiff, Defendants did not respond to correspondence regarding a proposed report of parties planning meeting in March 2025 so that the parties could initiate discovery "as soon as possible."  (ECF No. 30, PageID #621.)  Such a delay is justified, and courts in the Sixth Circuit have not determined otherwise.  *See, e.g.*, *York Risk Services Group, Inc. v. Couture*, 787 F. App'x 301, 309 (6th Cir. 2019) (determining that the plaintiff's delay of six months was not unreasonable "despite having waited months to file the lawsuit").

Defendants cite *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985), to support their claim that some courts have determined that a delay of ten weeks was unreasonable.  But that is not what that case stated.  Instead, the Second Circuit in *Citibank* observed that the plaintiff did not seek an injunction until "more than ten weeks after it learned directly of [the defendant's] plans, and *more than nine months* after it received notice through the press that [the defendant] intended to open a Long Island branch."  756 F.2d at 276 (emphasis added).  Moreover, a delay in conferring with counsel was not at issue in that case.

Nor is this case similar to *Ohio Contractors Association v. City of Akron*, No. 5:14-cv-0923, 2014 WL 1761611, at *8 (N.D. Ohio May 1, 2014).  There, the plaintiff "waited until the eve of bidding to seek injunctive relief, compromising

defendant's ability to finance the Rack 15 Project," resulting in "unconscionable delay." *Id.*  But no comparable or prejudicial delay appears in the record of this case.

*     *     *

Plaintiff takes steps to preserve and maintain the confidentiality of its mortgage service information, employs physical and electronic security measures, and requires its employees to sign employment agreements which contain restrictive covenants.  (ECF No. 1, ¶ 21, PageID #4; ECF No. 51, ¶ 24, PageID #1196–97.) Quantifying the loss from breach of the employment agreements, if ultimately proved, will present significant challenges.  *See PFG Ventures, L.P. v. Kennedy*, No. 1:22-cv-01177, 2022 WL 2900713, at *10 (N.D. Ohio July 22, 2022).  Moreover, an injunction better vindicates the nature of the confidentiality interests at issue than an award of damages.  After all, damages cannot unring the bell from any potential disclosure. *Id.*  In this regard, Plaintiff establishes irreparable injury based on the record at this stage of the proceedings.  *Wilson*, 961 F.3d at 836.

## III.  Substantial Harm to Others and the Public Interest

Plaintiff maintains that a temporary cessation of "Defendants' wrongful activities and enforcement of the Agreement will not adversely affect third parties," and "[f]air competition and the accurate and proper use of Union Home's information are plainly in the public interest."  (ECF No. 23, PageID #485–86; ECF No. 67, PageID #1790–91.)  Further, Wright testified that there was not a shortage of loan officers (ECF No. 49, PageID #855), which Plaintiff argues meant that business competition and the public interest would not be adversely affected (ECF No. 67, PageID #1790). Defendants counter that "[i]ssuing the requested injunction would force Defendants

64

out of work for a significant period of time," as well as access for customers, prospective customers, and referral partners that worked with Defendants. (ECF No. 27, PageID #585; ECF No. 66, PageID #1754–55.)

Although contracts in restraint of trade have long been void, the Ohio Supreme Court has crafted a limited and narrow exception to this rule of law where a court can modify the covenants in an employment agreement to impose only reasonable restrictions narrowly tailored to the legitimate interests of the former employer. *Raimonde*, 42 Ohio St. 2d at 26. With that formulation from the Ohio Supreme Court, restrictive covenants, modified to be reasonable if necessary, fall within the public interest in free and fair competition. *See UZ Engineered Prods.*, 2001-Ohio-8779, at ¶ 42.

Defendants cite two cases from outside the Sixth Circuit that have no application here. In *SAS Institute, Inc. v. World Programming Ltd.*, 874 F.3d 370, 388 (4th Cir. 2017), the Fourth Circuit determined that an injunction would cause customers to have to "expend significant time and money" to replace their software systems. There is no indication in the record that any customers or prospective customers would incur such friction in meeting their needs in the mortgage market. In *Cenveo Corp. v. Southern Graphic Systems, Inc.*, No. 08-5521, 2009 WL 161210, at *4 (D. Minn. Jan. 22, 2009), the court determined that it would be unreasonable to prevent third parties like Target from selecting a vendor of their choosing "given the concededly fluid, competitive pre-press industry." But the court also observed that, in the pre-press industry, "loyalty to a vendor is often trumped by cost or

65

convenience." *Id.* Defendants argue that many of their customers are "trusted friends and neighbors." (ECF No. 66, PageID #1755; ECF No. 69, PageID #1812.) Again, nothing in the record suggests that any prospective or current customer who might be affected by an injunction will face difficulty in the mortgage market as a result.

For these reasons, the Court determines that a preliminary injunction will not cause harm to third parties or the public interest. *Wilson*, 961 F.3d at 836.

## IV. Bond

Rule 65(c) provides that a court may only issue an injunction "if the movant gives security" in a proper amount. Under the law of this Circuit, however, a district court has discretion whether to require the posting of a bond or other security. *See Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.,* 714 F.3d 424, 431 (6th Cir. 2013) (quoting *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)). "Generally, the amount of bond in a non-compete/non-solicitation case should reflect 'the potential loss of salary reduced by the possibility of other employment opportunities in non-restricted areas and other mitigating factors.'" *Fratelli*, 2025 WL 639315, at *19 (citation omitted).

Plaintiff requests that the Court "set security at the minimal amount sufficient to satisfy the Court of Union Home's ability to respond to any potential loss by Defendants" and that a *de minimis* bond is appropriate. (ECF No. 23, PageID #487; ECF No. 67, PageID #1791.) Defendants argue that an injunction "would impose a significant harm" on the former employees. (ECF No. 27, PageID #585; ECF No. 66, PageID #1756.) Wright testified that the average of each Defendants' 2024

66

compensation was "close to a quarter million dollars."  (ECF No. 49, PageID #837.)
On a monthly basis, that works out to $20,833.  Because the preliminary injunction
the Court enters will run for a total of 76 months spread among the eight Defendants,
the Court will set a bond in the total amount of $2 million to account for this period
plus the additional injunctions that apply for one year that Plaintiff requested.
Calculated another way, the Court enjoins all eight Defendants in certain respects
for one year, resulting in a figure of $1,999,968, which the Court rounds up to set
bond at $2 million.

## CONCLUSION

For the foregoing reasons, and balancing the factors under Rule 65, the Court
determines that Plaintiff has clearly shown a likelihood of success on its breach of
contract claim.  Additionally, Plaintiff has shown that it will suffer irreparable harm
absent an injunction.  No third parties will suffer substantial harm, and the public
interest weighs in favor of granting an injunction.  Accordingly, the Court **GRANTS
IN PART AND DENIES IN PART** Plaintiff's motion for a preliminary injunction,
with the modifications set out below.

Specifically, the Court **ORDERS** as follows:

Defendant Michael Ballew shall be enjoined for three (3) months from
the effective date of the Court's Order from, directly or indirectly, in the
City of Roanoke, Virginia and Staunton, Virginia from:  (1) serving as a
branch manager, loan officer, or in any similar role which originates or
facilitates the origination of mortgage loans, or (2) being compensated
in any way for the origination of mortgage loans in the city or borough
limits in which he served for Union Home Mortgage.

Defendant Andy (Carl) Berryman shall be enjoined for ten (10) months
from the effective date of the Court's Order from, directly or indirectly,
in Hanover, Pennsylvania and Chambersburg, Pennsylvania from:  (1)

serving as a branch manager, loan officer, or in any similar role which originates or facilitates the origination of mortgage loans, or (2) being compensated in any way for the origination of mortgage loans in the city or borough limits in which he served for Union Home Mortgage.

Defendant Elias Gonzales shall be enjoined for eleven (11) months from the effective date of the Court's Order from, directly or indirectly, in Bethesda, Maryland and Rockville, Maryland from: (1) serving as a branch manager, loan officer, or in any similar role which originates or facilitates the origination of mortgage loans, or (2) being compensated in any way for the origination of mortgage loans in the city or borough limits in which he served for Union Home Mortgage.

Defendant Pedro Gonzalez shall be enjoined for eleven (11) months from the effective date of the Court's Order from, directly or indirectly, in Bethesda, Maryland and Rockville, Maryland from: (1) serving as a branch manager, loan officer, or in any similar role which originates or facilitates the origination of mortgage loans, or (2) being compensated in any way for the origination of mortgage loans in the city or borough limits in which he served for Union Home Mortgage.

Defendant Hong (Bobby) Luu shall be enjoined for one (1) year from the effective date of the Court's Order from, directly or indirectly, in Fairfax, Virginia and Vienna, Virginia from: (1) serving as a branch manager, loan officer, or in any similar role which originates or facilitates the origination of mortgage loans, or (2) being compensated in any way for the origination of mortgage loans in the city or borough limits in which he served for Union Home Mortgage.

Defendant Blain Rosenberry shall be enjoined for one (1) year from the effective date of the Court's Order from, directly or indirectly, in Chambersburg, Pennsylvania, Hanover, Pennsylvania, and York, Pennsylvania from: (1) serving as a branch manager, loan officer, or in any similar role which originates or facilitates the origination of mortgage loans, or (2) being compensated in any way for the origination of mortgage loans in the city or borough limits in which he served for Union Home Mortgage.

Defendant George Tabora shall be enjoined for eight (8) months and two (2) weeks from the effective date of the Court's Order from, directly or indirectly, in Bethesda, Maryland from: (1) serving as a branch manager, loan officer, or in any similar role which originates or facilitates the origination of mortgage loans, or (2) being compensated in any way for the origination of mortgage loans in the city or borough limits in which he served for Union Home Mortgage.

Defendant Robert Webb shall be enjoined for nine (9) months and one (1) week from the effective date of the Court's Order from, directly or indirectly, in the cities of Belmont, North Carolina and Shelby, North Carolina from: (1) serving as a branch manager, loan officer, or in any similar role which originates or facilitates the origination of mortgage loans, or (2) being compensated in any way for the origination of mortgage loans in the city or borough limits in which he served for Union Home Mortgage.

All eight Defendants shall be enjoined from soliciting or accepting business from Union Home Mortgage's customers and prospective customers with whom each Defendant previously had contact or about whom they obtained confidential information for one (1) year from the date the Court enters this Order.

Defendants Andy (Carl) Berryman and George Tabora shall be enjoined from soliciting or accepting business from Union Home Mortgage's referral sources with whom each Defendant previously had contact or about whom they obtained confidential information for one (1) year from the date the Courts enters this Order.

All eight Defendants shall be enjoined from using and/or disclosing Union Home Mortgage's confidential and/or trade secret information, including but not limited to, the information regarding referral sources, customers, and identified prospective customers.

All eight Defendants shall be enjoined from, directly or indirectly, soliciting Union Home Mortgage employees on behalf of a competitor of Union Home Mortgage for one (1) year from the date this Court enters this Order.

Nothing in this Order shall prohibit any Defendant from soliciting or accepting business from any customer or referral source that Defendant had before his employment with Union Home Mortgage.

Pursuant to Rule 65(d)(2)(C), American Pacific and any subsequent employer of all eight Defendants who competes with Union Home Mortgage shall be enjoined from acting in "active concert or participation" with Defendants to violate this Order.

*   *   *

In reaching its conclusion to enter a preliminary injunction, the Court makes a brief note regarding *Raimonde*, 42 Ohio St. 2d at 26.  Although the Ohio Supreme Court has followed this precedent and similar principles of its predecessors for decades, the Court has concerns about its broad grant of power for courts to serve essentially as a party to a contract between private parties.  Indeed, in *Raimonde*, 42 Ohio St. 2d at 25, the Ohio Supreme Court acknowledged that "[a]ppellee argues that adoption of a rule of reasonableness would allow employers to dictate restraints without fear, knowing that judges will rewrite contracts if they are taken to court." But it reasoned that "[s]uch a contention is without merit.  Most employers who enter contracts do so in good faith, and seek only to protect legitimate interests.  In fact, relatively few employment contracts reach the courts."  *Id.*

In the 50 years since *Raimonde*, the Court cannot say that the Ohio Supreme Court's prediction of infrequent litigation involving employment contracts has aged well.  And this case makes real the fear to which the Ohio Supreme Court gave the back of its hand in *Raimonde*.  Plaintiff has cobbled together individually reasonable contractual covenants and restrictions, which taken together work real hardship on run-of-the-mill employees, secure in the knowledge that a court will re-work the parties' deal.  If the law simply refused to enforce unreasonable or burdensome restraints on trade in employment contracts, outside narrow classes of senior employees or those with particularly sensitive positions, the parties would have more

70

serious incentives and motivation to act reasonably and craft meaningful and enforceable covenants.

As things stand, however, Ohio law asks courts to undertake a role to which they are not suited and which likely exceeds their constitutional authority.  Because the law has now reached the point where an employer can push restrictive covenants to the point of becoming little more than naked restraints on trade, as this case shows, it might well be time for the Ohio Supreme Court to revisit *Raimonde* to return courts to their proper and more limited role in enforcing covenants in employment contracts, not rewriting them:  "courts generally hold parties to the deals they make; and of course, courts should hesitate, and then hesitate some more, before modifying a contract, even to remove an inadvertent flaw."  *Kansas v. Nebraska*, 574 U.S. 445, 470 (2015).

**SO ORDERED.**

Dated:  December 29, 2025

_____
     J. Philip Calabrese
     United States District Judge
     Northern District of Ohio

71